1  George J. Gigounas (CA Bar No. 209334)   Adam Baas (CA Bar No. 220464)
2  george.gigounas@us.dlapiper.com   adam.baas@us.dlapiper.com
   **DLA PIPER LLP (US)**   **DLA PIPER LLP (US)**
3  555 Mission Street, Suite 2400   555 Mission Street, Suite 2400
   San Francisco, CA 94105   San Francisco, CA 94105-2933
4  Tel:    415.836.2500   Tel:    415.836.2500
   Fax:    415.836.2501   Fax:    415.836.2501
5
   *Attorney for Defendant*   *Attorney for Defendant*
6  *Michelin North America, Inc*   *Hankook Tire America Corp.*
7
   Gwendolyn Keyes Fleming (*Admitted Pro Hac*   Susan E. Smith (CA Bar No. 329539)
8  *Vice*)   ssmith@bdlaw.com
   Gwen.KeyesFleming@us.dlapiper.com   **BEVERIDGE & DIAMOND PC**
9  **DLA PIPER LLP (US)**   456 Montgomery Street, Ste. 1800
   500 8th Street, NW   San Francisco, CA  94104
10 Washington, DC 20004   Tel:    415.262.4023
   Tel:    202.799.4000
11 Fax:    202.799.5000   *Attorney for Defendants*
12                                               *Bridgestone Americas Tire Operations, LLC;*
   *Attorney for Defendant*   *Continental Tire the Americas, LLC; GITI Tire*
13 *Kumho Tire U.S.A., Inc.*   *(USA), Ltd.; The Goodyear Tire & Rubber*
                                               *Company, individually and as successor in*
14                                               *interest to Cooper Tire & Rubber Company;*
                                               *Nokian Tyres Inc.; Nokian Tyres U.S.*
15                                               *Operations, LLC; Pirelli Tire LLC; Sumitomo*
                                               *Rubber North America, Inc.; Sumitomo;*
16                                               *Rubber USA, LLC; Toyo Tire Holdings of*
                                               *Americas, Inc.; and Yokohama Tire*
17                                               *Corporation.*
18 (Additional Counsel on Signature Page)
19                    **UNITED STATES DISTRICT COURT**
20           **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
21
22 INSTITUTE FOR FISHERIES RESOURCES;   ) CASE NO. 3:23-cv-05748-JD
   and PACIFIC COAST FEDERATION OF    )
23 FISHERMEN'S ASSOCIATIONS,           ) **DEFENDANTS' JOINT:**
                                       )
24          Plaintiffs,                ) **(1) MOTION TO DISMISS PLAINTIFFS'**
                                       )     **AMENDED COMPLAINT FOR**
25          v.                         )     **DECLARATORY AND INJUNCTIVE**
                                       )     **RELIEF UNDER THE PRIMARY**
26 BRIDGESTONE AMERICAS TIRE           )     **JURISDICTION DOCTRINE AND**
   OPERATIONS, LLC; CONTINENTAL TIRE   )     **FAILURE TO STATE A CLAIM**
27 THE AMERICAS, LLC; GITI TIRE (USA), )     **UNDER FED. R. CIV. P. 12(b)(6);**
   LTD.; THE GOODYEAR TIRE & RUBBER    ) **(2) MEMORANDUM OF POINTS AND**
28 CO.; COOPER TIRE & RUBBER CO.;      )     **AUTHORITIES IN SUPPORT OF**
                                       )     **THEREOF**

---

HANKOOK TIRE AMERICA CORP.; KUMHO
TIRE U.S.A., INC.; MICHELIN NORTH
AMERICA, INC.; NOKIAN TYRES; PIRELLI
TIRE LLC; SUMITOMO RUBBER NORTH
AMERICA, INC.; TOYO TIRE HOLDINGS OF
AMERICAS INC.; and YOKOHAMA TIRE
CORP.,

      Defendants.

DATE: May 16
TIME: 10:00 A.M.
COURTROOM: 11, 19TH Floor
JUDGE: Hon. James Donato

DEFENDANTS' JOINT MOTION TO DISMISS; MEMORANDUM IN SUPPORT OF MOTION
Case No. 23-cv-05748-JD

1

<u>**NOTICE OF MOTION AND MOTION TO DISMISS**</u>

2

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

3

     **PLEASE TAKE NOTICE** that on May 16, 2024 at 10:00 a.m. before the Honorable

4

James Donato, Courtroom 11, 19th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102,

5

Defendants Bridgestone Americas Tire Operations, LLC., Continental Tire the Americas, LLC,

6

Giti Tire (USA), Ltd., The Goodyear Tire & Rubber Co., Cooper Tire & Rubber Co., Hankook

7

Tire America Corp., Kumho Tire U.S.A., Inc., Michelin North America, Inc., Nokian Tyres,

8

Pirelli Tire LLC, Sumitomo Rubber North America, Inc., Toyo Tire Holdings of Americas Inc.,

9

and Yokohama Tire Corp. ("Defendants") will and hereby do move the Court for an order

10

dismissing all claims asserted by Plaintiffs in their First Amended Complaint for Declaratory and

11

Injunctive Relief (the "FAC").

12

     Defendants make this motion on the following grounds:

13

     **(1) The doctrine of primary jurisdiction.** Even if Plaintiffs' claim were cognizable under

14

federal law, enforcement would require resolution of precisely the issues that have been placed

15

within the special competence of the U.S. Environmental Protection Agency ("EPA") under

16

comprehensive regulatory schemes that regulate manufacturing, distribution, use, and disposal of

17

chemical substances (the Toxic Substances Control Act ("TSCA")), and discharges of pollutants

18

and approval of water quality criteria (the Clean Water Act ("CWA")). The EPA is actively

19

engaged in specific regulatory processes, rulemaking, and guidance under both TSCA and the

20

CWA to address precisely the matters that Plaintiffs raise in this lawsuit. Two weeks before

21

serving notice on Defendants in this case, Plaintiffs' counsel, on behalf of other clients, petitioned

22

the EPA to conduct a TSCA rulemaking to address alleged salmonid impacts from 6PPD-q. The

23

EPA granted the Petition and confirmed it intends to issue an Advanced Notice of Proposed

24

Rulemaking by Fall 2024 and a Final Rule by 2025, among many other regulatory actions. Under

25

the CWA, the Washington State Department of Ecology (Ecology) has initiated a rulemaking to

26

establish aquatic life toxics criteria for 6PPD-q in stormwater and other discharges, which triggers

27

the EPA's CWA § 303 approval process and requires the EPA to consult with the National Marine

28

Fisheries Service (NMFS) under the Endangered Species Act (ESA) § 7 to address potential

impacts to listed salmonids and their habitat. To avoid intruding on these ongoing regulatory actions to address any harms to salmonids from 6PPD-q, this Court should exercise its discretion to dismiss Plaintiffs' case under the doctrine of primary jurisdiction.

**(2) Federal Rule of Civil Procedure 12(b)(6).** Plaintiffs fail to state a plausible claim for relief under Section 9 of the Endangered Species Act because, as a matter of law, a "take" under ESA § 9 does not include the manufacture or distribution of a product. Even under the broadest interpretation, the term "take"—whether by "harm," "harass," "wound," or "kill"—has never encompassed "inclusion" of a chemical in a consumer product manufactured for general use in any location or the distribution of that consumer product. Such an application improperly extends the ESA to overly remote, contingent, and indirect claims that are in no way foreseeable under ESA § 9.

For each of the foregoing reasons, Plaintiffs' FAC should be dismissed in its entirety. Defendants' motion is based on this Notice of Motion, the Memorandum of Points and Authorities and Request for Judicial Notice In Support of the Motion, all pleadings and papers filed in this action, and such oral argument and other matters as may be presented to the Court at the time of hearing.

Dated: March 8, 2024

DLA PIPER LLP (US)


By:   /s/ George Gigounas
      GEORGE GIGOUNAS
      CAROLINE LEE
      PAUL WIERENGA (*Admitted Pro Hac Vice*)

      Attorneys for Defendant
      Michelin North America, Inc.

Dated: March 8, 2024

**DLA PIPER LLP (US)**

By: /s/ *Gwendolyn Keyes Fleming*
    GWENDOLYN KEYES FLEMING
    (*Admitted Pro Hac Vice*)
    JUSTIN PARK
    DONGHYUN KIM

    Attorneys for Defendant
    Kumho Tire U.S.A., Inc.

Dated: March 8, 2024

**DLA PIPER LLP (US)**

By: /s/ *Adam Baas*
    ADAM BAAS
    ALLEXANDERIA BINGHAM

    Attorneys for Defendant
    Hankook Tire America Corp.

Dated: March 8, 2024

**BEVERIDGE & DIMOND PC**

By: /s/ *Susan E. Smith*
    SUSAN E. SMITH
    LOREN DUNN (*Admitted Pro Hac Vice*)
    W. PARKER MOORE (*Admitted Pro Hac Vice*)

    Attorneys for Defendants
    Bridgestone Americas Tire Operations, LLC; Continental Tire the Americas, LLC; GITI Tire (USA), Ltd.; The Goodyear Tire & Rubber Company, individually and as successor in interest to Cooper Tire & Rubber Company; Nokian Tyres Inc.; Nokian Tyres U.S. Operations, LLC; Pirelli Tire LLC; Sumitomo Rubber North America, Inc.; Sumitomo; Rubber USA, LLC; Toyo Tire Holdings of Americas, Inc.; and Yokohama Tire Corporation.

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................1

II.  RELEVANT FACTS ...........................................................................................3

III. ARGUMENT ......................................................................................................5

    A.   The Court Should Dismiss Plaintiffs' Claim Under the Primary Jurisdiction Doctrine Because it Implicates Important Technical and Policy Questions That the EPA and Its Counterparts are Addressing Under TSCA and the CWA...........................................................................................................5

    B.   Plaintiffs' ESA Section 9 Claim is not Plausible as Defendants' Manufacturing and/or Distribution of Tires for Commercial Use Cannot Constitute a "Take." ............................................................................10

IV.  CONCLUSION ................................................................................................14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arkansas v. Oklahoma*,
 503 U.S. 91 (1992) ................................................................................................................. 8

*Babbitt v. Sweet Home*,
 515 U.S. 687 (1995) ........................................................................................................ 11, 12

*Backus v. Gen. Mills, Inc.*,
 122 F. Supp. 3d 909 (N.D. Cal. 2015) .............................................................................. 6, 10

*Brown v. MCI WorldCom Network Servs., Inc.*,
 277 F.3d 1166 (9th Cir. 2002) ............................................................................................... 5

*Clark v. Time Warner Cable*,
 523 F.3d 1110 (9th Cir. 2008) ................................................................................... 5, 6, 9, 10

*Davel Communications, Inc. v. Qwest Corp.*,
 460 F.3d 1075 (9th Cir. 2006) ......................................................................................... 5, 10

*Defs. of Wildlife v. Bernal*,
 204 F.3d 920 (9th Cir. 2000) ............................................................................................... 12

*Freedline v. O Organics LLC*,
 445 F. Supp. 3d 85 (N.D. Cal. 2020) ..................................................................................... 6

*North Star Gas Co. v. Pac. Gas & Elec. Co.*,
 No. 15-cv-02575 HSG, WL 5358590 (N.D. Cal. Sept. 26, 2016) .......................................... 9

*Northcross v. Bd. of Ed. of Memphis City Sch.*,
 412 U.S. 427 (1973) ............................................................................................................ 11

*Northwest Env. Advocates v. EPA*,
 855 F. Supp. 2d 1199 (D. Or. 2012) ....................................................................................... 9

*PETA v. Miami Seaquarium*,
 189 F. Supp. 3d 1327 (S.D. Fla. 2016), *aff'd* 879 F.3d 1142 (11th Cir. 2018) ...................... 11

*PETA v. Miami Seaquarium*,
 879 F.3d 1142 (11th Cir. 2018) ..................................................................................... 11, 12

*PNG Telecomm., Inc. v. Pac-West Telecomm., Inc.*,
 No. Civ. S-10-1164 FCD, 2010 WL 3186195 (E.D. Cal. Aug. 11, 2010) ............................... 9

*Pronsolino v. Marcus*,
    91 F. Supp. 2d 1337 (N.D. Cal. 2000), *aff'd sub nom*, *Pronsolino v. Nastri*, 291
    F.3d 1123 (9th Cir. 2002) ........................................................................................ 8

*Syntek Semiconductor Co., Ltd. v. Microchip Technology, Inc.*,
    307 F.3d 775 (9th Cir. 2002) .................................................................................. 5

*Third Nat'l Bank in Nashville v. Impac Ltd.*,
    432 U.S. 312 (1977) .............................................................................................. 11

*United Levi v. Comcast Holdings Corp.*,
    No. 13-CV-05604-JD, 2014 WL 12646043 (N.D. Cal. June 2, 2014) ................... 6

*United States v. Hayashi*,
    22 F.3d 859 (9th Cir. 1993) .................................................................................. 11

*United States v. Western Pac. RR Co.*,
    352 U.S. 59 (1956) ........................................................................................... 5, 10

*Whitaker v. Tesla Motors, Inc.*,
    985 F.3d 1173 (9th Cir. 2021) .............................................................................. 10

*Wild Fish Conservancy v. EPA*,
    331 F. Supp. 3d 1210 (W.D. Wash. 2018) .............................................................. 8

**Statutes**

15 U.S.C. § 2601(b) ........................................................................................................ 3

15 U.S.C. § 2602(6) ........................................................................................................ 7

15 U.S.C. § 2603 ............................................................................................................. 4

15 U.S.C. § 2605(a) ................................................................................................. 3, 6, 7

15 U.S.C. § 2605(b)(4)(F) .............................................................................................. 7

15 U.S.C. § 2620 ............................................................................................................. 3

16 U.S.C. § 1531 ............................................................................................................. 3

16 U.S.C. § 1531(b) ...................................................................................................... 11

16 U.S.C. § 1532(19) .................................................................................................... 11

16 U.S.C. § 1533(d) ...................................................................................................... 11

16 U.S.C. § 1536 ................................................................................................ 2, 4, 8, 9

16 U.S.C. § 1538(a)(1)(B) ...................................................................................... *passim*

33 U.S.C. § 1251(a) .......................................................................................................... 8

33 U.S.C. § 1313(a)-(d) .................................................................................................... 8

33 U.S.C. § 1313(c)(1)-(2) ............................................................................................... 8

33 U.S.C. § 1314(a) .......................................................................................................... 8

33 U.S.C. § 1321(a)(2) .................................................................................................... 13

33 U.S.C. § 1362(12) ...................................................................................................... 13

**Other Authorities**

40 C.F.R. § 131.3(b) ......................................................................................................... 8

50 C.F.R. § 17.3 .............................................................................................................. 12

50 C.F.R. § 222.102 ........................................................................................................ 12

40 Fed. Reg. 44412, 44413 (Sept. 26, 1975) ................................................................. 12

64 Fed. Reg. 60727 (Nov. 8, 1999) ................................................................................ 12

Fed. R. Civ. P. 12(b)(6) .................................................................................................... 2

22 Cal. Code Regs. § 69511.7 .......................................................................................... 4

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

This is not a typical Endangered Species Act case. Plaintiffs ask this Court to step around the statutory responsibility of the U.S. Environmental Protection Agency to regulate a certain chemical used in tires and other products across the nation by stretching the ESA beyond its breaking point. The Court should decline this invitation and dismiss this suit.

Plaintiffs have sued a subset of 13 tire manufacturers and distributors in the United States under a novel and sweeping theory of ESA liability. They claim that Defendants' introduction of tires into commerce constitutes a prohibited "take" of protected salmon and trout across the West Coast because every tire distributed contains a chemical anti-degradant, known as "6PPD," that a 2020 laboratory study posited degrades to a chemical known as "6PPD-q" over time when it reacts with ozone. This study claimed to link 6PPD-q to pre-spawn mortality in coho salmon. Plaintiffs now allege: (i) the 6PPD added to every vehicle tire sold and distributed in the United States transforms into a new chemical, 6PPD-q, at some point during the tire's use, FAC ¶ 96, ECF No. 19, (ii) this new chemical (6PPD-q) is then released onto roads, highways, and parking lots, where it migrates to surface waters by way of "insufficient" or "nonexistent" stormwater management practices, *id.* ¶¶ 78, 95-96, (iii) it eventually reaches the habitat of 24 different protected salmonids across four western states, *id.* ¶ 74(a)-(x), where (iv) it causes "prespawn mortality and harmful sublethal effects in salmonids," *id.* ¶ 19, which (v) injures Plaintiffs, *id*. No matter how it is pled, this "chemical take" falls well outside the scope of the ESA.

This Court should dismiss the Amended Complaint for two reasons. ***First***, this Court should exercise its discretion to dismiss this case because its assertion of a "chemical take" squarely implicates the primary jurisdiction of the EPA under the Toxic Substances Control Act ("TSCA") and the Clean Water Act ("CWA"). Indeed, Plaintiffs' own counsel submitted a detailed TSCA citizen's petition to the EPA, asserting that the risks 6PPD-q presents to protected salmon and trout "***are precisely what TSCA was designed to address***" and demanding that the

/////

/////

EPA take regulatory action to address those alleged risks. Ex. A.[1] The EPA *granted* Plaintiffs'
counsel's petition and announced that it is actively engaging in myriad regulatory activities,
including rulemaking, data-gathering, funding, and collaboration, to manage the precise issues
Plaintiffs now ask this Court to address. The EPA committed to publishing an advance notice of
proposed rulemaking under TSCA § 6 by Fall 2024, to inform a subsequent regulatory action, and
also plans to issue a final TSCA § 8(d) rule to gather health and safety studies by the end of 2024.
Regulatory action under the CWA also is underway to address stormwater discharges of 6PPD-q
into the aquatic environment and establish water quality limits on the chemical in salmonid
streams. Last month, Washington Ecology proposed aquatic life toxics criteria for 6PPD-q in
stormwater and other point source discharges. Ex. B. After public comment, Ecology must submit
those criteria to the EPA for review and approval, at which point they become mandatory water
quality criteria under the CWA. Not only must these standards adequately protect aquatic life,
including protected salmonids, but the EPA's approval of them triggers ESA § 7 consultation,
15 U.S.C. § 1536, to address potential effects to listed species. *See* Ex. C ("EPA MOA"). This
Court would need to engage in an identical inquiry as the EPA to decide whether 6PPD-q is
harming protected salmonids and how best to address any such harm. This Court should not short-
circuit the EPA's ongoing efforts to address the issues this case presents by entertaining Plaintiffs'
double-tracked demands that invite conflict with the regulatory approaches the EPA is pursuing.

   ***Second***, this Court should dismiss the Amended Complaint because Plaintiffs have not,
and cannot, allege a "chemical take" of protected species under the ESA. Plaintiffs allege that
"inclusion" of 6PPD in tires leads to 6PPD-q eventually reaching aquatic habitats after tires are
driven, 6PPD interacts with ozone or other oxidants and transforms into 6PPD-q, 6PPD-q is
entrained in stormwater that runs off from driving surfaces, and the stormwater is conveyed to
surface waterways. Manufacturing a lawful consumer product and introducing it into the stream of
commerce does not violate the ESA simply because the product contains a chemical that, when

---

[1] Exhibit references are to the declaration of George J. Gigounas, dated March 8, 2024 ("Gigounas
Declaration"), filed in support of Defendants' Request for Judicial Notice in support of this
Motion.

1 shed, transformed, and transported through stormwater to a protected species' habitat, allegedly

2 harms that species. Plaintiffs' expansive interpretation of the ESA would (i) fundamentally alter

3 authority to regulate the use, processing and distribution of chemicals in the U.S. and (ii) could,

4 for the first time, expose an untold number of manufacturers, distributors, resellers, shippers, and

5 transporters of countless products to the ESA's civil and criminal penalties.

6      For each of these reasons, Defendants respectfully request that the Court dismiss the

7 Amended Complaint or, at a minimum, stay the proceeding under the primary jurisdiction doctrine.

8 ## II.    RELEVANT FACTS

9      On August 1, 2023, two weeks before issuing its 60-Day Notice of Intent to Sue in this

10 case, Plaintiffs' counsel submitted a petition to the EPA under TSCA § 21, 15 U.S.C. § 2620, on

11 behalf of the Yurok Tribe, Port Gamble S'Klallam Tribe, and the Puyallup Tribe of Indians. Ex. A

12 (the "Petition"). The Petition asked the EPA to "establish regulations prohibiting the

13 manufacturing, processing, use, and distribution of [6PPD], for and in tires under EPA's TSCA

14 § 6(a) authority … with such regulation to take effect as soon as practicable, in order to eliminate

15 the unreasonable risk 6PPD in tires presents to the environment." *Id.* The Petition asserted

16 precisely the same issues and problems that are asserted in Plaintiffs' Amended Complaint.

17      The Petition described at length the EPA's mandate and authority under TSCA to address

18 risk to the environment posed by 6PPD and 6PPD-q. Plaintiffs' counsel averred that the issues

19 asserted in the Petition (the same issues alleged in the instant case):

20      ***are precisely what TSCA was designed to address***: TSCA requires EPA to 'regulate
21      chemical substances and mixtures which present an unreasonable risk of injury to
     health or the environment, and to take action with respect to chemical substances and
22      mixtures which are imminent hazards.' 15 U.S.C. § 2601(b); see also 15 U.S.C.
     § 2605(a) (requiring that upon finding unreasonable risk, EPA Administrator 'shall'
23      apply risk management measures 'to the extent necessary so that the chemical
     substance or mixture no longer presents such risk'). *Id.* at 5.
24

25 The Petition directly linked the EPA's TSCA authority regarding 6PPD to alleged harm to ESA-

26 listed species. In particular, that "EPA must [] utilize its authority under TSCA Section 6 to

27 'further the purposes' of the ESA, 16 U.S.C. § 1531, by ensuring that 6PPD-q does not cause

28 continued harm to these threatened and endangered species." *Id.* at 13.

On November 2, 2023, the EPA granted the Petition. Ex. D. The Agency "intends to publish by Fall 2024 an [Advanced Notice of Proposed Rulemaking] for 6PPD under TSCA § 6(a) associated with risk management of 6PPD and 6PPD-quinone." The Agency also will issue a second rulemaking seeking unpublished 6PPD health and safety studies, which it "aims to finalize [] before 2025 with required reporting to occur 90 days after publication." *Id.* at 6.  It will also consider requiring the development of additional health and safety data through "rule(s), order(s), or consent agreement(s)" under TSCA § 4, 15 U.S.C. § 2603, "to inform EPA's subsequent decisions on how to proceed with any evaluation and any necessary mitigation of risks associated with 6PPD and its degradant 6PPD-quinone under TSCA."[2] *Id.* The EPA even has a webpage asserting its extensive activities, rulemaking, guidance, funding, and collaborations to address 6PPD-q. Ex. E.[3]

Regulators also are actively working under the CWA to address discharges of 6PPD-q into the aquatic environment and establish water quality limits on the chemical in salmonid streams. Last month, Washington Ecology proposed aquatic life toxics criteria for 6PPD-q in stormwater and other point source discharges. Exs. F, G. After public comment, Ecology must submit those criteria to the EPA for review and approval, at which point they become mandatory water quality criteria under the CWA. Not only must these standards adequately protect aquatic life, including ESA-protected salmonids, but the EPA's approval of them also triggers ESA § 7 consultation to address potential effects to listed species. *See* Ex. C. Demonstrating their familiarity with this

---

[2] Both California and Washington State are also actively engaged in 6PPD regulation and rulemaking. The California Department of Toxic Substances Control finalized a regulation listing 6PPD in tires as a priority product under the State's Safer Consumer Products Regulations ("SCPR"), 22 Cal. Code Regs. § 69511.7, and Washington also added 6PPD to its list of priority chemicals under its Safer Products Law. Ex. B.

[3] Among other things, the EPA asserts it is: sponsoring Tribal Partnership Groups; conducting research to address data gaps, including work on tire wear emissions, fate and transport, ecotoxicity, and management solutions to mitigate stormwater contamination; providing grant support to investigate stormwater data gaps; providing funding to support implementation of stormwater management practices; developing a draft detection method for surface and stormwater; developing draft screening values for 6PPD-quinone and 6PPD; funding development and commercialization of alternative anti-degradant technologies; participating in and partially funding the Interstate Technology and Regulatory Council 6PPD-quinone team; and coordinating with federal partners, Tribes, states, and industry.

1   process, Plaintiffs and their counsel recently sued the State of California to compel agency action

2   to establish water quality limits for pesticides, nutrients, and sediment to reduce impacts to

3   protected salmonids from agricultural activities. Ex. H. (*San Jerardo Coop., Inc. v. State Water*

4   *Res. Control Bd.*, Petition for Writ of Mandate (Cal. Super. Ct. Oct. 27, 2023)).

5   **III.    ARGUMENT**

6          **A.    The Court Should Dismiss Plaintiffs' Claim Under the Primary Jurisdiction
              Doctrine Because it Implicates Important Technical and Policy Questions That
7             the EPA and Its Counterparts are Addressing Under TSCA and the CWA.**

8          Primary jurisdiction "applies where a claim is originally cognizable in the courts, and

9   comes into play whenever enforcement of the claim requires the resolution of issues which, under

10  a regulatory scheme, have been placed within the special competence of an administrative body."

11  *United States v. Western Pac. RR Co.*, 352 U.S. 59, 63-64 (1956); *see also Clark v. Time Warner*

12  *Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008) (primary jurisdiction is a "'prudential' [doctrine]

13  under which a court determines that an otherwise cognizable claim implicates technical and policy

14  questions that should be addressed in the first instance by the agency with regulatory authority

15  over the relevant industry rather than by the judicial branch.").

16         The doctrine "allows courts to stay proceedings or to dismiss a complaint without

17  prejudice pending the resolution" of those issues. *Clark*, 523 F.3d at 1114. Application of the

18  doctrine "is committed to the sound discretion" of this Court. *Syntek Semiconductor Co., Ltd. v.*

19  *Microchip Technology, Inc.*, 307 F.3d 775, 781 (9th Cir. 2002). The Ninth Circuit holds the

20  doctrine should apply where there is:

21             (1) a need to resolve an issue that (2) has been placed by Congress within the
               jurisdiction of an administrative body having regulatory authority (3) pursuant to a
22             statute that subjects an industry or activity to a comprehensive regulatory authority
               that (4) requires expertise or uniformity in administration… In considering these
23             factors… the… doctrine is designed to protect agencies possessing quasi-legislative
               powers and that are actively involved in the administration of regulatory statutes.
24

25  *Clark*, 523 F.3d at 1115 (internal citations omitted); *Brown v. MCI WorldCom Network Servs.,*

26  *Inc.*, 277 F.3d 1166, 1172 (9th Cir. 2002). Moreover, "[i]t is precisely the purpose of the primary

27  jurisdiction doctrine to avoid the possibility of conflicting rulings by courts and agencies

28  concerning issues within the agency's special competence." *Davel Communications, Inc. v. Qwest*

*Corp.*, 460 F.3d 1075, 1090 (9th Cir. 2006). And the primary jurisdiction doctrine does not require that the agency have regulatory authority over the plaintiff's precise legal claim if "Congress [has] nonetheless granted the [agency] authority to regulate" the issue raised in the complaint. *Backus v. Gen. Mills, Inc.*, 122 F. Supp. 3d 909, 933 (N.D. Cal. 2015).

All factors, and ample case law, weigh in favor of the Court dismissing this case pending the outcome of the EPA's rulemakings under TSCA. *See, e.g.*, *Clark*, 523 F.3d 1110, 1115 (9th Cir. 2008) (affirming dismissal under the primary jurisdiction doctrine because plaintiff's claim "raises a question of first impression… and FCC's Notice of Proposed Rulemaking demonstrates that the agency is actively considering how it will regulate VoIP services and that the agency's development of a uniform regulatory framework to confront this emerging technology is important to federal telecommunications policy"); *United Levi v. Comcast Holdings Corp.*, No. 13-CV-05604-JD, 2014 WL 12646043, at *2 (N.D. Cal. June 2, 2014) (despite plaintiff asserting several claims, "the Court finds that those claims are sufficiently interrelated with the issue before the FCC to justify a stay of the entire case" under the primary jurisdiction doctrine and "any specific prejudice and the potential for delay alone is not enough to counsel against a stay where the FCC proceeding at issue is likely to be highly relevant to this case"); *Backus*, *supra*, 122 F. Supp. 3d at 933 (granting stay under the primary jurisdiction doctrine in case raising "both an important question of first impression, and a complicated issue that has been committed to the FDA" even despite plaintiff's claim being filed under a different statute).[4]

TSCA requires the EPA, if it determines that "the manufacture, processing, distribution in commerce, use or disposal of a chemical substance or mixture, or that any combination of such activities, presents an unreasonable risk of injury to health or the environment," to adopt requirements "to the extent necessary so that the chemical substance or mixture no longer presents such risk." 15 U.S.C. § 2605(a). TSCA defines "environment" broadly to include "water, air, and land and the interrelationship which exists among and between water, air, and land and *all living*

---

[4] Further, unlike in *Freedline v. O Organics LLC*, where Congress was only "considering legislation," here the EPA has accepted rulemaking responsibility under TSCA and is currently engaged in myriad, detailed activities to address the matter. 445 F. Supp.3d 85, 91 (N.D. Cal. 2020).

*things.*" *Id.* § 2602(6) (emphasis added). TSCA § 6(a) establishes a detailed, multifactor regulatory process to address any unreasonable risk—including to ESA-protected species—posed by the manufacture, distribution, processing, use or disposal of chemical substances in interstate commerce. 15 U.S.C. § 2605(a).

In determining whether the use of 6PPD presents an unreasonable risk to the environment, TSCA requires the EPA to: (1) "integrate and assess available information on hazards and exposures for the conditions of use of the chemical substance, including information that is relevant to specific risks of injury to… the environment"; (2) "take into account, where relevant, the likely duration, intensity, frequency, and number of exposures under the conditions of use of the chemical substance"; and (3) "describe the weight of the scientific evidence for the identified hazard and exposure." 15 U.S.C. § 2605(b)(4)(F). If the EPA determines that a chemical like 6PPD presents an unreasonable risk, it may, among other options, prohibit the manufacture or distribution of the chemical; prohibit particular uses of the chemical; require products containing the chemical to include a warning; regulate the commercial use of the chemical; or regulate the method of disposal of the chemical. 15 U.S.C. § 2605(a)(1), (2), (3), (5), (6).

On November 2, 2023, *before* Plaintiffs filed their Complaint, the EPA granted the TSCA Petition separately filed by their counsel on behalf of three Tribes. Ex. B. In the EPA's words, the Petition "requests that the EPA promulgate a rule under TSCA §§ 6(a)(2)(A)(i) and 6(a)(5) to prohibit the manufacture, processing, use, and distribution of 6PPD in and for tires." *Id.* at 4.

In granting the Petition, the EPA determined that the chemical risk management rulemaking under TSCA Section 6(a) can proceed *without* a separate risk evaluation under TSCA § 6(b)(4), typically a multi-year process. For 6PPD, the EPA directly initiated the rulemaking process under TSCA § 6(a) to consider application of regulatory limits on the manufacture, processing, use or distribution of 6PPD in tires to eliminate any unreasonable risk to the ESA-protected salmonids. The EPA has also announced additional research and rulemaking actions under TSCA § 8(d) and § 4 to develop methods and gather more data to inform its evaluation of environmental risks that may arise from 6PPD, including harm to protected salmonids. Ex. E.

/////

Separately, the CWA requires the EPA to work in partnership with the state and tribal governments to achieve the statute's purpose to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" by reducing or eliminating the discharge of pollutants into these waters. *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992); 33 U.S.C. § 1251(a). The protection of aquatic life and aquatic habitats is an express statutory objective. *Pronsolino v. Marcus*, 91 F. Supp. 2d 1337, 1341 (N.D. Cal. 2000), *aff'd sub nom*, *Pronsolino v. Nastri*, 291 F.3d 1123 (9th Cir. 2002) (citation omitted).

Water quality standards, which are used to establish limits on the discharge or release of pollutants into the aquatic environment, are one of many methods used by the agencies to implement the CWA. 33 U.S.C. §§ 1313(a)-(d), 1314(a). "The states are required to set water quality standards for *all* waters within their boundaries regardless of the sources of the pollution entering the waters." *Pronsolino*, 291 F.3d at 1127.  Further, states and tribal governments must periodically update these standards over time and submit proposed revisions or new standards for the EPA review and approval to ensure they protect, among other factors, "propagation of fish and wildlife." 33 U.S.C. § 1313(c)(1)-(2). The EPA's approval of state water quality standards triggers ESA § 7 consultation to address potential effects to listed species. Ex. C; *see also Wild Fish Conservancy v. EPA*, 331 F. Supp. 3d 1210, 1225-26 (W.D. Wash. 2018) (recognizing that the CWA reserves substantial "discretionary involvement and control" for EPA over state water quality standards, including a duty to reinitiate ESA § 7 consultation if necessary to protect listed species). Once approved, newly adopted water quality standards can be implemented, for example, when CWA permits are renewed or when new permits are issued. Washington Ecology has initiated a rulemaking process to update its water quality standards by establishing an aquatic life acute exposure criteria limits for 6PPD-q.[5] Exs. F, G. Ecology will submit those criteria to the EPA and, if approved, they will become mandatory. The EPA's approval process will require ESA § 7 consultation with NMFS and the U.S. Fish and Wildlife Service ("USFWS"). In fact, courts

---

[5] Water quality criteria are elements of water quality standards, which are established as constituent concentrations, levels or narrative criteria to achieve water quality standards based on a designated use of the waterway such as for aquatic species. 40 C.F.R. § 131.3(b).

have held that § 7 consultation must include review of the impacts of proposed water quality standards on each *individual* evolutionary significant units ("ESUs") of listed species, like those identified by Plaintiffs' FAC. *Northwest Env. Advocates v. EPA*, 855 F. Supp. 2d 1199, 1223 (D. Or. 2012).

Although courts may not ordinarily defer to state regulatory processes under the doctrine of primary jurisdiction, the N.D. Cal. has distinguished instances where "Congress vest[ed] in [states] some degree of regulatory authority." *North Star Gas Co. v. Pac. Gas & Elec. Co.*, No. 15-cv-02575 HSG, WL 5358590, at *8 (N.D. Cal. Sept. 26, 2016); *also PNG Telecomm., Inc. v. Pac-West Telecomm., Inc*., No. Civ. S-10-1164 FCD, 2010 WL 3186195, at *7 (E.D. Cal. Aug. 11, 2010) (finding the state public utilities commission had primary jurisdiction under Federal Telecommunications Act). Further, because the CWA dictates that the EPA *shall* review and approve or require changes to water quality standards proposed by states, it has federal authority over the final standards to ensure a consistent federal review process. *See Clark,* 523 F.3d at 1115 (primary jurisdiction serves to avoid non-uniformity in administration). Accordingly, initiation of the CWA process by Washington Ecology serves to bolster the appropriateness of exercising primary jurisdiction to dismiss or stay this case pending the resolution of the EPA's TSCA Section 6(a) rulemaking process.[6]

This is a paradigm case for the application of the primary-jurisdiction doctrine. Plaintiffs seek to "enjoin Defendants from continuing the unauthorized take" which is purportedly caused by "inclusion of 6PPD in tires they manufacture and/or distribute …" FAC ¶¶ 107, 109. But TSCA gives primary responsibility for determining whether the distribution of the chemical 6PPD in commerce poses an unreasonable risk of harm to the environment (including protected salmonids) to the EPA, based on its expert evaluation of available information and scientific evidence; and the CWA similarly gives the EPA the responsibility for developing and overseeing specific water

---

[6] Plaintiffs themselves recognize the CWA provides a regulatory mechanism to protect salmon species. Just last year, they, along with several other environmental organizations, sued the State of California to compel water quality limits for pesticides, nutrients, and sediment to address salmonid impacts from agriculture activities. *See, e.g.*, Ex. H (*San Jerardo Coop., Inc. v. State Water Res. Control Bd.*, Petition for Writ of Mandate (Cal. Super. Ct. Oct. 27, 2023).

quality criteria to protect such species. Plaintiffs effectively concede that the issues facing the EPA (and now this Court) are novel, stating that 6PPD-q was not even identified as toxic to salmon until 2020. FAC ¶ 83. Whether to impose nationwide restrictions on the use of an anti-degradant chemical in a manufactured product is the type of regulatory question that has "been placed within the special competence" of the EPA and "requires expertise or uniformity in administration." *Western Pac. RR Co.*, 352 U.S. at 64; *Clark*, 523 F.3d at 1115; *Backus*, 122 F. Supp. 3d at 934 ("[w]hether a body of evidence sufficiently demonstrates that a particular amount of a chemical substance poses a serious public health risk is precisely the kind of expert question that agencies are better suited to answer than courts or juries"); *see also Davel Communications*, 460 F.3d at 1090 ("[i]t is precisely the purpose of the primary jurisdiction doctrine to avoid the possibility of conflicting rulings by courts and agencies concerning issues within the agency's special competence."). By ruling on Plaintiffs' claim, this Court risks making findings of fact or crafting injunctive relief that conflict with the EPA's forthcoming rulemaking or constrain the scope of the EPA's decision-making. A lawsuit alleging ESA "take" is not a comparable "quasi-legislative process" and is not suited to defining protective limits for manufacturing and distribution activities in interstate commerce that are far removed from any alleged "take" of protected species. *See Clark*, 523 F.3d at 1115.

### B.   Plaintiffs' ESA Section 9 Claim is not Plausible as Defendants' Manufacturing and/or Distribution of Tires for Commercial Use Cannot Constitute a "Take."

A Plaintiff must plead sufficient facts "to raise a right to relief above a speculative level . . . [a] formulaic recitation of the elements of a cause of action will not do." *Whitaker v. Tesla Motors, Inc.*, 985 F.3d 1173, 1176 (9th Cir. 2021). Further, courts "need not accept as true legal conclusions or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* (internal citations omitted). Plaintiffs' theory that manufacturing a commercial product and distributing it into the stream of commerce—far removed from protected species and their habitat—constitutes an unlawful take of those species falls well short of this basic plausibility requirement.

/////

Congress enacted the ESA to, among other things, "provide a program for the conservation of [] endangered species and threatened species." 16 U.S.C. § 1531(b). Under ESA § 9, no person may "take" any listed species of fish or wildlife. *Id.* § 1538(a)(1)(B) (prohibiting unauthorized take of "endangered" species); *see also id.* § 1533(d) (authorizing NMFS to extend the take prohibition to "threatened" species).  The ESA defines "take" to mean activities that "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" a listed species.  *Id.* § 1532(19). In other words, "*conduct* that poses a threat of serious harm to an endangered animal." *PETA v. Miami Seaquarium*, 879 F.3d 1142, 1147 (11th Cir. 2018) (emphasis added). Plaintiffs' contention that manufacturing and distributing products is conduct that constitutes a "take" of listed species— years later, in distant locations, and following extensive use and degradation of those products— stretches the ESA's prohibition beyond recognition and statutory applicability.

Plaintiffs' claim that Defendants harass, wound, kill, and harm ESA-protected salmonids, FAC ¶¶ 97-98, is implausible by any definition. While the ESA does not define those terms, the analyses of federal courts and relevant federal agencies demonstrate they are inapplicable to Defendants' manufacture and distribution of tires, regardless of what substances they include. The U.S. Supreme Court has explained that the terms "harass," "wound" and "kill," like "pursue," "hunt," "shoot," "trap," "capture," and "collect," "generally retain independent meanings" and "refer to deliberate actions," though not necessarily "direct applications of force." *Babbitt v. Sweet Home*, 515 U.S. 687, 698 n. 11, 701 (1995).

- "*Kill*" is a form of prohibited "taking" that "involve[s] direct and significant intrusions upon the normal, life-sustaining activities of a [species]." *Cf. United States v. Hayashi*, 22 F.3d 859, 864 (9th Cir. 1993) (citing *Third Nat'l Bank in Nashville v. Impac Ltd.*, 432 U.S. 312, 322 (1977)).[7]

---

[7] While *Hayashi* evaluated "take" under the ESA's counterpart statute, the Marine Mammal Protection Act, the court relied in part on NMFS's regulatory definitions of "take" under the ESA, noting that they provide "analogous authority that is of considerable assistance in interpreting" identical terms under both statutes. 22 F.3d at 864; *see also PETA v. Miami Seaquarium*, 189 F. Supp. 3d 1327, 1346 n. 24 (S.D. Fla. 2016), *aff'd* 879 F.3d 1142 (11th Cir. 2018) ("'[T]ake' within the meaning of the MMPA should be analyzed reasonably consistent with the ESA.") (citing *Northcross v. Bd. of Ed. of Memphis City Sch.*, 412 U.S. 427, 428 (1973)).

- "***Harass***" contemplates deliberate conduct and excludes forms of indirect "take" such as habitat modification. *Sweet Home*, 515 U.S. at 698 n. 11. Although NMFS has not defined "harass" in its ESA regulations regarding marine species, the U.S. Fish and Wildlife Service (USFWS), which protects terrestrial species under the ESA, defines "harass" to require "an intentional or negligent act or omission" and to not include forms of indirect take, such as habitat modification. 50 C.F.R. § 17.3; *see* 40 Fed. Reg. 44412, 44413 (Sept. 26, 1975) (explaining that FWS defined "harass" to prevent the term from "apply[ing] to any action, regardless of intent or negligence").[8]

- "***Wound***" is an act causing "an injury to the body consisting of a laceration or breaking of the skin or mucous membrane [usually] by a hard or sharp instrument forcefully driven or applied." *PETA v. Miami Seaquarium*, 879 F.3d 1142, 1147 (11th Cir. 2018) (defining "wound" based on common usage in the absence of a regulatory definition).

Defendants' manufacturing and distribution of tires does not involve the deliberate act or direct effect to salmonids that is required to constitute "harass," "wound," or "kill."

"***Harm***," the fourth form of "take" Plaintiffs allege, "may be indirect, in that [it] may be caused by habitat modification," *Defs. of Wildlife v. Bernal*, 204 F.3d 920, 924-25 (9th Cir. 2000). But it does not encompass the mere manufacturing and distribution of tires into the stream of commerce or the inclusion of a substance as a component in a consumer good.

NMFS defines "harm" as "an act which actually kills or injures fish or wildlife… includ[ing] significant habitat modification or degradation where it actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including breeding, spawning, rearing, migrating, feeding or sheltering." 50 C.F.R. § 222.102. NMFS issued that definition "to clarify the type of actions that may result in take of a listed species under the ESA" specifically in response to stakeholder concerns over "the listings of Pacific salmon and steelhead stocks" under the ESA. 64 Fed. Reg. 60727 (Nov. 8, 1999). To assist the regulated community, along with the

---

[8] *See also* Ex. I (USFWS, Guidance on Trigger for an Incidental Take Permit Under Section 10(a)(1)(B) of the ESA (Apr. 26, 2018)) (clarifying that conduct that "harasses" a species is ineligible for an ESA incidental take permit, which only "applies to taking 'incidental to, but not the purpose of, the carrying out of an otherwise lawful activity'").

1   rule, the agency identified a non-exhaustive list of the types of activities that "may harm listed

2   species and, therefore, constitute a 'take' under the ESA" "to provide clear notification to [those]

3   parties." *Id.* at 60730. Only one category of activity identified by NMFS[9] is relevant here:

4   "*[d]ischarging* pollutants, such as oil, toxic chemicals, radioactivity, carcinogens, mutagens,

5   teratogens or organic nutrient-laden water including sewage water into a listed species' habitat."

6   *Id.* (emphasis added).

7   NMFS's singular focus on the "discharge"[10] of those substances as conduct that may

8   constitute a prohibited "take" is telling. Nowhere does the agency suggest, or say anything from

9   which to reasonably infer, that simply manufacturing or distributing a product containing those

10   substances could be considered a "take"—even if those substances dissociate from the product at

11   some point in the future and are "discharged" by third parties at some distant location. This is fatal

12   to Plaintiffs' theory because they repeatedly allege that it is the stormwater "discharge of 6PPD-q"

13   "into waterways" that "takes" listed salmonids. FAC ¶¶ 5, 79, 95-96. But Plaintiffs do not—and

14   cannot—allege that Defendants directly or indirectly "discharge" 6PPD-q into salmonid streams.

15   They allege only that Defendants "include" 6PPD in tires they manufacture and distribute. FAC

16   ¶¶ 105-07. That simply is not enough to fall within the ESA's "take" prohibition.

17   Congress never intended, no court has ever held, and NMFS has never interpreted the

18   "take" prohibition to reach across the stream of commerce in the manner Plaintiffs attempt here.

19   To conclude otherwise would mean that product manufacturing and distribution activities

20

21   _____

22   [9] The other nine activity categories NMFS identified involve (1) constructing or maintaining
barriers to habitat or migration, (2) reducing a species' food, habitat attributes, or other life needs,
(3) removing or altering essential habitat components, (4) removing or altering streamflow, (5)
23   introducing non-native species into occupied habitat, (6) constructing or operating dams or water
diversions, (7) constructing, maintaining, or using inadequate bridges, roads, or trails on stream
24   banks or unstable hill slopes beside or above species habitat, (8) substantially increasing
sedimentation of streams by conducting timber harvesting, grazing, mining, or other earth
25   disturbance, and (9) conducting land-use activities in riparian and other areas subject to mass
wasting and surface erosion.  64 Fed. Reg. 60727, 60730 (Nov. 8, 1999).

26   [10] Neither the ESA nor its implementing regulations define "discharge," but Congress defines the
term under the Clean Water Act (which is relevant here due to NMFS's ESA responsibility for
27   listed marine species) to mean "spilling, leaking, pumping, pouring, emitting, emptying
or dumping" or the "addition of a pollutant to navigable waters from any point source." 33 U.S.C.
28   §§ 1321(a)(2), 1362(12).

conducted anywhere in the United States would face the risk of an ESA citizen suit regardless of time, distance, or circumstance. That would be implausible, just as it is implausible here. As discussed elsewhere in this Motion, there are specific statutory programs for regulating the "inclusion" of substances in consumer products that are manufactured and distributed into commerce and for controlling third-party discharges of substances into waterways. The "take" prohibition of the ESA just is not one of them. As a result, their claim should be dismissed.

## IV.   CONCLUSION

For each of the foregoing reasons, this Court should dismiss Plaintiffs' FAC in its entirety, or alternatively, stay this action under the doctrine of primary jurisdiction.

Dated: March 8, 2024

**DLA PIPER LLP (US)**

By:   /s/ *George Gigounas*
　　　GEORGE GIGOUNAS
　　　CAROLINE LEE
　　　PAUL WIERENGA (*Admitted Pro Hac Vice*)

　　　Attorneys for Defendant
　　　Michelin North America, Inc.

Dated: March 8, 2024

**DLA PIPER LLP (US)**

By:   /s/ *Gwendolyn Keyes Fleming*
　　　GWENDOLYN KEYES FLEMING
　　　(*Admitted Pro Hac Vice*)
　　　JUSTIN PARK
　　　DONGHYUN KIM

　　　Attorneys for Defendant
　　　Kumho Tire U.S.A., Inc.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: March 8, 2024

**DLA PIPER LLP (US)**

By:  /s/ *Adam Baas*
ADAM BAAS
ALLEXANDERIA BINGHAM

Attorneys for Defendant
Hankook Tire America Corp.

Dated: March 8, 2024

**BEVERIDGE & DIMOND PC**

By:  /s/ *Susan E. Smith*
SUSAN E. SMITH
LOREN DUNN (*Admitted Pro Hac Vice*)
W. PARKER MOORE (*Admitted Pro Hac Vice*)

Attorneys for Defendants
Bridgestone Americas Tire Operations, LLC; Continental Tire the Americas, LLC; GITI Tire (USA), Ltd.; The Goodyear Tire & Rubber Company, individually and as successor in interest to Cooper Tire & Rubber Company; Nokian Tyres Inc.; Nokian Tyres U.S. Operations, LLC; Pirelli Tire LLC; Sumitomo Rubber North America, Inc.; Sumitomo; Rubber USA, LLC; Toyo Tire Holdings of Americas, Inc.; and Yokohama Tire Corporation.