ELIZABETH B. FORSYTH (CA Bar No. 288311)
eforsyth@earthjustice.org
JANETTE K. BRIMMER (*Pro Hac Vice*)
jbrimmer@earthjustice.org
NOORULANNE JAN (*Pro Hac Vice*)
njan@earthjustice.org
Earthjustice
810 3rd Ave #610
Seattle, WA 98104
Tel: (206) 343-7340

GREGORY C. LOARIE (CA Bar No. 215859)
gloarie@earthjustice.org
SCOTT W. STERN (CA Bar No. 336427)
sstern@earthjustice.org
Earthjustice
50 California Street #500
San Francisco, CA 94111
Tel: (415) 217-2000

*Counsel for Plaintiffs Institute for Fisheries Resources*
*& Pacific Coast Federation of Fishermen's Associations*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INSTITUTE FOR FISHERIES RESOURCES; and PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, | Case No. 23-cv-05748-JD |
| Plaintiffs, | **PLAINTIFFS' RESPONSE TO MOTION TO DISMISS** |
| v. | |
| BRIDGESTONE AMERICAS TIRE OPERATIONS, LLC; CONTINENTAL TIRE THE AMERICAS, LLC; GITI TIRE (USA) Ltd.; THE GOODYEAR TIRE & RUBBER COMPANY, individually and as successor in interest to COOPER TIRE & RUBBER COMPANY; HANKOOK TIRE AMERICA Corp.; KUMHO TIRE U.S.A., Inc.; MICHELIN NORTH AMERICA, Inc.; NOKIAN TYRES Inc.; NOKIAN TYRES U.S. OPERATIONS LLC; PIRELLI TIRE LLC; SUMITOMO RUBBER NORTH AMERICA, Inc.; SUMITOMO RUBBER USA, LLC; TOYO TIRE HOLDINGS OF AMERICAS Inc.; and YOKOHAMA TIRE Corporation. | Hearing Date: May 16, 2024 Time: 10:00 AM Courtroom: 11, 19th Floor Judge: Hon. Jame Donato |
| Defendants. | |

1

**TABLE OF CONTENTS**

2

TABLE OF AUTHORITIES ................................................................................................. ii

3

INTRODUCTION ..............................................................................................................1

4

FACTUAL BACKGROUND .............................................................................................2

5

THE ENDANGERED SPECIES ACT "TAKE" PROHIBITION ......................................3

6

ARGUMENT .....................................................................................................................5

7

I.      The Primary Jurisdiction Doctrine Does Not Apply. .........................................5

8

9

II.     Defendants' Inclusion of 6PPD in Tires Is a Foreseeable Cause of "Take" of Protected Salmonids. .........................................................................................10

10

CONCLUSION ................................................................................................................15

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

# TABLE OF AUTHORITIES
## CASES

3

4

*Am. Bald Eagle v. Bhatti,*
    9 F.3d 163 (1st Cir. 1993)................................................................................................14

5

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ......................................................................................................10

6

7

*Astiana v. Hain Celestial Grp., Inc.,*
    783 F.3d 753 (9th Cir. 2015) ......................................................................................5–6

8

9

*Atl. Salmon Fed'n U.S. v. Merimil Ltd. P'ship,*
    No. 1:21-CV-00257-JDL, 2022 WL 951709 (D. Me. Mar. 30, 2022)...........................9

10

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon,*
    515 U.S. 687 (1995) ........................................................................................ 4, 11, 12, 13

11

12

*Backus v. Gen. Mills, Inc.,*
    122 F. Supp. 3d 909 (N.D. Cal. 2015)....................................................................7, 8, 9

13

14

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ......................................................................................................10

15

16

*Brown v. MCI WorldCom Network Servs.*
    277 F.3d 1166 (9th Cir. 2002) ........................................................................................6

17

*Cascadia Wildlands v. Kitzhaber,*
    911 F. Supp. 2d 1075 (D. Or. 2012)..............................................................................12

18

19

*Clark v. Time Warner Cable,*
    523 F.3d 1110 (9th Cir. 2008) .....................................................................................8–9

20

21

*Coho Salmon v. Pac. Lumber Co.,*
    61 F. Supp. 2d 1001 (N.D. Cal. 1999)............................................................................9

22

23

*Davel Commc'ns, Inc. v. Qwest Corp.,*
    460 F.3d 1075 (9th Cir. 2006) ........................................................................................6

24

*Defs. of Wildlife v. Adm'r, E.P.A.,*
    882 F.2d 1294 (8th Cir. 1989) ......................................................................................14

25

26

*Defs. of Wildlife v. Boyles,*
    608 F. Supp. 3d 336 (D.S.C. 2022)...........................................................................13–14

27

28

*Friends of Merrymeeting Bay v. NextEra Energy Res. LLC,*
    No. 2:11-CV-38-GZS, 2011 WL 4025713 (D. Me. July 22, 2011)...............................9

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*,
   378 F.3d 1059 (9th Cir. 2004) .................................................................3

*Griggs v. Firestone Tire & Rubber Co.*,
   513 F.2d 851 (8th Cir. 1975) ................................................................15

*Harmoni Int'l Spice, Inc. v. Hume*,
   914 F.3d 648 (9th Cir. 2019) ................................................................12

*Holmes v. Sec. Inv. Prot. Corp.*,
   503 U.S. 258 (1992) .............................................................................12

*Leonard v. Uniroyal, Inc.*,
   765 F.2d 560 (6th Cir. 1985) ................................................................15

*Levi v. Comcast Holdings Corp.*,
   No. 13-CV-05604-JD, 2014 WL 12646043 (N.D. Cal. June 2, 2014) ...................9

*Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.*,
   148 F.3d 1231 (11th Cir. 1998).............................................................13

*Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.*,
   896 F. Supp. 1170 (M.D. Fla. 1995) .......................................................9

*Nat'l Wildlife Fed'n v. Burlington N.R.R.*,
   23 F.3d 1508 (9th Cir. 1994) ................................................................13

*Nat'l Wildlife Fed'n v. Hodel*,
   23 Env't Rep. Cas. (BNA) 1089 (E.D. Cal. 1985)......................................14

*Nw. Coal. for Alternatives to Pesticides v. U.S. E.P.A.*,
   No. C10-1919 TSZ, 2012 WL 4511371 (W.D. Wash. Oct. 1, 2012) ................14

*Our Children's Earth v. Leland Stanford Junior Univ.*,
   No. 13-CV-00402-EDL, 2015 WL 12745786 (N.D. Cal. Dec. 11, 2015) ...........6, 9

*Palila v. Hawaii Dep't of Land & Nat. Res.*,
   852 F.2d 1106 (9th Cir. 1988) ..............................................................13

*Robles v. Domino's Pizza, LLC*,
   913 F.3d 898 (9th Cir. 2019) ..................................................... 5, 6, 9, 10

*San Luis Obispo Coastkeeper v. Santa Maria Valley Water Conservation Dist.*,
   49 F.4th 1242 (9th Cir. 2022) ...............................................................12

*Strahan v. Coxe*,
   127 F.3d 155 (1st Cir. 1997).................................................................13

*Tenn. Valley Auth. v. Hill*,
  437 U.S. 153 (1978) ............................................................................................3

*Thompson v. Hankook Tire Am. Corp.*,
  No. CIV.A. 2:14-0295-CG-M, 2015 WL 4524295 (S.D. Ala. July 27, 2015) ......................15

*Washington Toxics Coal. v. Env't Prot. Agency*,
  413 F.3d 1024 (9th Cir. 2005) ................................................................ 1, 5, 7, 8

*WaterWatch of Oregon v. Winchester Water Control Dist.*,
  No. 3:20-CV-01927-IM, 2021 WL 4317150 (D. Or. Sept. 22, 2021) ......................9

### STATUTES AND LEGISLATIVE MATERIALS

7 U.S.C. § 136 *et seq.*...............................................................................................7

7 U.S.C. § 136d(c) ...................................................................................................7

7 U.S.C. § 136w .......................................................................................................7

15 U.S.C. § 2601 *et seq.*.........................................................................................7

15 U.S.C. § 2605(a) .................................................................................................7

15 U.S.C. § 2620 ......................................................................................................7

15 U.S.C. § 2625 ......................................................................................................7

16 U.S.C. § 1532(13) ...............................................................................................4

16 U.S.C. § 1532(16) ...............................................................................................4

16 U.S.C. § 1532(19) ..........................................................................................4, 11

16 U.S.C. § 1533(d) .................................................................................................4

16 U.S.C. § 1538(a)(1)(B) .......................................................................................4

16 U.S.C. § 1539(a)(1)(B) .......................................................................................5

16 U.S.C. § 1539(a)(2) .............................................................................................5

16 U.S.C. § 1540(c) .............................................................................................8, 10

16 U.S.C. § 1540(g) .............................................................................................8, 10

33 U.S.C. § 1313 ......................................................................................................8

33 U.S.C. § 1342 ......................................................................................................8

S. Rep. No. 93-307 (1973)............................................................................. 4, 11, 15

**REGULATIONS AND ADMINISTRATIVE MATERIALS**

40 C.F.R. § 154.10 ......................................................................................................7

50 C.F.R. § 17.3 ........................................................................................................11

50 C.F.R. § 222.102 ..................................................................................................11

50 C.F.R. § 222.307(b)(5) ..........................................................................................5

50 C.F.R. § 223.102 ....................................................................................................4

50 C.F.R. § 223.203 ....................................................................................................4

64 Fed. Reg. 60,727 (Nov. 8, 1999)..........................................................................11

65 Fed. Reg. 42,422 (July 10, 2000)...........................................................................4

70 Fed. Reg. 37,160 (Aug. 29, 2005)............................................................... 4, 11–12

73 Fed. Reg. 55,451 (Sept. 25, 2008)..........................................................................4

**RULES**

Fed. R. Civ. P. 12(b)(6)......................................................................................... 1, 5, 10

**INTRODUCTION**

This Endangered Species Act ("ESA") Section 9 case challenges the unlawful "take" of protected coho salmon, steelhead trout, and Chinook salmon ("salmonids") caused by Defendant U.S. tire manufacturers' inclusion of the chemical "6PPD" in their tires. 6PPD is designed to transform into 6PPD-quinone and to be shed from the surface of tires. 6PPD-quinone is a chemical so deadly that minute amounts kill salmonids within hours. The California Department of Toxics Substances Control has linked 6PPD-quinone from tires to the near extirpation of coho from the San Francisco Bay Area, and scientists have concluded that already-depleted salmon populations up and down the West Coast cannot survive unless 6PPD-quinone is removed from their waterways. Plaintiffs therefore agree in one respect with Defendants that "[t]his is not a typical Endangered Species Act case," Motion to Dismiss ("Mot.") at 1 (Dkt. 111): never have Plaintiffs encountered a common consumer product that has wreaked so much havoc on threatened and endangered species and continues to do so, unchecked.

Defendants' motion to dismiss this case is meritless. The doctrine of "primary jurisdiction" does not apply. In an attempt to delay indefinitely their own accountability under the ESA, Defendants wrongly ask this Court to dismiss this case to allow various lengthy and uncertain state and federal regulatory processes to play out, but not one of those processes will resolve the present, ongoing ESA "take" liability issues in this case. Defendants also fail to alert the Court to analogous Ninth Circuit precedent holding that the primary jurisdiction doctrine is "inapplicable" in an ESA case like this. *Washington Toxics Coal. v. Env't Prot. Agency*, 413 F.3d 1024, 1034 (9th Cir. 2005). Further, Plaintiffs state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). Plaintiffs' complaint delineates how Defendants' inclusion of 6PPD in tires foreseeably harms and kills ESA-protected salmonids and therefore unlawfully "takes" them within the meaning of the ESA. The Court should reject Defendants' bid to continue to harm and kill coho, Chinook, and steelhead with impunity. The Court should deny the motion to dismiss.

**FACTUAL BACKGROUND**

Salmon and steelhead were once abundant on the West Coast, and are a defining element of the region's culture, economy, and environment. First Am. Compl. for Declaratory and Injunctive Relief ("FAC") ¶ 72, Ex. A at 4 (Dkt. 19). Populations of wild salmon and steelhead have plummeted, however, since Euro-American contact, with only approximately 2% of historic wild populations remaining. *Id.* ¶ 72. The loss of these salmonid populations has reverberated across the economies and ecosystems of the region, causing a domino effect that affects the livelihoods of fishing families, including those represented by Plaintiffs Institute for Fisheries Resources and Pacific Coast Federation of Fishermen's Associations. *Id.* ¶¶ 12–23.

Scientists now understand that 6PPD in tires is a significant cause of the collapse of these fisheries. *Id.* ¶ 91. Since the 1980s, scientists have observed adult coho salmon in freshwater urbanized environments exhibiting symptoms of acute toxic poisoning: swimming in circles, mouth gaping, loss of equilibrium, and disorientation, leading to the death of an otherwise healthy adult coho prior to spawning. *Id.* ¶ 80, Ex. A at 35.[1] Scientists dubbed this phenomenon "Urban Runoff Mortality Syndrome" and found it resulted in the deaths of up to 100% of coho salmon returning to spawn in urban streams. *Id.* In 2020, scientists discovered the cause: a highly toxic quinone transformation product of the chemical N-(1,3-Dimethylbutyl)-N'-phenyl-p-phenylenediamine ("6PPD"), which is present in urban streams and causes acute mortality to coho. *Id.* ¶ 83.

6PPD is a ubiquitous tire additive present in all tires manufactured by Defendants, who manufacture and distribute the vast majority of tires on the market in the United States. *Id.* ¶¶ 24, 77. By design, 6PPD migrates (or "blooms") to the surface of the tire over time. *Id.* ¶¶ 76, 96. On the surface of tires, 6PPD is designed to react with ozone and oxygen to prevent tire cracking. *Id.*

---

[1] For videos documenting this phenomenon, *see, e.g.,* U.S. Geological Survey, *Coho Salmon 6PPD-Q Exposure Study*, Videos (Dec. 5, 2023), https://www.usgs.gov/media/videos/coho-salmon-6ppd-q-exposure-study; U.S. Fish and Wildlife Service, *Male Coho Suffering from Coho Urban Runoff Mortality Syndrome*, Facebook (Oct. 16, 2018), https://www.facebook.com/WashingtonEcologicalServices/videos/male-coho-suffering-from-coho-urban-runoff-mortality-syndrome/164395571171657/.

¶ 76. As it reacts with ozone and oxygen, it creates several transformation products, including 6PPD-quinone or "6PPD-q." *Id.* In this manner, the total concentration of 6PPD in the tire decreases over the life of the tire as it transforms to 6PPD-q which then sheds from the tire onto paved areas. *Id.* ¶¶ 76, 96. 6PPD-q then washes off paved surfaces into stormwater and then into aquatic habitats. *Id.* ¶¶ 76–79, 95–97.

In terms of its toxicity to aquatic life, 6PPD-q is second only to parathion—a chemical war agent that has been banned across the globe due to its high toxicity. *Id.* ¶ 3. Once exposed to stormwater containing 6PPD-q, fish begin to die within just two to four hours. *Id.* ¶ 87. And once symptoms of 6PPD-q poisoning begin, fish cannot recover, even if they are transferred to clean water. *Id.* ¶ 86.

In 2022, two further studies confirmed that not only are adult coho killed, but juvenile coho, Chinook salmon, and steelhead also show the same characteristic symptoms and die when exposed to 6PPD-q. *Id.* ¶¶ 88–89. Scientists have also confirmed 6PPD-q is ubiquitous in urban streams and rivers at levels that can kill coho salmon and steelhead and cause sublethal harm to coho, steelhead, and Chinook, and therefore 6PPD-q appears to pose a significant and widespread ecological risk. *Id.* ¶ 94, Ex. A at 34–36. Scientists have concluded that the source of this 6PPD-q in aquatic habitats is from tires. *Id.* ¶ 84.

### THE ENDANGERED SPECIES ACT "TAKE" PROHIBITION

The Endangered Species Act is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). The ESA was adopted to forestall the extinction of species, "whatever the cost," *id.* at 184, and to allow species to recover to the point where the protections afforded by the ESA are no longer necessary. *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004), *amended*, 387 F.3d 968 (9th Cir. 2004).

To accomplish these goals, the ESA includes a variety of substantive and procedural protections for species listed as "threatened" or "endangered" pursuant to the Act's terms. Due to their marked declines, 24 populations of coho, Chinook, and steelhead are now listed as

threatened or endangered species under the ESA. FAC ¶ 73.[2] All 24 of these species occupy habitat affected by runoff containing 6PPD-q, and all 24 of these species are harmed and killed by exposure to 6PPD-q from tires. *Id.* ¶¶ 74–75, 90.

At issue in this case is the ESA's prohibition on activities that "take" endangered species. 16 U.S.C. § 1538(a)(1)(B). The ESA defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). Congress intended that "take" be defined "in the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon*, 515 U.S. 687, 704 (1995) (quoting S. Rep. No. 93-307, at 2995 (1973)). The prohibition of take applies to all "persons," which includes corporations. 16 U.S.C. § 1532(13).

While the statutory take prohibition in Section 9 applies only to "endangered" species, under Section 4(d), the National Marine Fisheries Service ("NMFS") can, by regulation, extend the take prohibition to "threatened" species under its jurisdiction, 16 U.S.C. § 1533(d), and the agency has done so here for the threatened populations of coho, Chinook, and steelhead at issue. 50 C.F.R. § 223.203; *see also id.* § 223.102. As part of its Section 4(d) rules for threatened salmon and steelhead, NMFS specifically warns that "discharges or dumping of toxic chemicals or other pollutants (e.g., sewage, oil, gasoline) into waters or riparian areas supporting listed [entities]" may violate the Section 9 take prohibition.[3]

---

[2] For management and ESA-listing purposes, steelhead and salmon populations are grouped into distinct population segments ("DPSs") (steelhead) or "evolutionary significant units ("ESUs") (coho salmon and Chinook salmon). These DPSs and ESUs are considered a "species" under the ESA. *See* 16 U.S.C. § 1532(16) (defining "species" under the ESA as including "any distinct population segment of any species of vertebrate fish . . . which interbreeds when mature").

[3] Endangered and Threatened Species: Final Listing Determinations for 16 ESUs of West Coast Salmon, and Final 4(d) Protective Regulations for Threatened Salmonid ESUs, 70 Fed. Reg. 37,160 (Aug. 29, 2005); Endangered and Threatened Species: Final Protective Regulations for Threatened Puget Sound Steelhead, 73 Fed. Reg. 55,451 (Sept. 25, 2008) (extending this take guidance to Puget Sound steelhead); Endangered and Threatened Species; Final Rule Governing Take of 14 Threatened Salmon and Steelhead Evolutionarily Significant Units (ESUs), 65 Fed. Reg. 42,422 (July 10, 2000) (extending guidance to 14 threatened salmon and steelhead ESUs).

A person who conducts an otherwise lawful activity that may incidentally result in "take" may seek exemption from liability under the ESA by applying for a permit under Section 10(a)(1) of the ESA. 16 U.S.C. § 1539(a)(1)(B). To obtain an incidental take permit allowing take of protected coho, Chinook, or steelhead, an applicant must submit a "conservation plan" to NMFS. 16 U.S.C. § 1539(a)(2); 50 C.F.R. § 222.307(b)(5). The conservation plan must, among other things, specify the impact that will likely result from any take and the actions the applicant will take to minimize and mitigate take to the maximum extent practicable, and to ensure adequate funding for the plan. *Id.*

## ARGUMENT

Defendants' arguments are meritless. The doctrine of "primary jurisdiction" does not apply to this ESA Section 9 case. Further, Plaintiffs' claim as outlined in their complaint—that Defendant tire manufactures' inclusion of 6PPD in their tires foreseeably harms and kills protected salmonids—alleges a cognizable cause of action under the ESA, making dismissal for "failure to state a claim" under Federal Rule of Civil Procedure 12(b)(6) unwarranted.

## I.   The Primary Jurisdiction Doctrine Does Not Apply.

The doctrine of primary jurisdiction does not apply to this ESA case, and the Court should decline to exercise its discretion to dismiss on this basis. While Defendants claim that this is "a paradigm case for the application of the primary-jurisdiction doctrine," Mot. at 9, they fail to disclose, much less address, Ninth Circuit precedent explaining that the doctrine is "inapplicable" in ESA cases, even when there are other applicable statutes at play with "different but complementary purposes," because these other environmental statutes do not "trump those [remedies] Congress expressly made available under the ESA." *Washington Toxics Coal.*, 413 F.3d at 1032−34. Indeed, *every* court that has ever addressed whether to apply the primary jurisdiction doctrine in an ESA Section 9 case has rejected its applicability. The Court should not be the first to dismiss an ESA "take" case on this basis.

The primary jurisdiction doctrine is a prudential doctrine that "does not implicate the subject matter jurisdiction of the federal courts." *Robles v. Domino's Pizza, LLC*, 913 F.3d 898, 910 (9th Cir. 2019) (citing *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 759 (9th Cir.

2015) (internal citations omitted)). It is entirely discretionary. It allows a court to stay, or sometimes dismiss without prejudice, a complaint pending resolution of an issue within or consigned to the special competence of an administrative agency. *Id.* at 909–10. The Ninth Circuit has outlined four factors to guide a court's exercise of its discretion:

> the court is to consider (1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity of administration.

*Id.* at 910.

The Ninth Circuit has explained that the doctrine's purpose "is not to secure expert advice from an agency every time a court is presented with an issue conceivably within the agency's ambit," but rather to promote efficiency, which is the doctrine's "deciding factor." *Id.* (cleaned up). "Primary jurisdiction is not implicated simply because a case presents a question, over which [an agency] could have jurisdiction." *Our Children's Earth v. Leland Stanford Junior Univ.*, No. 13-CV-00402-EDL, 2015 WL 12745786, at *4 (N.D. Cal. Dec. 11, 2015) (*quoting Brown v. MCI WorldCom Network Servs., Inc.*, 277 F.3d 1166, 1172 (9th Cir. 2002)). The doctrine should not be invoked when referral to an agency would significantly postpone a ruling that a court is otherwise competent to make. *Robles*, 913 F.3d at 910. Applying the doctrine at the motion to dismiss stage is a case-by-case decision, based upon the specific nature of the specific case. *Davel Commc'ns, Inc. v. Qwest Corp.*, 460 F.3d 1075, 1088 (9th Cir. 2006). If "the allegations of the complaint do not necessarily require the doctrine's applicability, then the primary jurisdiction doctrine *may not be applied on a motion to dismiss*." *Id.* (emphasis added).

Here, Defendants wrongly suggest that, because "[the Toxic Substances Control Act ("TSCA")] gives [the Environmental Protection Agency ("EPA")] primary responsibility for determining whether the distribution of the chemical 6PPD in commerce poses an unreasonable risk of harm to the environment (including protected salmonids)" and because "the [Clean Water Act] similarly gives the EPA the responsibility for developing and overseeing specific water quality criteria to protect such species," this Court should dismiss this case on primary

jurisdiction grounds. Mot. at 9–10. *Washington Toxics Coalition* is fatal to Defendants' argument. In that case, a coalition that included Plaintiffs here brought an ESA case against the EPA's registration of pesticide ingredients that—like 6PPD-q—harm protected fish populations. EPA argued that because the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") allows "any interested person" to petition EPA for cancellation of a registered pesticide, and because FIFRA allows EPA to suspend pesticide registrations due to an "unreasonable hazard to the survival" of an ESA-listed species, the Court should apply the doctrine of primary jurisdiction to bar plaintiffs' ESA suit. *Washington Toxics Coal.* 413 F.3d at 1031. The Ninth Circuit disagreed. Finding the doctrine "inapplicable," the Court explained that FIFRA and the ESA have "complementary purposes," and that EPA could not "escape its obligation to comply with the ESA merely because it is bound to comply with another statute that has consistent, complementary objectives." *Id.* at 1032–34.

So too here. TSCA and FIFRA are similar statutes, making *Washington Toxics Coal.* on all fours with this case. Both establish a legal framework for the regulation of chemical substances. 15 U.S.C. § 2601 *et seq.*; 7 U.S.C. § 136 *et seq.* Both provide EPA with jurisdiction to regulate. 15 U.S.C. § 2625; 7 U.S.C. § 136w. Both establish an "unreasonable risk" standard for EPA to take action, while providing citizens the ability to petition the agency to do so. 15 U.S.C. §§ 2605(a), 2620; 7 U.S.C. § 136d(c), 40 C.F.R. § 154.10. And neither bars simultaneous enforcement of remedies available through the ESA. *See Washington Toxics Coal.*, 413 F.3d at 1034. To the contrary, that EPA here has granted a TSCA petition to initiate rulemaking because 6PPD-q poses such "unreasonable risk" to salmonids only underscores the validity of Plaintiffs' substantive claim in this case that Defendants' continued inclusion of this chemical in tires unlawfully harms salmon and steelhead, and therefore violates the ESA.

Defendants' misplaced reliance on a quote from *Backus v. General Mills*, that "[w]hether a body of evidence sufficiently demonstrates that a particular amount of a chemical substance poses a serious public health risk is precisely the kind of expert question that agencies are better suited to answer than courts or juries," Mot. at 10 (citing 122 F. Supp. 3d 909, 934 (N.D. Cal. 2015)), does not alter the outcome. *Backus* concerned state-law claims regarding the safety of

trans fats, a question Congress had "committed" to the Food and Drug Administration ("FDA"), which was actively considering the precise safety issue. 122 F. Supp. 3d at 933–35. The court therefore held that "this [food safety] question, which is central to Backus's claims in this case, is therefore properly left to the FDA's determination under the primary jurisdiction doctrine." *Id.* at 935. Here, by contrast, Congress has both vested EPA with TSCA administration *and* authorized citizen suits to challenge unlawful taking under the ESA. 16 U.S.C. § 1540(c), (g). Moreover, EPA's response to the TSCA petition has already found that "petitioners submitted sufficient evidence to show that 6PPD-quinone, a degradant of 6PPD, presents lethal hazards to coho salmon in the Pacific Northwest," Mot. Ex. B ("EPA Resp. to Pet.") at 4 (Dkt. 111-4), and that, as Defendants acknowledge, the agency therefore does not need to conduct "a separate risk evaluation under TSCA § 6(b)(4)." Mot. at 7. Accordingly, unlike in *Backus*, the question of *whether* 6PPD-q poses a risk is not pending before an agency: EPA has already found there is sufficient evidence that 6PPD-q is lethal to ESA-protected species. EPA Resp. to Pet at 4.

Nor do federal and state jurisdiction over water pollution counsel in favor of employing the doctrine here. *Contra* Mot. at 8–9. Resolution of the case does not require a determination as to state water-quality standards, which are developed and enforced through a fractured state-by-state, discharger-by-discharger process. 33 U.S.C. §§ 1313, 1342. Plaintiffs' complaint alleges unlawful take of protected species in Washington, Oregon, California, and Idaho, under federal law. FAC ¶ 74. Defendants baldly claim Washington Ecology's initiation of a Clean Water Act process "bolster[s] the appropriateness of exercising primary jurisdiction," Mot. at 9, without explaining how it will resolve Plaintiffs' ESA "take" claim here regarding species in Washington, let alone species in Oregon, California, and Idaho. The Clean Water Act, like TSCA, simply accomplishes different, while complimentary, ends for protecting the environment and results in different, while complimentary, remedies for those protections, making the primary jurisdiction doctrine inapplicable. *See Washington Toxics Coal.*, 413 F.3d at 1034.

Defendants point to no case suggesting primary jurisdiction should be invoked here. None of the "ample case law" cited by Defendants, Mot. at 6, involved ESA cases, and all involved claims regarding "novel and technical" questions that extensively overlapped with

pending agency determinations. Mot. at 6, *citing Clark v. Time Warner Cable*, 523 F.3d 1110, 1112 (9th Cir. 2008) (applying the primary jurisdiction doctrine "to refer a claim raising a novel and technical question of federal telecommunications policy to the Federal Communications Commission for its consideration in the first instance"); *Levi v. Comcast Holdings Corp.*, No. 13-CV-05604-JD, 2014 WL 12646043, at *3 (N.D. Cal. June 2, 2014) (same); and *Backus v. Gen. Mills, Inc.*, 122 F. Supp. 3d 909, 933 (N.D. Cal. 2015) (staying case regarding safety of trans fats to await pending FDA ruling on this novel food safety issue). Contrary to Defendants' argument, there is nothing novel about a court receiving evidence of harm to listed species and providing a remedy for that harm under the ESA. Indeed, the primary-jurisdiction doctrine has uniformly been *rejected* by courts as inapplicable in an ESA Section 9 case. *See, e.g., Coho Salmon v. Pac. Lumber Co.*, 61 F. Supp. 2d 1001, 1016 (N.D. Cal. 1999) (rejecting primary jurisdiction argument in an ESA Section 9 case); *Our Children's Earth*, 2015 WL 12745786, at *4 (same); *Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.*, 896 F. Supp. 1170, 1177 (M.D. Fla. 1995) (same); *WaterWatch of Oregon v. Winchester Water Control Dist.*, No. 3:20-CV-01927-IM, 2021 WL 4317150, at *4–7 (D. Or. Sept. 22, 2021) (same); *Atl. Salmon Fed'n U.S. v. Merimil Ltd. P'ship*, No. 1:21-CV-00257-JDL, 2022 WL 951709, at *5 (D. Me. Mar. 30, 2022) (same); *Friends of Merrymeeting Bay v. NextEra Energy Res. LLC*, No. 2:11-CV-38-GZS, 2011 WL 4025713, at *3–4 (D. Me. July 22, 2011), *aff'd*, No. 2:11-CV-38-GZS, 2011 WL 4025508 (D. Me. Sept. 9, 2011) (same). This Court should not be the first to rule otherwise.

At bottom, the legal issue here—whether Defendants' inclusion of 6PPD in their tires causes "take" because it foreseeably harms and kills threatened and endangered species—is one that the Court is "competent" to answer. *Robles*, 913 F.3d at 910. Indeed, "enforcement of the ESA's prohibition against the 'take' of endangered or threatened species has been placed squarely within the jurisdiction of the courts through the ESA's citizen-suit provisions." *Coho Salmon*, 61 F. Supp. 2d at 1016 (rejecting primary jurisdiction argument in an ESA Section 9 case and explaining that, "[i]n determining whether a take of coho salmon has occurred or is likely to occur . . . the court must only decide whether [defendant's] logging operations have resulted in a take of or will cause imminent harm to coho salmon in the watersheds at issue.");

1    *see also* 16 U.S.C. § 1540(c), (g) (vesting federal district courts with authority to decide Section
2    9 "take" cases). Dismissing this case pending the resolution of EPA's rulemaking regarding
3    6PPD-q—a process for which EPA has promised no "specific rulemaking timeframe or
4    outcome," EPA Resp. to Pet. at 6—would only serve to "*significantly postpone a ruling* that
5    [this] court is otherwise competent to make," *Robles*, 913 F.3d at 910 (emphasis in original), and
6    significantly extend and increase the take of imperiled species from 6PPD-q. The doctrine of
7    primary jurisdiction does not apply, and the Court should decline to exercise its equitable
8    discretion to dismiss on this basis.

9    **II.   Defendants' Inclusion of 6PPD in Tires Is a Foreseeable Cause of "Take" of**
10   **Protected Salmonids.**

11       Defendants' inclusion of 6PPD in the tires they manufacture and distribute foreseeably
12   harms and kills threatened and endangered salmon and steelhead and therefore unlawfully
13   "takes" these species within the meaning of ESA Section 9. Plaintiffs have adequately stated a
14   claim that is plausible on its face, and the Court should decline to dismiss this case under Federal
15   Rule of Civil Procedure 12(b)(6). *Contra* Mot. at 10–14.

16       To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must allege "enough
17   facts to state a claim to relief that is plausible its face." *See Bell Atl. Corp. v. Twombly*, 550
18   U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content
19   that allows the court to draw the reasonable inference that the defendant is liable for the
20   misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). These factual allegations are
21   accepted as true for the purposes of the motion to dismiss. *Id.*

22       Plaintiffs have alleged that "Defendants' use of 6PPD in tires . . . causes prespawn
23   mortality and harmful sublethal effects in salmonids," which constitutes unlawful "taking"
24   prohibited by Section 9 of the ESA. FAC ¶ 19; *see also id*. ¶¶ 101–03. Plaintiffs have alleged
25   that Defendants include 6PPD in all the tires they manufacture and/or distribute, *see id*. ¶¶ 25–
26   54, 77; that, through Defendants' design, this substance migrates to the surface of tires where it
27   (and its transformation product, 6PPD-q) are shed into the environment, *id.* ¶ 76; and that
28   precipitation foreseeably transports 6PPD-q into the habitats of ESA-listed species. *Id*. ¶¶ 79, 96.

Plaintiffs have additionally alleged that, once 6PPD-q enters aquatic habitats, it causes the deaths of ESA-protected salmonids. *See id.* ¶¶ 76–79, 81–85. Thus, Plaintiffs' complaint establishes a clear link tracing Defendants' inclusion of 6PPD in tires to the foreseeable unlawful "take" of protected salmonids. *See id.* ¶¶ 105–07.

Notwithstanding this direct chain of causation, Defendants assert that the ESA's definition of "take" cannot encompass Plaintiffs' claim. Mot. at 11–13. Contrary to their argument, the take prohibition in the ESA is intentionally broad and designed to prevent any action that frustrates the survival and recovery of protected species. This prohibition makes it unlawful for any person to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" a protected animal. 16 U.S.C. § 1532(19). The inclusion of so many terms in this prohibition reflects Congress' intention to define "take" under Section 9 in the "*broadest possible manner to include every conceivable way*" that a person could harm protected fish or wildlife. S. Rep. No. 93-307, at 2995 (1973) (emphasis added).

NMFS regulations are similarly broad, defining "harm" prohibited by Section 9 to include "an act which actually kills or injures fish or wildlife." 50 C.F.R. § 222.102. NFMS intended this definition of "harm" to be consistent and substantively aligned with the definition of harm promulgated by the U.S. Fish and Wildlife Service,[4] which shares responsibility with NMFS for enforcing the ESA. The U.S. Supreme Court has upheld the Fish and Wildlife Service's regulation interpreting the "harm" prohibited by Section 9 to include "indirect as well as direct injuries." *Babbitt*, 515 U.S. at 697–98. Also applicable here, as part of its 4(d) rules for threatened salmon and steelhead, NMFS specifically considers that "[d]ischarges or dumping of toxic chemicals or other pollutants (e.g., sewage, oil, gasoline) into waters or riparian areas supporting listed [populations]" may violate the Section 9 take prohibition. *See, e.g.,* 70 Fed. Reg. at 37,196 (Aug. 29, 2005). Thus, under both the broad statutory definition of "take," and

---

[4] *Compare* 50 C.F.R. § 17.3 (FWS regulation) with 50 C.F.R. § 222.102 (NMFS regulation). The preamble to NMFS' final Harm Rule expressly states NMFS' intent to define "harm" in the same way that FWS does. 64 Fed. Reg. at 60,727 ("This final rule clarifies that NMFS' interpretation of harm is consistent with that of FWS.").

NMFS's 4(d) regulations that specifically highlight that discharge of a toxic chemical into "waters" can constitute a "take," Plaintiffs' theory that including a chemical in tires that, by design, discharges a toxic substance into the environment, where it kills salmonids within hours, satisfies both these statutory and regulatory definitions of "take."

Defendants incorrectly claim that because they do not directly discharge 6PPD-q into streams, their conduct "simply is not enough to fall within the ESA's 'take' prohibition." Mot. at 13. In the Ninth Circuit, "[o]rdinary requirements of proximate causation and foreseeability" apply in a Section 9 "take" case. *Babbitt*, 515 U.S. at 700 n.13; *San Luis Obispo Coastkeeper v. Santa Maria Valley Water Conservation District*, 49 F.4th 1242, 1246 (9th Cir. 2022). Proximate cause "normally eliminates the bizarre," "inject[s] a foreseeability element," and "depends to a great extent on considerations of the fairness of imposing liability for remote consequences." *Babbitt*, 515 U.S. at 713 (O'Connor, J., concurring). Proximate cause generally "requires some direct relation between the injury asserted and the injurious conduct alleged." *Harmoni Int'l Spice, Inc. v. Hume*, 914 F.3d 648, 651 (9th Cir. 2019) (quoting *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992)). "In the context of the ESA, proximate cause issues entail determining whether the alleged injury . . . is fairly traceable to the challenged action of Defendants." *Cascadia Wildlands v. Kitzhaber*, 911 F. Supp. 2d 1075, 1084 (D. Or. 2012). Here, the impact to ESA-listed salmonids from Defendants' inclusion of 6PPD in tires—where Defendants actually designed this substance to migrate to the tires' surface where it releases a toxic byproduct into the environment and onto paved surfaces exposed to precipitation—is not some remote and bizarre contingency that springs unexpectedly from Defendants' challenged conduct; it is the direct, foreseeable, and readily traceable result of that conduct.

Defendants are also wrong that Plaintiffs' theory of take "falls well short" of a "basic plausibility requirement." Mot. at 10. In an often-cited discussion, Justice O'Connor's concurrence in *Babbitt* suggested that the chain of causation under ESA Section 9 cannot be too attenuated: "The farmer whose fertilizer is lifted by a tornado from tilled fields and deposited miles away in a wildlife refuge cannot, by any stretch of the term, be considered the proximate cause of death or injury to protected species occasioned thereby. At the same time, the

landowner who drains a pond on his property, killing endangered fish in the process, would likely satisfy any formulation of the principle." *Babbitt*, 515 U.S. at 713. On the spectrum of proximate causation, the situation here is much closer to Justice O'Connor's hypothetical farmer draining a pond and killing endangered fish than it is to a freak tornado unexpectedly lifting fertilizer from tilled fields into a wildlife refuge removed from those fields.

The chain of causation alleged here is also well within the bounds of other Ninth Circuit Section 9 take cases. For example, in *National Wildlife Federation v. Burlington Northern Railroad*, the Ninth Circuit accepted that a railroad company's "accidental corn spills" constituted "take" of grizzly bears attracted to the corn spills and then hit by trains (before concluding that plaintiffs failed to meet their "burden of demonstrating enough likelihood of irreparable future injury to grizzly bears to justify judicial intervention in the form of an injunction"). 23 F.3d 1508, 1509 (9th Cir. 1994). And in *Palila v. Hawaii Department of Land & Natural Resources*, a plaintiff established causation through proof that a state agency allowed sheep to eat the vegetation on which the endangered palila finch relied, thereby harming the bird. 852 F.2d 1106, 1109 (9th Cir. 1988). These chains of proximate causation of "take," where accidentally spilling corn and routinely grazing sheep are innocuous at first glance, appear *less* direct and foreseeable than Plaintiffs' allegations here: that Defendants have known for years that their tires, by design, discharge a transformation product so toxic it kills salmon within hours, yet have continued to manufacture and distribute these deadly tires in disregard of the ESA.[5]

---

[5] Cases outside the Ninth Circuit are similarly in accord that an activity may constitute a "take" through a direct, albeit multi-step, chain of causation. *See, e.g., Strahan v. Coxe*, 127 F.3d 155, 163–64 (1st Cir. 1997), *cert. denied*, 525 U.S. 830 (1998) (holding that state licensing/permitting of gillnets and lobster pot fishing that harmed a threatened whale species constituted "take"); *Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.*, 148 F.3d 1231, 1251 (11th Cir. 1998) (determining for standing purposes that county's ordinance allowing landowners to use beachfront lighting at night could be a cause of "take" of protected sea turtles because sea turtles could be disoriented by nighttime beach lighting); *Defs. of Wildlife v. Boyles*, 608 F. Supp. 3d 336, 346 (D.S.C. 2022) (finding that complaint alleging that a company's harvest of horseshoe crabs at the time ESA-protected migratory birds need to feed on the crabs' eggs included "sufficient allegations for proximate cause" of take).

1    That this case involves a consumer product also does not make this case meaningfully

2 different than other ESA Section 9 cases where proximate cause was apparent. *Contra* Mot. at

3 13–14. Other ESA cases have found foreseeable "take" from use of consumer products,

4 including, for instance, pesticides and lead shot. For example, in *Defenders of Wildlife v.*

5 *Administrator, E.P.A.,* the Eighth Circuit explained that "the EPA's decision to register

6 pesticides containing strychnine or to continue these registrations was critical to the resulting

7 poisonings of endangered species. The relationship between the registration decision and the

8 deaths of endangered species is clear. We thus conclude the EPA's registrations constituted

9 takings of endangered species." 882 F.2d 1294, 1301 (8th Cir. 1989); *see also Nw. Coal. for*

10 *Alternatives to Pesticides v. U.S. E.P.A.*, No. C10-1919 TSZ, 2012 WL 4511371, at *7–9 (W.D.

11 Wash. Oct. 1, 2012) (holding that plaintiffs had adequately alleged a take was occurring from

12 EPA's failure to implement pesticide biological opinions). And in *National Wildlife Federation*

13 *v. Hodel*, the court held that the Fish and Wildlife Service's authorization of lead shot

14 ammunition, which ultimately resulted in the poisoning of protected bald eagles, similarly

15 constituted a taking under the ESA. 23 Env't Rep. Cas. (BNA) 1089, 1092–93 (E.D. Cal. 1985).[6]

16 In these cases, plaintiffs challenged an agency's decision to authorize the use of products by third

17 parties whose subsequent utilization of such products ultimately led to the poisoning of ESA-

18 protected species. By contrast, Plaintiffs here do not challenge a government authorization for

19 Defendants' conduct that foreseeably leads to the deaths of ESA-listed species; they challenge

20

21

22 [6] The First Circuit in *American Bald Eagle v. Bhatti* addressed a claim that the Massachusetts
Division of Fisheries and Wildlife's allowance of a deer hunt would cause "take" of bald eagles
23 on a theory that "some of the deer shot by hunters during the Quabbin hunt would not be
24 recovered but would die thereafter within the feeding area of the Quabbin bald eagles; these deer,
termed 'cripple-loss deer,' would contain lead in their bodies from the lead slugs used by the
25 hunters as ammunition; and bald eagles would feed on these unrecovered deer carcasses,
consume a portion of the lead in the deer, and be harmed by the lead." 9 F.3d 163, 164 (1st Cir.
26 1993). The court rejected this claim, but not because of the chain of causation; rather the court
found no "take" because plaintiffs ultimately failed to prove at trial that there was any evidence
27 the eagles actually ate the lead slugs. *Id.* at 166 & n. 6 (distinguishing the case from *National*
*Wildlife Federation* on the basis that *National Wildlife Federation* involved significant evidence
28 that bald eagles were poisoned by lead shot).

Defendants' conduct itself. This chain of causation is therefore more direct than those involved in these government-authorization cases, where Section 9's proximate causation requirement was nevertheless satisfied.[7]

Finally, Defendants' warning that rejection of their arguments would present manufacturers and distributors "anywhere in the United States" with "the risk of an ESA citizen suit regardless of time, distance, or circumstance," Mot. at 14, is grossly overstated. Proximate causation remains a safeguard against Defendants' parade of horribles if, unlike here, an ESA violation is not the direct and foreseeable consequence of a defendant's actions. And, to the extent that some other product in the future is found to pose a similar foreseeable threat to imperiled wildlife, this is precisely the type of harm that Congress enacted the ESA to prevent. S. Rep. No. 93-307, at 2997 (1973).

## CONCLUSION

The doctrine of primary jurisdiction does not apply, and Plaintiffs have stated a claim upon which relief may be granted. Defendants manufacture a consumer product designed to emit a byproduct so toxic to salmon that it is second only to a globally banned chemical war agent in its lethality to aquatic life. This constitutes an unlawful "take," prohibited by the ESA. The Court should deny Defendants' motion to dismiss.

DATED this 22nd day of March, 2024,

*/s/ Elizabeth B. Forsyth*

---

[7] The chain of proximate causation here is also less attenuated than in cases where courts have found tire manufactures liable for harm in other contexts, despite significant intervening acts of tire users. *See, e.g., Leonard v. Uniroyal, Inc.*, 765 F.2d 560 (6th Cir. 1985) (upholding verdict against tire manufacturer where tire blowout resulted in injury and death, despite underinflation, tread wear, and decision by plaintiff not to replace tire before trip); *Thompson v. Hankook Tire Am. Corp.*, No. CIV.A. 2:14-0295-CG-M, 2015 WL 4524295 (S.D. Ala. July 27, 2015) (denying tire manufacturer's motion to dismiss claim arising from tire failure, despite fact that tire had been retreaded after leaving manufacturer's possession, as retreading may have been foreseeable); *Griggs v. Firestone Tire & Rubber Co.*, 513 F.2d 851 (8th Cir. 1975) (affirming verdict against tire manufacturer in claim arising from explosion of tire mounted on mismatched rim components installed by the prior owner of the vehicle, because such mismatch was foreseeable).

ELIZABETH B. FORSYTH (CA Bar No. 288311)
eforsyth@earthjustice.org
JANETTE K. BRIMMER (*Pro Hac Vice*)
jbrimmer@earthjustice.org
NOORULANNE JAN (*Pro Hac Vice*)
njan@earthjustice.org
Earthjustice
810 3rd Ave #610
Seattle, WA 98104
Tel: (206) 343-7340

GREGORY C. LOARIE (CA Bar No. 215859)
gloarie@earthjustice.org
SCOTT W. STERN (CA Bar No. 336427)
sstern@earthjustice.org
Earthjustice
50 California Street #500
San Francisco, CA 94111
Tel: (415) 217-2000

*Counsel for Plaintiffs Institute for Fisheries Resources and Pacific Coast Federation of Fishermen's Associations*