1  ELIZABETH B. FORSYTH (CA Bar No. 288311)
   eforsyth@earthjustice.org
2  JANETTE K. BRIMMER (*Pro Hac Vice*)
   jbrimmer@earthjustice.org
3  NOORULANNE JAN (*Pro Hac Vice*)
   njan@earthjustice.org
4  Earthjustice
   810 3rd Ave #610
5  Seattle, WA 98104
   Tel: (206) 343-7340
6

7

8  GREGORY C. LOARIE (CA Bar No. 215859)
   gloarie@earthjustice.org
9  SCOTT W. STERN (CA Bar No. 336427)
   sstern@earthjustice.org
10 Earthjustice
   50 California Street #500
11 San Francisco, CA 94111
   Tel: (415) 217-2000
12

13 *Counsel for Plaintiffs Institute for Fisheries Resources*
   *& Pacific Coast Federation of Fishermen's Associations*

14

15                  UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF CALIFORNIA

16 INSTITUTE FOR FISHERIES RESOURCES; and        Case No. 23-cv-05748-JD
17 PACIFIC COAST FEDERATION OF FISHERMEN'S
   ASSOCIATIONS,

18                                                **PLAINTIFFS' STATEMENT**
                    Plaintiffs,                   **OF RECENT DECISION**
19
            v.
20                                                Hearing Date: May 16, 2024
   BRIDGESTONE AMERICAS TIRE OPERATIONS,          Time: 10:00 AM
21 LLC; CONTINENTAL TIRE THE AMERICAS, LLC;       Courtroom: 11, 19th Floor
   GITI TIRE (USA) Ltd.; THE GOODYEAR TIRE &      Judge: Hon. James Donato
22 RUBBER COMPANY, individually and as successor in
   interest to COOPER TIRE & RUBBER COMPANY;
23 HANKOOK TIRE AMERICA Corp.; KUMHO TIRE
   U.S.A., Inc.; MICHELIN NORTH AMERICA, Inc.;
24 NOKIAN TYRES Inc.; NOKIAN TYRES U.S.
   OPERATIONS LLC; PIRELLI TIRE LLC;
25 SUMITOMO RUBBER NORTH AMERICA, Inc.;
   SUMITOMO RUBBER USA, LLC; TOYO TIRE
26 HOLDINGS OF AMERICAS Inc.; and YOKOHAMA
   TIRE Corporation.
27
                    Defendants.
28

**PLAINTIFFS' STATEMENT OF RECENT DECISION**

Pursuant to Civil Local Rule 7-3(d)(2), Plaintiffs Institute for Fisheries Resources and Pacific Coast Federation of Fishermen's Associations respectfully submit this Statement of Recent Decision to bring to the Court's attention the Northern District of California's recent summary judgment order in *White v. United States Army Corps of Engineers*, 22-cv-06143-JSC (May 6, 2024). A true and correct copy of the order is attached as Exhibit A. The *White* decision was published after Plaintiffs' response to Defendants' motion to dismiss in this case, Dkt. 115, and it is relevant to Plaintiffs' argument on pages 10–15 of Plaintiffs' previously filed response. *See* Civil L.R. 7-3(d)(2) (allowing counsel to "bring to the Court's attention a relevant judicial opinion published after the date [of] the opposition or reply" through filing a Statement of Recent Decision).

DATED this 8th day of May, 2024,

*/s/ Elizabeth B. Forsyth*
ELIZABETH B. FORSYTH (CA Bar No. 288311)
eforsyth@earthjustice.org
JANETTE K. BRIMMER (*Pro Hac Vice*)
jbrimmer@earthjustice.org
NOORULANNE JAN (*Pro Hac Vice*)
njan@earthjustice.org
Earthjustice
810 3rd Ave #610
Seattle, WA 98104
Tel: (206) 343-7340

GREGORY C. LOARIE (CA Bar No. 215859)
gloarie@earthjustice.org
SCOTT W. STERN (CA Bar No. 336427)
sstern@earthjustice.org
Earthjustice
50 California Street #500
San Francisco, CA 94111
Tel: (415) 217-2000

*Counsel for Plaintiffs Institute for Fisheries Resources and Pacific Coast Federation of Fishermen's Associations*

# Exhibit A

1
2
3
4                        UNITED STATES DISTRICT COURT

5                      NORTHERN DISTRICT OF CALIFORNIA

6

7    SEAN K WHITE,                              Case No.  22-cv-06143-JSC

8                    Plaintiff,

9             v.                                **ORDER RE: CROSS MOTIONS FOR
                                                SUMMARY JUDGMENT**
10   UNITED STATES ARMY CORPS OF
     ENGINEERS, et al.,                         Re: Dkt. Nos. 72, 76
11
                     Defendants.
12

13          Sean K. White brings this lawsuit under the Endangered Species Act of 1973 ("ESA").  He

14   alleges Defendants' "flood control operations," which release water from the Coyote Valley Dam

15   into the Russian River, are injuring protected species of salmonids in violation of the ESA.

16   Pending before the Court are the parties' cross-motions for summary judgment.  Having

17   considered the parties' written submissions, and having had the benefit of oral argument on April

18   18, 2024, the Court **DENIES** Defendants' motion for summary judgment, **GRANTS** Plaintiff's

19   motion for summary judgment on the merits but **HOLDS** Plaintiff's requested injunctive relief **IN**

20   **ABEYANCE** until at least August 2024 pending the anticipated completion of Defendants'

21   reinitiated consultation.

22                              **FACTUAL BACKGROUND**

23          The United States Army Corps of Engineers (the "Corps") owns and operates the Coyote

24   Valley Dam.  (Dkt. No. 1-1 at 20.)[1]  They constructed the dam, which in turn created Lake

25   Mendocino more than 50 years ago.  (Dkt. No. 51-2 ¶ 4.)  Today, the Corps jointly operates the

26   dam with the Sonoma County Water Agency ("Sonoma Water").  (Dkt. No. 76-2 ¶ 9.)  The Corps

27   _____

28   [1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the
     ECF-generated page numbers at the top of the documents.

                                              1

controls the dam's flood control operations when Lake Mendocino's water level reaches an elevation above the "Top of Conservation Pool." (*Id.* ¶¶ 9, 23.) Sonoma Water controls the dam's water supply operations, which are in effect at water elevations below the "Top of Conservation Pool" level. (*Id.*) The "Top of Conservation Pool" is a variable reservoir storage threshold separating water supply storage from flood control storage. (Dkt. No. 51-2 ¶ 6.) The threshold value is greater during the dry season between May and October and lower during the rainy season between November and February. (*Id.*)

The dam has one single outlet at the bottom of Lake Mendocino. (Dkt. No. 72-2 ¶ 30.) Turbidity remains high at the bottom of the lake, in part because of the lake's depth. (Dkt. No. 1-1 at 140; *see also* Dkt. Nos. 78-2 at 18, 78-3 at 17.) Water released from the dam flows into the East Fork of the Russian River, then merges with the West Fork and flows into the Russian River mainstream. (Dkt. No. 51-1 ¶ 28; 72-2 at 8, Figure 2.)

Under the ESA, three species of salmonids in the Russian River are protected as threatened or endangered: the Central California Coast Steelhead ("CCC Steelhead"), the Central California Coast Coho Salmon ("CCC Coho") and the California Coast Chinook Salmon ("CC Chinook"). (Dkt. No. 1-1 at 6.)

## I.    2008 Biological Opinion and Incidental Take Statement

Consistent with the ESA Section 7, in 2008 the Corps requested a biological opinion ("BiOp") from the National Marine Fisheries Service ("NMFS") regarding the impact of Corps' activities around the Russian River watershed—including their operation of the Coyote Valley Dam—on the protected salmonids. (Dkt. No. 1-1 at 6.) The 2008 BiOp concluded the Corps' "continued operations" of the Coyote Valley Dam "in a manner similar to recent historic practices," together with their operations of another dam, channel maintenance, and estuary management activities, "are likely to jeopardize the continued existence of threatened CCC steelhead and endangered CCC coho salmon" and "adversely modify critical habitat for CCC coho salmon and CCC steelhead." (Dkt. No. 1-1 at 259.) The 2008 BiOp observed "flood releases [of the Coyote Valley Dam's flood operations] have the potential to scour the streambed, erode banks,

United States District Court
Northern District of California

1    increase turbidity. . ." and identified the dam as "a major contributor to sustained turbidity in the

2    Russian River." (*Id.* at 164, 340.)  Releases from the dam "likely contribute high and persistent

3    levels of turbidity to the main stem Russian River" and lengthen the amount of time for the river

4    to transport sediment downstream, which is "a particular concern for both salmonids and their

5    habitat." (*Id.* at 140.)  The BiOp anticipated turbidity caused by the dam would adversely impact

6    the listed salmonids, but "the precise magnitude of the impact, while expected to be low, [was]

7    unknown." (*Id.* at 341.)

8           Together with the BiOp, the NMFS provided the Corps with an incidental take statement,

9    covering the "taking of listed salmonids that is likely to occur due to the implementation of [the

10   Corp's proposed operations including those at the Coyote Valley Dam]." (*Id.* at 18.)  The

11   incidental take statement included eight Reasonable and Prudent Measures deemed "necessary and

12   appropriate to minimize the likelihood of take on [the listed salmonids]." (*Id.* at 337.)  The

13   incidental take statement emphasized to remain eligible for the ESA exemption under Section

14   7(o)(2), the Reasonable and Prudent Measures "must be undertaken" and were "nondiscretionary."

15   (*Id.* at 315.)

16          Reasonable and Prudent Measure No. 4 addressed turbidity. (*Id.* at 340.)  It contained ten

17   "Terms and Conditions." (*Id.* at 341-342.)  These terms included conducting a "bathymetric

18   survey of Lake Mendocino" to determine if dredging was a reasonable alternative to reduce

19   turbidity levels within two years; installing turbidity meters in specific locations before 2009;

20   publishing turbidity data for 10 years; reporting on turbidity monitoring; analyzing turbidity data

21   to determine if flood control operations increase turbidity; submitting that data to the Fisheries

22   Service annually; drafting a plan to minimize any adverse effects found on the relevant species;

23   and implementing plans to minimize and avoid adverse effects by 2014. (*Id.*)  Except for the first

24   term of conducting a bathymetric survey of Lake Mendocino, the Corps failed to comply with all

25   the requirements under the Reasonable and Prudent Measure No. 4. (*See* Dkt. No. 51-4.)

26   Defendants claim the Corps' efforts to satisfy the requirements are ongoing. (Dkt. No. 51-1 ¶¶ 24-

27   25.)

28

United States District Court
Northern District of California

The 2008 incidental take statement expired on September 23, 2023.  (Dkt. No. 15-2 ¶ 2.)  The NMFS met with the Corps in February 2020 to begin discussion of a new consultation.  (Dkt. No. 51-1 ¶ 17.)  The Corps formally requested reinitiation of consultation in February 2023.  (*Id.* ¶ 18.)  The NMFS notified the Corps more information was needed for the new consultation, and the Corps provided the requested information.  (Dkt. No. 76-1 ¶¶ 5-7.)  On February 12, 2024, the NMFS confirmed reinitiation of the consultation upon receiving all the necessary information.  (*Id.* at 9.)

## II.    Plaintiff's Data Showing the Coyote Valley Dam's Adverse Impact on Protected Species

Between January and May 2023, Plaintiff collected water samples from five locations in the upper Russian River watershed around the Coyote Valley Dam.  (Dkt. No. 72-2 ¶ 17.)  One of the locations sampled, "Site 4," is located 0.40 miles below the dam's outlet, on the East Fork of the Russian River.  (*Id.* ¶ 18.)  The other locations are tributaries to the Russian River (Site 1-3) and the source water above Lake Mendocino and the dam (Site 5).  (*Id.* ¶ 18, Figure 2.)  Plaintiff took the samples to Alpha Labs, an environmental Laboratory Accreditation Program certified laboratory, for turbidity analysis.  (*Id.* ¶ 19.)  Lab results showed turbidity from Site 4 was higher and more persistent than the receiving waters (Site 1-3) and source water (Site 5).  (*Id.* ¶ 19, Figure 3.)  Applying models from the scientific literature, the high turbidity measured by Plaintiff near the dam has significant negative effects on the protected salmonids, including "egg-to-fry mortality, delayed embryo development, physiological stress and negative effects on homing behavior, feeding and growth that threaten overall population viability."  (*Id.* ¶ 77.)

## III.    Army Corps' 2023 Turbidity Assessment and Biological Assessment

In September 2023, the Corps published "Russian River Turbidity Assessment and Proposed Plan."  (Dkt. No. 80-1.)  The report contains turbidity data the Corps collected from six locations near the Coyote Valley Dam, including the dam outlet, as well as other tributaries and source water.  (*Id.* at 5.)  The Corps identified "higher levels of turbidity released from the Dam Outlet at [the Coyote Valley Dam] than typically occur under the non-project conditions exemplified by turbidity measurements collected at West Fork [located in the upstream of the

confluence with the East Fork]."  (*Id.* at 30.)  The "well-defined differences" among the locations' turbidity levels confirm there are "turbidity effects from [the Coyote Valley Dam] releases," and the findings are in line with the Corps' "over 70 years of anecdotal observations and informal assessments."  (*Id.*)  However, the mechanisms controlling the turbidity from the dam's releases and the extent of downstream effects remain unclear, primarily due to insufficient data.  (*Id.*) "[T]urbidity from releases at the Dam Outlet potentially could cause lethal effects to eggs and larvae [of the protected salmonids,] on about 50 percent of days in the fall and winter."  (*Id.* at 25.) The "potential lethal effects occurred often enough to be of concern not only at the Dam Outlet, but also at Hopland [12 miles downstream of the dam] and the West Fork."  (*Id.*)

Also in September 2023, the Corps re-submitted to the NMFS an updated Biological Assessment for the new consultation.  (Dkt. No. 76-1 ¶ 5.)  The Biological Assessment acknowledged the Coyote Valley Dam's "flood control operations include both water storage and water releases, which have the potential to. . . increase turbidity."  (USACE0007549.)  "Sub-lethal and lethal levels of turbidity were present on 34 percent and 43 percent of days, respectively, just downstream of [the Coyote Valley River] during the fall and winter."  (USACE0007560.) Moreover, the Biological Assessment observed "[t]he primary adverse impact from turbidity associated with flood control releases is the potential for smothering salmonid eggs and larvae in redds."  (USACE0007559.)

**PROCEDURAL BACKGROUND**

On October 18, 2022, Plaintiff filed suit under the ESA's citizen suit provision.  16 U.S.C. 1540(g).  He brings two claims: (1) the Corps engages in unlawful takes of listed salmonoid species, in violation of the ESA Section 9, 16 U.S.C. § 1538(a)(1)(B) (Dkt. No. 1 at 27); and (2) the Corps and the NMFS failed to reinitiate consultation in violation of the ESA Section 7, 16 U.S.C. § 1536(a)(2), and Administrative Procedure Act, 5 U.S.C. § 706.  (*Id.* at 27-29.)

Defendants moved to dismiss the litigation as prudentially moot because Defendants intended to reinitiate consultation under the ESA.  (Dkt. No. 15.)  In the alternative, Defendants requested the Court stay the litigation pending the completion of consultation.  (*Id.*)  The Court

United States District Court
Northern District of California

1   denied both requests, holding effective relief was possible if Plaintiff prevailed and a stay could

2   harm Plaintiff by allowing Defendants to engage in unlawful behavior with no guaranteed end date

3   to such behavior.  (Dkt. No. 26.)

4          Plaintiff then moved for a preliminary injunction, requesting the Court order, among other

5   things, that Defendants refrain from making flood control releases unless they determine such a

6   release will reduce threat to life and property below Coyote Valley Dam, report to the Court either

7   seven days before or after the release, and obtain Court permission if the release extends more

8   than 30 days.  (Dkt. No. 50 at 22.)  The Court concluded Plaintiff demonstrated a likelihood of

9   success on the merits of his claims (Dkt. No. 57 at 5-11), but nevertheless denied the motion

10  because Plaintiff failed to show immediate and irreparable harm and did not demonstrate how the

11  proposed injunction would remedy his alleged harms.  (*Id.* at 11-17, 19-22.)

12         Plaintiff moves for summary judgment on both of his claims and requests the Court order

13  further briefing on appropriate injunctive relief.  (Dkt. No. 72.)  Defendants oppose, insisting the

14  already reinitiated consultation is the appropriate remedy, so other injunctive relief is unnecessary,

15  and cross-move for summary judgment.  (Dkt. No. 76.)  Defendants also oppose further briefing

16  on other injunctive relief.  (*Id.* at 26-27.)

17                                      **LEGAL STANDARD**

18         Claims under the ESA are reviewed under the Administrative Procedure Act ("APA")

19  standard of review.  *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir.

20  2014); 5 U.S.C. § 706(2)(A).  This standard of review is "highly deferential" to the agency's

21  decisions.  *Id.*  "In reviewing claims brought under the APA, [courts] will only set aside agency

22  action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

23  law.'"  *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481 (9th Cir. 2011) (quoting 5

24  U.S.C. § 706(2)(A)).

25  //

26  //

27  //

28

1

**DISCUSSION**

**I.    Whether Defendants Engaged in Unlawful Taking Prohibited by Section 9**

The ESA Section 9 makes it unlawful for any person to "take" endangered species or engage in other prohibited acts regarding species protected under the ESA.  16 U.S.C. § 1538 (a)(1)(B).  The ESA defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  Congress intended "take" to be defined "in the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife."  *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704 (1995) (quoting S. Rep. No. 93–307, p. 7 (1973)).

**A.  Defendants Are Not Eligible for Section 7 Exemptions**

Not all "takes" are prohibited.  *Cold Mountain v. Garber*, 375 F.3d 884, 888 (9th Cir. 2004), *as amended* (Aug. 9, 2004).  If, after consultation under Section 7, the consulting agency finds an agency action does not jeopardize a species but may result in "incidental take," a consulting agency may issue an "incidental take statement."  *Id*.  Any taking in compliance with an incidental take statement's terms and conditions is then exempt from the general take prohibition of the ESA Section 9.  16 U.S.C. § 1536(b)(4)(C)(iv), (o)(2).

However, Defendants are not eligible for this exemption because they failed to comply with the terms and conditions of Reasonable and Prudent Measure No. 4.  (Dkt. No. 76 at 14.) Defendants also admit there is no valid incidental take statement in effect since the 2008 statement expired and the consultation process for a new BiOp is still ongoing.  (*Id*. at 15.)  As such, Defendants' Coyote Valley Dam operations are not exempt from Section 9, and any resulting takes violate the ESA.

**B.  Flood Control Releases at the Coyote Valley Dam Cause Take**

Under Section 9's "take" definition, "harass" means "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding,

7

feeding, or sheltering."  50 C.F.R. § 17.3.  Reflective of the statute's intended breadth, Congress included "harass" to allow the government to regulate or prohibit seemingly innocuous activities such as birdwatchers' activities that "might disturb the birds and make it difficult for them to hatch or raise their young."  *Sweet Home*, 515 U.S. at 705 (quoting S. Rep. No. 93–307, p. 11 (1973)).  To prove "take," a plaintiff also needs to show the taking is proximately caused by the alleged unlawful actions.  *Sweet Home*, 515 U.S. at 700, n.13; *see also Cold Mountain*, 375 F.3d at 890 (granting summary judgment for the government agency because the plaintiff failed to establish a "causal link" between the specific agency action and the action allegedly causing the "take").  The proximate cause requirement serves to "preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity."  *Paroline v. U.S.,* 572 U.S. 434, 445 (2014) (citing *Exxon Co., U.S.A. v. Sofec, Inc.,* 517 U.S. 830, 838-39 (1996)).

Plaintiff has established there is no factual dispute that Defendants' flood control releases at the Coyote Valley Dam create a "likelihood of injury" to and, thus, taking of the protected salmonids.  Plaintiff provides data he collected between January and May 2023—when the Corps was operating the dam for flood control operations—showing turbidity at the dam's outlet is much higher and more persistent than that from the other tributaries to the Russian River and the source water above Lake Mendocino.  (Dkt. No. 72-2 ¶ 19, Figure 3.)  Applying the turbidity data to the scientific literature, Plaintiff shows the increased turbidity has significant negative effects on the protected salmonids, including "egg-to-fry mortality, delayed embryo development, physiological stress and negative effects on homing behavior, feeding and growth that threaten overall population viability."  (*Id*. ¶ 77.)

Plaintiff's data corroborate Defendants' conclusion that the increased turbidity caused by releases from the Coyote Valley Dam potentially harms the protected salmonids.  For example, in the 2008 BiOp from the previous consultation, NMFS observed releases from the dam "likely contribute high and persistent levels of turbidity to the main stem Russian River" and lengthen the amount of time for the river to transport sediment downstream, which is "a particular concern for

both salmonids and their habitat." (*Id*. at 140.) The NMFS further concluded, "[t]urbidity from [the Coyote Valley Dam] may be causing delay harm to eggs and alevins, and limiting rearing opportunities by reducing feeding, displacing rearing juveniles downstream, reducing growth rates for rearing salmonids, and reducing their food supply." (*Id*. at 141.)

Two reports produced by Defendants in 2023—the "Turbidity Assessment" and the "Biological Assessment"—also acknowledge the dam's potential harm to the protected salmonids. Both reports found releases from the Coyote Valley Dam add turbidity to the Russian River, and the increased turbidity can adversely affect the protected salmonids in the river. (*See* Dkt. No. 80-4 at 25-30; USACE0007549-USACE0007559.) So, Defendants know the flood releases are creating the likelihood of injury to—and therefore, harassing of—the protected salmonids. Their knowledge establishes proximate causation because they cannot argue the takes of the protected salmonids are remote consequences or "mere fortuity" of their activities; Defendants can foresee the takes based on the well-documented analyses Defendants produced themselves. *See Paroline*, 572 U.S. at 445; s*ee also Ark. Project v. Shaw*, 775 F.3d 641, 657 (5th Cir. 2014) (acknowledging proximate cause has "functionally equivalent alternative characterizations in terms of foreseeability and duty") (cleaned up).

### i. Defendants' Proximate Cause Challenge is Unavailing

Defendants do not dispute the findings in the 2008 BiOp or the 2023 Turbidity Assessment and Biological Assessment. While they challenge Plaintiff's data collected on days when dam releases did not amount to a volume large enough to qualify as flood control releases, they concede some data was collected during flood control releases and "does show generally that there was higher turbidity below the dam than above it." (Dkt. No. 76 at 20.) They also admit elevated turbidity from the dam's outflows has likely resulted in "some adverse effects to habitat, and effects to species individuals and life stages." (Dkt. No. 51-1 ¶ 40.) There is thus no dispute the Corps' flood control releases—as part of their flood control operations—at the Coyote Valley Dam are causing higher turbidity at the river that can injure the protected salmonids.

United States District Court
Northern District of California

1   Defendants argue instead that Plaintiff fails to show the Corps' flood control releases at the

2   dam are the proximate cause of the increased turbidity because certain pre-existing conditions

3   outside of the Corps' control also contribute to turbidity.  For example, storms or other weather

4   events can cause increased turbid upstream waters coming into the reservoir (Lake Mendocino).

5   (*Id.*)  In addition, the structural limitations of the dam itself contribute to turbidity: intheir reply,

6   Defendants cite two reports by Sonoma Water to show the turbidity in Lake Mendocino's bottom

7   strata was often comparable to, if not higher than, the turbidity below the dam outlet.  (Dkt. Nos.

8   78-2 at 18, 78-3 at 17.)  So, they argue the dam's single outlet located at the bottom of Lake

9   Mendocino, rather than the Corps' dam operations, is primarily responsible for the increased

10  turbidity.  (Dkt. No. 78 at 17.)

11  Plaintiff does not dispute these pre-existing conditions.  He acknowledges there is higher

12  background turbidity during and after storms and the Coyote Valley Dam's design—specifically,

13  the single outlet at the bottom of the Mendocino Lake—is the "root" of the turbidity problem.

14  (Dkt. No. 72-2 ¶¶ 30, 32.)  However, that other factors also increase turbidity does not negate the

15  flood control releases' contribution to the increased turbidity.  When discussing the definition of

16  "harm" in Section 9, NMFS acknowledged under the ESA, "[a]n action which contributes to

17  injury can be a 'take' even if it is not the only cause of the injury.  This concept includes actions

18  reasonably certain to contribute to the death or injury of listed species. . ."  (Dkt. No. 77 at 22

19  (quoting 64 Fed Reg. 60728).)  Therefore, contrary to Defendants' position, Plaintiff does not

20  need to distinguish the impact of the Corps' flood control releases from other contributing factors

21  to establish proximate causation.  (*See* Dkt. No. 76-3 ¶ 13.)  During oral argument, Defendants

22  conceded the ESA Section 9 liability only requires an agency's activity to be a contributing factor.

23  Defendants do not purport the flood control releases have no impact on the increased turbidity.

24  (*See* Dkt. No. 51-1 ¶ 40.)  The 2008 BiOp and the 2023 Turbidity Assessment and Biological

25  Assessment, which explicitly conclude the flood control releases—as part of the Corps' flood

26  control operations—can cause higher turbidity harming the listed salmonids, are sufficient to

27  establish Defendants' unlawful takes in the form of harassment.

28

**ii. Plaintiff Need Not Identify Specific Discretionary Action if Defendants Can Comply with the ESA without Compromising their Obligations Imposed by Congress**

Defendants also insist that to prevail on the Section 9 claim, Plaintiff cannot allege flood control operations broadly[2] cause the "take" but must identify a specific discretionary action— "taken while the Dam is in Flood Control Operation"—as the proximate cause of the takes. (Dkt. No. 78 at 15.)   The Court is unpersuaded.  Although Defendants cite cases concluding an agency's legally required action cannot be the proximate cause of Section 9 takes, the cases are factually distinguishable because they all concerned situations where, to comply with Section 9, agencies would have to breach their duties imposed by Congress or by contracts.  *See Nat'l Wildlife Fed'n v. U. S. Army Corps of Eng'rs*, 384 F.3d 1163, 1179 (9th Cir. 2004) (holding the Corps' dam operations' noncompliance with water standards under the Clean Water Act was lawful because the Corps made "good-faith and diligent efforts. . . to do all that is feasible to avoid" such noncompliance and to hold otherwise would construe the Clean Water Act as superseding the Corps' dam operations mandated by Congress); *NRDC v. Norton*, 236 F. Supp. 3d 1198, 1239 (E.D. Cal. 2017) (holding it is inappropriate to impose Section 9 liability on a government agency for performing non-discretionary terms under otherwise valid contracts. To hold otherwise would require the agency to either (1) breach valid contracts necessary to a water project's operation in compliance with state law, or (2) obtain a likely unavailable incidental take permit before fulfilling their contractual obligations because the current permit intentionally carved out the challenged takes in this case).  No such scenario exists here, as Defendants do not need to break any law to comply with Section 9.  Their takes could have been exempted from Section 9 if they complied with the 2008 incidental take statement's Reasonable and Prudent Measures or reinitiated consultation promptly.

---

[2] The parties' dispute as to whether the focus should be on the Corps' overall flood control operations or on the specific component of flood control releases is immaterial for this analysis.  If a particular component is contributing to the takes of the protected salmonids, it logically follows that the overall operations are also contributing to the takes.

This factual difference is highlighted in the third case cited by Defendants.  In *In re Operation of the Missouri River System Operation*, the court referenced cases, including the Ninth Circuit's *National Wildlife* decision, and noted environmental and wildlife-protection statutes do not apply when they would "render an agency unable to fulfill a non-discretionary statutory purpose or require it to exceed its statutory authority."  421 F.3d 618, 630 (5th Cir. 2005).  Nevertheless, the court concluded the cases were "inapposite" to its case because "compliance with the ESA d[id] not prevent the Corps from meeting its statutory duty."  *Id.* at 631.  In *In re Missouri River*, one of the plaintiffs' claims was the Corps was operating a reservoir system that failed to comply with the ESA Section 7 consultation requirement.  *Id*. at 630.  The defendants contended the ESA was inapplicable because compliance with the Section 7 consultation would interfere with the Corps' work for downstream navigation, a project purpose mandated by the Flood Control Act.  *Id*.  The court rejected the defendants' argument because the Flood Control Act did not mandate a particular level of river flow or length of navigation season, but rather allowed the Corps to decide how best to support the primary interest of navigation in balance with other interests.  *Id*. at 631.  Since the Corps "can comply with the elements of the 2003 Amended BiOp [Reasonable and Prudent Alternative] while continuing to operate the dams 'consistent with the purposes stated by Congress,'" their operation of a reservoir system is subject to the ESA Section 7's requirement.  *Id*. (quoting *Nat'l Wildlife*, 384 F.3d at 1179).

As in *In re Missouri River*, here the Corps could have complied with Section 9 while operating the Coyote Valley Dam "consistent with the purposes stated by Congress."  *See* 421 F.3d at 631.  The Corps admit they have discretion controlling "the magnitude of and timing of flood control releases" and they continue to evaluate "whether there are any discretionary changes the Corps can make to its flood control operations that will reduce turbidity."  (Dkt. Nos. 76-2 ¶ 13, 76-3 ¶ 10.)  The Corps obtained the 2008 incidental take statement from the NMFS precisely for this reason: to shield the otherwise unlawful takes caused by its dam operations—including flood control releases—with a Section 7 safe harbor.  16 U.S.C. § 1536(o)(2).  The Corps could have avoided the Section 9 violation by complying with the terms in the incidental take statement

to be in the safe harbor, which would render the takes lawful.  The Reasonable and Prudent Measure No. 4 with which Defendants failed to comply requires the Defendants conduct surveys and monitor turbidity levels around the dam to devise plans to mitigate the identified harm.  (Dkt. No. 1-1 at 341-342.)  Defendants do not claim the Reasonable and Prudent Measure No. 4 in any way interferes with their legal obligations at the Coyote Valley Dam.  In fact, they are currently working to satisfy the Reasonable and Prudent Measure No. 4 requirements by, among other things, evaluating "whether there are any discretionary changes the Corps can make to its flood control operations that will reduce turbidity."  (Dkt. Nos 51-4, 76-3 ¶ 10.)

So, Defendants' emphasis on the Corps' lack of authority to address the inherent flaw of the dam's existing structure—having only one single outlet at the bottom of Mendocino Lake—is unavailing.  (Dkt. Nos. 76 at 21, 78 at 18.)  This argument concerns remedy, not liability; it does not address the Corps' flood control operations which increase turbidity by releasing water into the Russian River, proximately causing the harassment of the protected salmonids.

***

Defendants' flood control releases at the Coyote Valley Dam are harassing the protected salmonids, which is "not in accordance" with the ESA Section 9.  5 U.S.C. § 706(2)(A).  The Court GRANTS summary judgment for Plaintiff on his Section 9 claim.

**II.  Whether Defendants Failed to Reinitiate Consultation in Violation of Section 7**

The ESA Section 7 imposes substantive and procedural requirements on "each Federal agency" concerning "any action authorized, funded, or carried out by such agency."  16 U.S.C. § 1536(a)(2).  Each agency must "insure" such actions are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species."  *Id.*  Procedurally, when an agency determines its action may affect an endangered or threatened species, it must engage in formal consultation with the Fish and Wildlife Service or the NMFS pursuant to 50 C.F.R. § 402.14.  Further, consultation must be reinitiated under certain circumstances such as when an agency's action is "subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not

United States District Court
Northern District of California

United States District Court
Northern District of California

1    considered in the BiOp." 50 C.F.R. § 402.16.  The duty to reinitiate consultation lies with both the

2    action agency and the consulting agency.  *Id.*

3         There is no dispute regarding Defendants' failure to reinitiate consultation in a timely

4    manner.  Defendants did not attempt to reinitiate consultation when they failed to comply with all

5    of the mandatory Reasonable and Prudent Measures of the 2008 incidental take statement—a

6    modification in their action that triggered the duty to reinitiate consultation under the ESA.  *See* 50

7    C.F.R. § 402.16.  Aware of the 2008 BiOp's expiration date in September 2023, NMFS met with

8    the Corps in February 2020 to begin discussion of a new consultation.  (Dkt. No. 51-1 ¶ 17.)  But,

9    the Corps did not request reinitiation of consultation until February 2023.  (*Id.* ¶ 18.)  The NMFS

10   was only able to formally commence the consultation on February 12, 2024, upon receiving all the

11   necessary information and well after the expiration of the 2008 BiOp.  (Dkt. No. 76-1 at 9.)  So,

12   Defendants also failed to reinitiate consultation promptly to ensure a new BiOp was issued before

13   the 2008 BiOp expired.  As such, Defendants failed to comply with the ongoing responsibilities

14   mandated by the ESA's Section 7 to insure their actions are "not likely to jeopardize the continued

15   existence of any endangered species or threatened species."  16 U.S.C. § 1536(a)(2).

16        Defendants do not dispute their failure to reinitiate consultation; instead, they urge

17   Plaintiff's Section 7 claim is moot because they reinitiated consultation on February 12, 2024.

18   (Dkt. Nos. 76 at 18, 76-1 ¶ 8.)  Defendants expect the consultation to be completed between June

19   26, 2024 and August 25, 2024, as there is a statutorily defined timeline of 135 days for the

20   consultation process, with a potential for a 60-day extension.  (Dkt. No. 76-1 ¶ 9.)

21        Defendants' mootness argument is unavailing.  The statutory timeline is aspirational, not

22   mandatory.  The statute leaves room for further extension upon agreement between the agencies.

23   50 C.F.R. § 402.14(e).  Defendants' own witness acknowledges a lack of certainty about the

24   timeline: "[a]lthough NMFS intends to meet this deadline [of completing the consultation between

25   June and August 2024], doing so is extremely challenging given the simultaneous, extensive

26   support required in response to this ongoing litigation."  (Dkt. No. 76-1 ¶ 10.)  Although

27   Defendants have formally reinitiated the consultation, uncertainty remains as to when (and if) a

28                                                    14

new BiOp or incidental take statement will be issued.  It is possible that if consultation is not completed by August, injunctive relief may be needed to address the takes likely to occur during the next rainy season, assuming appropriate injunctive relief is identified.

***

As it is not certain when reinitiation of consultation will be complete, and injunctive relief may be appropriate in the interim, Plaintiff's Section 7 claim is not presently moot as a matter of law.  There is no dispute as to Defendants' violation of the ESA Section 7.  The Court therefore GRANTS Plaintiff's motion for summary judgment on this claim.

## III.    Remedies

Plaintiff's Complaint seeks a declaratory judgment holding the Corps is engaging in unauthorized take in violation of Section 9.  (Dkt. No. 1 at 29.)  Plaintiff also seeks injunctive relief, including ordering Defendants to reinitiate consultation.  (*Id*.)  In light of the already-commenced re-consultation and the Court's previous order holding Plaintiff failed to propose an injunction closely tailored to the alleged harm (Dkt. No. 57 at 19-22), Plaintiff now requests the Court order the parties to further brief appropriate injunctive relief that can enforce the ESA and prevent harm to the protected salmonids pending completion of the consultation.  (Dkt. No 72 at 31.)

### A.    Reinitiating Consultation is Not the Only Appropriate Injunctive Relief for Plaintiff's Claims

Defendants urge the already commenced reinitiation of consultation is the appropriate remedy for both of Plaintiff's claims.  (Dkt. No. 76 at 24-27.)  They characterize Plaintiff's requested relief for his Section 7 claim as solely reinitiating consultation.  (*Id*. at 24.)  They also view Plaintiff's Section 9 claim as centrally about the Corps' failure to comply with the Reasonable and Prudent Measure No. 4, which renders any takes by their operations at Coyote Valley Dam unlawful.  (*Id*. at 25.)  Therefore, Defendants assert reinitiating consultation is the appropriate remedy for both of Plaintiff's claims because it allows the Corps, "with the expert wildlife agency, to reassess the effects of its modified action on listed species" and "as

appropriate, develop[] mitigation measures to avoid jeopardizing their continued existence." (*Id.* at 26.)

While leaving technical assessments to expert agencies aligns with the APA's mandated deference to agency decisions, *see* 5 U.S.C § 706(2), Defendants overlook other relief sought by Plaintiff. Plaintiff is seeking more than reinitiating consultation for his Section 7 claim—he also seeks restraints on Defendants' actions in the interim to avoid further jeopardizing the protected salmonids. Moreover, as discussed above, the consultation timeline is not mandatory for the agencies, so it is possible the consultation process will be delayed and extend into next year's flood season. Regarding the Section 9 claim, Defendants do not claim reinitiating consultation is the only remedy, but suggest the parties would not be able to devise appropriate injunctive relief targeting the alleged harm before a new BiOp is issued. (Dkt. Nos. 76 at 26, 78 at 18.) Indeed, the Court previously denied Plaintiff's request for a preliminary injunction because Plaintiff failed to propose an appropriate injunction. Plaintiff is still unable to specify his requested injunction, asking the Court instead to set aside the injunction's content for further briefing. (Dkt. No. 72 at 31.)

At oral argument, both parties agreed we are at the tail end of this year's flood season. If Defendants can produce a new BiOp and obtain an incidental take statement before the next flood season begins as they anticipate (Dkt. No. 76-1 ¶ 9), there is no reason for the Court to step into the shoes of the expert agencies to prematurely determine what is the best dam operation practice for the protected salmonids. At oral argument, Plaintiff also agreed there is no imminent need for injunction during the dry season when the Coyote Valley Dam will primarily be in water supply operations by Sonoma Water rather than flood control operations by the Corps.

So, the Court holds the injunctive relief consideration in abeyance. The Court will revisit this issue should Defendants fail to meet the statutory timeline—the timeline they intend to meet— of issuing a new BiOp by August 2024.

//

//

16

**B. Declaratory Judgment for Section 9 Claim Provides Effective Relief**

"The decision to grant declaratory relief is a matter of discretion." *U. S. v. State of Wash.*, 759 F.2d 1353, 1356 (9th Cir. 1985). "Declaratory relief should be denied when it will neither serve a useful purpose in clarifying and settling the legal relations in issue nor terminate the proceedings and afford relief from the uncertainty and controversy faced by the parties." *Id.* at 1357. Even when an injunction is rendered moot during litigation, a declaratory judgment does not become moot if it could provide effective relief. *See, e.g., Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1174–75 (9th Cir. 2002); *Forest Guardians v. Johanns*, 450 F.3d 455, 462 (9th Cir. 2006). Plaintiff seeks declaratory relief for his Section 9 claim. (Dkt. No. 77 at 30.) Defendants do not address Plaintiff's declaratory relief claim in their cross-motion.

In *Forest Guardians*, the plaintiff alleged the defendant violated the ESA Section 7 by failing to engage in formal consultation and sought declaratory judgment that the defendant violated the ESA and an injunction requiring the defendant to re-initiate consultation on the challenged allotments. 450 F.3d at 458-60. While the defendant reinitiated consultation after the plaintiff filed the suit and mooted the injunctive relief, the Ninth Circuit declined to hold the reinitiation of consultation mooted the declaratory relief. *Id.* at 462. The court reasoned the case involved a continuing practice and the defendant's non-compliance with the ESA requirements was "likely to persist despite the recent re-consultation," concluding a declaratory judgment would provide effective relief to ensure the defendant "does not continue to fail" to meet its responsibilities under the ESA. *Id.*

Here, as in *Forest Guardians*, Defendants' duties to reinitiate consultation and obtain an up-to-date BiOp and incidental take statement are continuing because (1) a BiOp may have a limited term like the 2008 BiOp and therefore may require renewal, and (2) Defendants must reinitiate consultation upon finding changes in their activities impacts on the protected salmonids. *See* 50 C.F.R. § 402.16. Therefore, a declaratory judgment can provide effective relief to help ensure Defendants meet their responsibilities under the ESA.

United States District Court
Northern District of California

1        Accordingly, the Court grants Plaintiff's request for declaratory relief and declares the

2   Corps violated the ESA's Section 9.

3                                    **CONCLUSION**

4        There is no dispute as to any material fact showing (1) Defendants' flood releases at the

5   Coyote Valley Dam cause unlawful takes of the protected salmonids in the Russian River, at least

6   by harassing them, and (2) Defendants failed to reinitiate consultation timely upon failing to

7   comply with the mandatory Reasonable and Prudent Measure No. 4 or in time to obtain a new

8   BiOp before the 2008 BiOp expired.  These actions are "not in accordance" with the ESA Section

9   9 and Section 7.

10       Accordingly, the Court (1) **DENIES** Defendants' motion for summary judgment; and (2)

11  **GRANTS** Plaintiff's motion for summary judgment on the merits.  As for remedies, the Court (a)

12  **DECLARES** the Corps is violating the ESA Section 9, and (b) **HOLDS** the injunctive relief

13  consideration **IN ABEYANCE** pending the completion of Defendants' reinitiated consultation or

14  further Court order.

15       The Court will hold a further case management conference by Zoom video on August 29,

16  2024 at 1:30 p.m. via Zoom video.  A joint case management conference statement is due August

17  22, 2024.

18       This Order disposes of Docket Nos. 72, 76.

19       **IT IS SO ORDERED.**

20  Dated: May 6, 2024

21

22

23                                    JACQUELINE SCOTT CORLEY
                                      United States District Judge
24

25

26

27

28

                                         18

*United States District Court*
*Northern District of California*