ELIZABETH B. FORSYTH (CA Bar No. 288311)
eforsyth@earthjustice.org
JANETTE K. BRIMMER (*Pro Hac Vice*)
jbrimmer@earthjustice.org
NOORULANNE JAN (*Pro Hac Vice*)
njan@earthjustice.org
Earthjustice
810 3rd Ave #610
Seattle, WA 98104
Tel: (206) 343-7340

GREGORY C. LOARIE (CA Bar No. 215859)
gloarie@earthjustice.org
SCOTT W. STERN (CA Bar No. 336427)
sstern@earthjustice.org
Earthjustice
50 California Street #500
San Francisco, CA 94111
Tel: (415) 217-2000

*Counsel for Plaintiffs Institute for Fisheries Resources*
*& Pacific Coast Federation of Fishermen's Associations*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INSTITUTE FOR FISHERIES RESOURCES; and PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS,<br><br>          Plaintiffs,<br><br>     v.<br><br>BRIDGESTONE AMERICAS TIRE OPERATIONS, LLC; CONTINENTAL TIRE THE AMERICAS, LLC; GITI TIRE (USA) Ltd.; THE GOODYEAR TIRE & RUBBER COMPANY, individually and as successor in interest to COOPER TIRE & RUBBER COMPANY; HANKOOK TIRE AMERICA Corp.; KUMHO TIRE U.S.A., Inc.; MICHELIN NORTH AMERICA, Inc.; NOKIAN TYRES Inc.; NOKIAN TYRES U.S. OPERATIONS LLC; PIRELLI TIRE LLC; SUMITOMO RUBBER NORTH AMERICA, Inc.; SUMITOMO RUBBER USA, LLC; TOYO TIRE HOLDINGS OF AMERICAS Inc.; and YOKOHAMA TIRE Corporation.<br><br>          Defendants. | Case No. 23-cv-05748-JD<br><br>**PLAINTIFFS' RESPONSE TO RULE 12(b)(1) MOTION TO DISMISS**<br><br>Hearing Date: July 25, 2024<br>Time: 10:00 AM<br>Courtroom: 11, 19th Floor<br>Judge: Hon. James Donato |

1

**INTRODUCTION**

2   Defendant U.S. tire manufacturers fail to demonstrate that Plaintiffs lack Article III

3 standing. In this Endangered Species Act ("ESA") case, commercial fishing families challenge

4 the unlawful "take" of protected salmon and trout species caused by Defendants' use of the tire

5 additive "6PPD," a chemical that by design transforms into 6PPD-quinone ("6PPD-Q"), the

6 second-most toxic chemical to aquatic life ever evaluated. A straightforward causal chain links

7 Defendants' intentional use of a fish-killing chemical with the downstream deaths of those fish

8 and the economic devastation of Plaintiff fishermen. Defendants make much of the "intervening

9 steps" supposedly separating their use of 6PPD from the injuries borne by Plaintiffs, but these

10 injuries flow directly and inexorably from Defendants' conduct. Plaintiffs have also carried the

11 undemanding burden of redressability, which requires only that they show their injuries would

12 likely be reduced to some extent by the requested relief. This Court could help relieve Plaintiffs'

13 injuries by, for example, crafting an injunction (i) facilitating Defendants' elimination of 6PPD

14 from the tires they manufacture/distribute, and/or (ii) ordering Defendants to minimize and

15 mitigate harm to salmonids during the time it takes to eliminate 6PPD. Plaintiffs clearly have

16 standing, and this Court should therefore deny Defendants' motion to dismiss.

17

**STANDARD OF REVIEW**

18   "For purposes of ruling on a motion to dismiss for want of standing," trial courts "accept

19 as true all material allegations of the complaint and must construe the complaint in favor of the

20 complaining party." *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011) (citation

21 omitted). "At the motion to dismiss stage, Article III standing is adequately demonstrated

22 through allegations of 'specific facts plausibly explaining' why the standing requirements are

23 met." *Strojnik v. 574 Escuela, LLC*, No. 3:18-CV-06777-JD, 2020 WL 1557434, at *2 (N.D. Cal.

24 Mar. 31, 2020) (quoting *Barnum Timber Co. v. EPA*, 633 F.3d 894, 899 (9th Cir. 2011)).[1]

25

**BACKGROUND**

26   Plaintiff Pacific Coast Federation of Fishermen's Associations ("PCFFA") is the largest

27

28

---

[1] Declarations supporting standing, while not required at the motion to dismiss stage, *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), have been provided for the Court's convenience.

commercial fishing industry trade association on the U.S. West Coast, representing approximately 750 family commercial ocean fishing businesses. PCFFA's sister organization, Plaintiff Institute for Fisheries Resources ("IFR"), is a 501(c)(3) nonprofit dedicated to fisheries conservation, restoration, research, and science. *See* First Am. Compl. ("FAC") ¶¶ 12–18, ECF No. 19. These organizations' members have watched with mounting alarm as populations of coho, Chinook, and steelhead plummeted all along the West Coast. Declaration of Glen H. Spain ("Spain Decl.") ¶¶ 12–13. The emptying fisheries have devastated Plaintiffs' members. "The lives of thousands of fishing-dependent families have become much more difficult as a result, as many have had to travel great distances to make their catch quotas . . . and nearly all struggled to bring in as many fish as they have in the past," states Glen Spain, Northwest Regional Director and General Legal Counsel for IFR and PCFFA. *Id.* ¶ 17. For instance, Joel Kawahara, who fishes for salmon in the Pacific Northwest, estimates that his income fell by *half* following the recent closure of the Chinook fishery in California and Oregon due to decimated population numbers. *See* Declaration of Joel Kawahara ("Kawahara Decl.") ¶ 9. The drastic decline in fish populations, adds David Bitts (a salmon fisherman for nearly fifty years), has resulted "in high anxiety and uncertainty . . . . I do not have a time during the year where I am not stressed about my financial future as a fisherman." Declaration of David Bitts ("Bitts Decl.") ¶ 10.

In 2020, however, fishing families received promising news: scientists identified the chemical that "was causing much of the mortality"—6PPD-Q from tires. Spain Decl. ¶ 13; *see also id.* Exs. A–C (scientific studies documenting link between 6PPD in tires and mortality of salmonids). With a culprit identified, the tire companies could eliminate this deadly substance. Four years later, however, Defendants still manufacture and distribute tires with 6PPD. This continued use of 6PPD, Kawahara explains, "bears significant responsibility" for the plummeting salmonid populations. Kawahara Decl. ¶ 12; *see also* FAC ¶¶ 83–84, 96–98, 105–06 (alleging causation). He has read about the toxicity of 6PPD and 6PPD-Q to salmonids and personally witnessed the discharge of road runoff into a creek in which he and others were attempting—without success—to hatch coho eggs, a failure he attributes to the runoff "containing 6PPD/6PPD-q." Kawahara Decl. ¶¶ 12–13. "What this means," Kawahara continues, "is that

1 | many, many fishermen have left fishing for other livelihoods. The boats have been sold or
2 | abandoned. The entire community has been severely depleted." *Id*. ¶ 11.

3 |     Plaintiffs thus turn to this Court for relief, seeking an injunction compelling Defendants
4 | to stop imperiling the lives of salmonids and the livelihoods of fishing families. As Kawahara
5 | concludes, "If tire companies ceased to include 6PPD in all of their tires, that would eventually
6 | result in less 6PPD in road runoff and therefore less 6PPD in aquatic environments, giving
7 | imperiled Chinook and Coho—and therefore salmon trollers—a fighting chance." *Id*. ¶ 14.

8 | **ARGUMENT**

9 |     Plaintiffs have properly pled Article III standing. Plaintiffs have alleged specific facts
10 | establishing that their members have been injured by Defendants' inclusion of 6PPD in tires,
11 | which has been linked to declining salmon harvests. *See* FAC ¶¶ 12–23; Declaration of Sarah
12 | Jane Bates ("Bates Decl.") ¶¶ 6–8; Bitts Decl. ¶ 7; Kawahara Decl. ¶¶ 7–9, 11; Spain Decl. ¶¶
13 | 17–23 & Exs. A–C. Plaintiffs have also alleged these injuries are fairly traceable to Defendants'
14 | inclusion of 6PPD in tires because this chemical's inclusion in tires foreseeably harms and kills
15 | salmon. *See* FAC ¶¶ 83–84, 96–98, 105–06; Bates Decl. ¶¶ 10–11; Bitts Decl. ¶ 9; Kawahara
16 | Decl. ¶¶ 12–13; Spain Decl. ¶¶ 14, 18, 22. Finally, Plaintiffs have alleged this Court can redress
17 | Plaintiffs' injuries by ordering Defendants either to cease including this chemical in tires or to
18 | minimize and mitigate such harm to the maximum extent practicable, including by obtaining a
19 | permit under Section 10 of the ESA. *See* FAC ¶¶ 23, 108–09; Bates Decl. ¶ 12; Bitts Decl. ¶ 11;
20 | Kawahara Decl. ¶ 14; Spain Decl. ¶¶ 24–26. These allegations adequately demonstrate standing.

21 |     **A.**    **Plaintiffs' injuries are fairly traceable to Defendants' actions.**

22 |     Defendants' assertions regarding the "fairly traceable" element of standing lack merit. To
23 | meet this element, Plaintiffs have properly "show[n] a predictable chain of events leading from
24 | the [challenged conduct] to the asserted injury." *FDA v. All. for Hippocratic Med.*, Nos. 23-235
25 | & 23-236, slip op. at 12 (S. Ct. June 13, 2024); *see also Brill v. Chevron Corp.*, No. 15-cv-
26 | 04916-JD, 2017 WL 76894, at *2 (N.D. Cal. Jan. 9, 2017) (finding traceability where plaintiffs
27 | alleged "a causal connection between the injury and the conduct complained of showing that the
28 | injury is the product of the challenged action of the defendant" (cleaned up)). Notably, for

purposes of Article III standing, defendants' actions need not be "the 'proximate cause' of plaintiffs' injuries. It is sufficient to 'establish a line of causation between defendants' action and their alleged harm that is more than attenuated,' and a causal chain 'does not fail simply because it has several links, provided those links are not hypothetical or tenuous and remain plausible.'" *Brill*, 2017 WL 76894, at *3 (quoting *Maya*, 658 F.3d at 1070). Even a "rather thin chain of causation" can be sufficient. *Id.*; *see also Env't Def. Ctr. v. EPA*, 344 F.3d 832, 867 (9th Cir. 2003) (causal chain must be "probable," not "definitively established").

Here, the causal chain is clear. Plaintiffs have alleged that "Defendants' use of 6PPD in tires . . . causes prespawn mortality and harmful sublethal effects in salmonids," which constitutes unlawful "taking" prohibited by ESA Section 9. FAC ¶ 19; *see also id.* ¶¶ 101–03. Plaintiffs have alleged that Defendants include 6PPD in all of the tires they manufacture and/or distribute, *see id.* ¶¶ 25–54, 77, and that precipitation transports this 6PPD (and its transformation product, 6PPD-Q) "into aquatic environments," *Id.* ¶¶ 79, 96. Indeed, Plaintiffs have alleged that "the source of 6PPD-q in aquatic environments is from tires." *Id.* ¶ 84. Plaintiffs have additionally alleged that in aquatic environments 6PPD-Q causes the deaths of protected salmonids. *See id.* ¶¶ 76–79, 81–85. Thus, Plaintiffs' complaint establishes a clear causal link tracing the unlawful harm and harassment (i.e., "take") of protected salmonids to Defendants' inclusion of 6PPD in tires. *See* ¶¶ 105–07. Previously, this Court appropriately denied Defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), finding "[t]he complaint plausibly alleges a claim under [ESA] Section 9." *See* Civil Mins., ECF No. 123, May 16, 2024. Such a claim necessarily alleges that Defendants' conduct is the proximate cause of Plaintiffs' injuries. *See San Luis Obispo Coastkeeper v. Santa Maria Valley Water Conservation Dist.*, 49 F.4th 1242, 1246 (9th Cir. 2022). Because Plaintiffs have already made allegations sufficient to meet the higher bar of proximate cause, Defendants' present argument that Plaintiffs fail to meet the lower bar of traceability necessarily fails.

Defendants argue that Plaintiffs' causal chain "is simply too attenuated," purporting to identify "more than a dozen intervening steps." Defs. Rule 12(b)(1) Mot. to Dismiss ("MTD"), at 7. This is unconvincing; any system of cause-and-effect can be made to sound lengthy when

described in pedantic detail. Besides, "what matters is not the length of the chain of causation, but rather the plausibility of the links that comprise the chain." *Mendia v. Garcia*, 768 F.3d 1009, 1012–13 (9th Cir. 2014) (cleaned up). Here, each of the links in Plaintiffs' chain is eminently plausible, a conclusion illustrated by analogous precedent from this district. In *S.F. Herring Ass'n v. Pac. Gas & Elec. Co.*, 81 F. Supp. 3d 847, 854, 858 (N.D. Cal. 2015), the court found traceability where fishermen alleged that waste produced by gas plants entered groundwater, which then flowed into stormwater, which was washed into the Bay through outfall pipes, which then weakened herring and killed off fertilized eggs, which negatively affected "the pelagic food web," which harmed fishermen's livelihoods. The harm to salmonids and fishermen from 6PPD-Q in stormwater is similarly traceable to Defendants' use of 6PPD in their tires.

Nor does it matter that "third parties" play some role in stormwater management and transportation. MTD at 7. Traceability does not require that Defendants' actions be the sole source of injury, and Plaintiffs "need not eliminate any other contributing causes to establish its standing." *Barnum Timber Co*., 633 F.3d at 901. Traceability demands merely that it be "sufficiently predictable how third parties would react . . . or cause downstream injury to plaintiffs." *All. for Hippocratic Med.*, slip op. at 11. Plaintiffs in ESA Section 9 cases routinely show causation "even though the actions or inactions of those third parties not before the court may be another cause of the harm." *Loggerhead Turtle v. Cnty. Council of Volusia Cnty*., 148 F.3d 1231, 1253 (11th Cir. 1998) (internal quotations omitted).[2] In this case, it is predictable that third parties will "buy and install" Defendants' tires. MTD at 7. And it is predictable that 6PPD-Q from these tires will enter aquatic habitats and harm fish; runoff often enters salmonid habitat without passing through stormwater treatment facilities, *see, e.g.*, Kawahara Decl. ¶¶ 12–13, and even stormwater treatment does not generally remove 6PPD-Q, *see* FAC ¶ 95.

---

[2] *See also Wild Fish Conservancy v. Thom*, No. C20-417-RAJ-MLP, 2021 WL 8445587, at *9 (W.D. Wash. Sept. 27, 2021) (finding causation even where "there are several environmental and third-party factors that have contributed to the population decrease for . . . Chinook salmon," because more Chinook "would otherwise be available" to plaintiffs "absent" defendants' conduct); *Coho Salmon v. Pac. Lumber Co*., 61 F. Supp. 2d 1001, 1013 (N.D. Cal. 1999) (rejecting argument that plaintiffs lacked standing on the basis that "the reduction of coho salmon is attributable to a variety of factors other than [defendant's] operations").

1    Because Plaintiffs have alleged that Defendants' use of 6PPD in tires unlawfully takes

2    salmonids and therefore harms members' livelihoods, Plaintiffs have established causation.

3          **B.      Plaintiffs' injuries are redressable.**

4          Defendants' redressability arguments are equally meritless. The redressability element is

5    an "undemanding burden." *Ocean Advocs. v. Army Corps of Eng'rs*, 402 F.3d 846, 861 (9th Cir.

6    2005). Plaintiffs need only show that their asserted injury "would be reduced to some extent" by

7    the requested relief. *Massachusetts v. EPA*, 549 U.S. 497, 526 (2007); *see also Cal. Sea Urchin*

8    *Comm'n v. Bean*, 239 F. Supp. 3d 1200, 1206 (C.D. Cal. 2017) (environmental plaintiff's injury

9    would be redressed if "a favorable verdict will constitute a meaningful step towards remedying

10   the alleged harm"). Moreover, a plaintiff need only show that such redress would "likely" result

11   from a favorable court order, "not that a favorable decision will inevitably redress his injury."

12   *Beno v. Shalala*, 30 F.3d 1057, 1065 (9th Cir. 1994) (emphasis omitted).

13         Here, Plaintiffs' injuries "are redressable by this Court, because this Court has the

14   authority to enjoin Defendants' continued unlawful take of endangered and threatened

15   salmonids." FAC ¶ 23; *see also* 16 U.S.C. § 1540(g)(1). "A plaintiff who seeks injunctive relief

16   satisfies the requirement of redressability by alleging a continuing violation or the imminence of

17   a future violation of an applicable statute or standard . . . . Because they [seek] an injunction to

18   halt those continuing violations, Plaintiffs satisf[y] the requirement of redressability." *Nat. Res.*

19   *Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 995 (9th Cir. 2000); *see also All. for Hippocratic*

20   *Med.*, slip op. at 8 ("If a defendant's action causes an injury, enjoining the action . . . will

21   typically redress that injury."). An injunction in this case could take many forms, including an

22   order enjoining Defendants to phase out or eliminate 6PPD from tires and/or mitigate the harm

23   resulting from 6PPD (by, for instance, funding stormwater infrastructure that can stop 6PPD-Q

24   from entering salmonid habitat). *See* FAC ¶ 109; Spain Decl. ¶ 24. Were this Court to award

25   such injunctive relief, the quantity of 6PPD-Q that is transported by runoff into aquatic

26   environments would fall significantly, reducing harm to protected salmonids.

27         Defendants provide a single sentence to support their claim that such an injunction would

28   not redress Plaintiffs' injury: "Redress would still depend on the unfettered choices made by

independent actors not before the courts—namely, the roadway operators, stormwater managers, and each person who continues to drive a motor vehicle on the roadways." MTD at 9 (internal quotations omitted). This is irrelevant. Redressability does not require a plaintiff "to solve all roadblocks simultaneously"—rather, a plaintiff may seek "to tackle one roadblock at a time." *Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 993 (9th Cir. 2012). Eliminating or even reducing the amount of 6PPD in tires (or mitigating its transportation by runoff) would address the overwhelming source of 6PPD in salmonid habitat; it would "reduce[] to some extent" Plaintiffs' injury. *Massachusetts*, 549 U.S. at 526. Defendants do not claim otherwise. Indeed, because Defendants' tires make up the overwhelming majority of the U.S. tire market, *see* FAC ¶ 24, and because Defendants include 6PPD in all of their tires, *see* FAC ¶¶ 25–54, 77, the injury to the protected salmonids (and thus to Plaintiffs' interests in these salmonids) would be *substantially* remedied if this Court compelled Defendants to stop using 6PPD in tires or otherwise minimize and mitigate the harm from their use of 6PPD.[3]

Defendants' claim that such redress would "paralyze the country's transportation system," MTD at 8, is unsubstantiated fearmongering. Defendants provide *no* evidence to support this claim. To the contrary, Defendants' own trade association has already identified five potential replacements for 6PPD: 7PPD, IPPD, 77PD, CCPD, and specialized graphene. *See* Declaration of Susan Smith ("Smith Decl.") Ex. A, at ES-2. Further, while a court faced with an

---

[3] For this reason, it is likewise irrelevant to the redressability analysis whether Plaintiffs' "injury will continue for years." MTD at 8. "Because of the enormity of the potential consequences associated with" Defendants' continued inclusion of 6PPD in tires, "the fact that the effectiveness of a remedy might be delayed during the (relatively short) time it takes for a new motor-vehicle fleet to replace an older one is essentially irrelevant." *Massachusetts*, 549 U.S. at 525 (case involving greenhouse gas emissions from motor vehicles); *see also Sierra Club v. Franklin Cnty. Power of Ill., LLC*, 546 F.3d 918, 927–28 (7th Cir. 2008) (plaintiff's injury would be redressed by order requiring more stringent emissions controls, even though defendant would likely be allowed to continue polluting). Nor does it matter that Plaintiffs' requested relief will not immediately restore all imperiled salmonid populations. *See Coho Salmon v. Pac. Lumber Co.*, 30 F. Supp. 2d 1231, 1243 (N.D. Cal. 1998) (rejecting defendants' claim that plaintiffs' injuries are not redressable because a favorable order "is not certain to 'result in the increased coho salmon population'"). "While it is without question that plaintiffs would like to see increased coho salmon populations in the watersheds at issue, at root, the organizations seek only to . . . halt[] the illegal 'takes' caused by [Defendants'] activities." *Id.* at 1244.

ESA Section 9 violation does not have discretion to decline to order injunctive relief, *see Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 193–94 (1978), the court enjoys "broad latitude" in *fashioning* that relief, clothed with the authority not merely to "declare that [a statutory] requirement exists and repeat that it must be followed," but rather to craft "equitable measures [that] are reasonably calculated to remedy an established wrong," *Nat. Res. Def. Council*, 236 F.3d at 1000–01 (internal quotations omitted). In addition to ordering Defendants to eliminate 6PPD from their tires, this Court has broad latitude to craft an injunction ordering Defendants to mitigate 6PPD's harms during the time it takes to achieve complete elimination.[4]

Casting about for an alternative basis for dismissal, Defendants devote most of their redressability argument to asserting their supposed "ineligibility" for ESA Section 10 incidental take permits ("ITPs"). MTD at 9–12. ITPs allow a party engaged in "otherwise lawful activity" that results in an "incidental" taking of ESA-listed species to nonetheless undertake that activity so long as that party submits a Habitat Conservation Plan ("HCP") detailing how they "will, to the maximum extent practicable, minimize and mitigate the impacts of such taking" and commits to providing "adequate funding" for the HCP. 16 U.S.C. § 1539(a); *see also* 50 C.F.R. § 222.307. However, even if Defendants *were* ineligible for ITPs, that would not deprive Plaintiffs of standing because another form of redress—injunctive relief compelling Defendants to cease take, as discussed above—remains available. This alone satisfies the redressability element. *See Aransas Proj. v. Shaw*, 835 F. Supp. 2d 251, 259–61 (S.D. Tex. 2011) (finding redressability where there was a "range" of "equitable remedies" the court could order to reduce take, just "one" of which was ordering defendants to start "the process for development of [an HCP]").

Moreover, Defendants fail to show their "ineligibility" for ITPs. The ITP process is

---

[4] *See, e.g.*, *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 823–24 (9th Cir. 2018) (holding that district court did not abuse its broad equitable discretion under ESA Section 9 where it "ordered the parties to develop a spill operation plan" to mitigate harm to salmonids "and gave them a year of lead time to do so" even if "uncertainty" remained about the "benefits" of the ordered action and the action did "not completely prevent" the identified harm); *Wishtoyo Found. v. United Water Conservation Dist.*, No. CV-16-3869-DOC (PLAx), 2018 WL 6265099, at *69–74 (C.D. Cal. Sept. 23, 2018) (ordering defendant to cease taking steelhead "without [ESA] take authorization" and to "implement an adaptive management monitoring system" and design long-term steelhead passage infrastructure).

PLS.' RESP. TO RULE 12(B)(1)
MOT. TO DISMISS
CASE NO. 23-cv-05748-JD

meant to be flexible. Congress intended for regulators to "encourage *creative* partnerships between the public and private sectors and among governmental agencies in the interest of species and habitat conservation," utilizing their ITP authority "[*t*]*o the maximum extent possible.*" H.R. Rep. No. 97-835, at 30 (1982) (emphases added). The very guidance document on which Defendants rely states that "flexibility, ingenuity, [and] innovation . . . are key to developing effective HCPs and resolving complex and controversial issues that may arise." Declaration of Scott W. Stern ("Stern Decl.") Ex. A, at 1-2. Reflecting this flexibility, project proponents regularly receive ITPs predicated on funding a wide variety of mitigation measures.[5] Here, a tire company's ITP could be predicated on the funding of stormwater buffers, habitat restoration, or "the green infrastructure necessary to remove the 6PPD-Q produced from their tires before it enters aquatic habitats." Spain Decl. ¶ 25; *see also id.* Exs. E–G (scientific studies).

Defendants ignore all of this, instead premising their purported "ineligibility" on an unpersuasive interpretation of nonbinding agency guidance providing advice to landowners.[6] Glossing this guidance, they first claim that they cannot be required to pursue an ITP because, "[a]s pled," the harm to salmonids from 6PPD "results from an activity that is not 'otherwise lawful.'" MTD at 9. This assertion—that the illegality of Defendants' conduct immunizes them from suit to remedy the consequences of that conduct—is nonsensical. If anything, illegality would make injunctive relief *more* necessary. Defendants next claim they "are ineligible for ITPs because they do not have the requisite legal control over the stormwater, the discharges, or the

---

[5] *See, e.g., Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 202 F. Supp. 2d 594, 610–19, 622 (W.D. Tex. 2002) (describing ITP predicated on "the perpetual preservation of eight caves on five off-site karst preserves totaling 179 acres with the preservation measures . . . to include: routine inspections, vegetation and habitat management, red-imported fire ant control, fencing, signage, cave-gating, control of mammals, surface and subsurface monitoring, and other measures," such as "funding outreach and research programs"); Stern Decl. Ex. B, at 51–53, 96–97 (prescribing the creation of an offsite seabird preserve, at which proponents will fund "predator proof fencing, predator eradication and the implementation of social attraction").

[6] Defendants also provide a declaration from a former regional director of the U.S. Fish & Wildlife Service, similarly relying on this guidance. *See* Declaration of Leopoldo Miranda-Castro ¶¶ 10, 14. Yet the National Marine Fisheries Service, not USFWS, is the agency that considers HCPs/ITPs for coho, Chinook, and steelhead. *See* FAC ¶ 64. No Defendant claims to have consulted with NMFS at all. Stern Decl. Ex. C. Defendants' claims of "ineligibility" thus ring hollow, a situation they cannot remedy by relying on former staff from the wrong agency.

dischargers." MTD at 10. Again, this unduly literal reading of nonbinding agency guidance entirely ignores statutory and regulatory text—notably, the word "control" appears not once in 16 U.S.C. § 1539(a) or 50 C.F.R. §§ 222.307, 224.102—as well as the hallmark flexibility of the ITP process. In fact, the Services utilize this flexibility to *routinely* approve ITPs where the permittee lacks the kind of control Defendants claim to be paramount.[7]

Finally, Defendants argue "the HCP/ITP process" simply does not "apply to manufacture and distribution of a consumer product like tires." MTD at 11. Defendants' support for this claim is again a single quotation from nonbinding agency guidance. *Id*. Even so, Defendants take this quote out of context; they claim "[a] party can only apply for an ITP 'if they are conducting (or planning to conduct) any type of activity in an area where ESA-listed species are known to occur[.]'" *Id*. (quoting HCP Handbook) (emphasis omitted). Yet the full quotation makes clear this is merely advice, not a requirement for an ITP: "A landowner or project proponent *should be advised* to develop an HCP and seek an incidental take permit if they are conducting (or planning to conduct) any type of activity in an area where ESA-listed species are known to occur[.]" Smith Decl. Ex. F, at 3-2 (emphasis added). In fact, just two sentences later the Handbook states: "[I]f a landowner or project proponent's activities will potentially impact an ESA-listed species, they should be advised to . . . seek an incidental take permit for take anticipated from their activities[.]" *Id*. What matters for an ITP is thus whether a proponent will harm an ESA-listed species, not whether the project is *in* protected habitat.[8] Defendants fail to show their "ineligibility" for ITPs, much less the absence of redressability.

## CONCLUSION

In sum, Plaintiffs' allegations are sufficient to establish standing. The Court should deny Defendants' motion.

---

[7] For instance, the Washington Department of Natural Resources recently received an ITP for activities likely to harm bull trout despite a finding that "[b]ull trout are . . . affected by factors beyond the control of WSDNR." Stern Decl. Ex. D, at 6; Similarly, a court upheld an ITP conditioned on the proponent funding the purchase and maintenance of "conservation land . . . off-site," the actual purchase and maintenance of which was delegated to an independent organization. *Nat'l Wildlife Fed'n v. Norton*, 306 F. Supp. 2d 920, 922–23 (E.D. Cal. 2004).

[8] *See* Stern Decl. Ex. E, at 1 (HCP addressing project activities "upstream" of salmonid habitat).

1   DATED this 27th day of June, 2024,

2                               */s/* Scott W. Stern
                                SCOTT W. STERN (CA Bar No. 336427)
3                               sstern@earthjustice.org
                                GREGORY C. LOARIE (CA Bar No. 215859)
4                               gloarie@earthjustice.org
                                Earthjustice
5                               50 California Street #500
                                San Francisco, CA 94111
6                               Tel: (415) 217-2000
7
8                               ELIZABETH B. FORSYTH (CA Bar No. 288311)
                                eforsyth@earthjustice.org
9                               JANETTE K. BRIMMER (*Pro Hac Vice*)
                                jbrimmer@earthjustice.org
10                              NOORULANNE JAN (*Pro Hac Vice*)
                                njan@earthjustice.org
11                              Earthjustice
                                810 3rd Ave #610
12                              Seattle, WA 98104
                                Tel: (206) 343-7340
13
14
15                              *Counsel for Plaintiffs Institute for Fisheries*
                                *Resources and Pacific Coast Federation of*
16                              *Fishermen's Associations*
17
18
19
20
21
22
23
24
25
26
27
28