1  ELIZABETH B. FORSYTH (CA Bar No. 288311)
   eforsyth@earthjustice.org
2  JANETTE K. BRIMMER (*Pro Hac Vice*)
   jbrimmer@earthjustice.org
3  NOORULANNE JAN (*Pro Hac Vice*)
   njan@earthjustice.org
4  Earthjustice
   810 3rd Ave #610
5  Seattle, WA 98104
   Tel: (206) 343-7340
6

7

8  GREGORY C. LOARIE (CA Bar No. 215859)
   gloarie@earthjustice.org
9  SCOTT W. STERN (CA Bar No. 336427)
   sstern@earthjustice.org
10 Earthjustice
   50 California Street #500
11 San Francisco, CA 94111
   Tel: (415) 217-2000
12

13 *Counsel for Plaintiffs Institute for Fisheries Resources*
   *& Pacific Coast Federation of Fishermen's Associations*
14

15                UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF CALIFORNIA

16 INSTITUTE FOR FISHERIES RESOURCES; and          Case No. 23-cv-05748-JD
17 PACIFIC COAST FEDERATION OF FISHERMEN'S
   ASSOCIATIONS,
18
                 Plaintiffs,                        **DECLARATION OF SCOTT**
19                                                  **W. STERN IN SUPPORT OF**
        v.                                          **PLAINTIFFS' RESPONSE TO**
20                                                  **RULE 12(b)(1) MOTION TO**
   BRIDGESTONE AMERICAS TIRE OPERATIONS,            **DISMISS**
21 LLC; CONTINENTAL TIRE THE AMERICAS, LLC;
   GITI TIRE (USA) Ltd.; THE GOODYEAR TIRE &
22 RUBBER COMPANY, individually and as successor in
   interest to COOPER TIRE & RUBBER COMPANY;
23 HANKOOK TIRE AMERICA Corp.; KUMHO TIRE
   U.S.A., Inc.; MICHELIN NORTH AMERICA, Inc.;
24 NOKIAN TYRES Inc.; NOKIAN TYRES U.S.
   OPERATIONS LLC; PIRELLI TIRE LLC;
25 SUMITOMO RUBBER NORTH AMERICA, Inc.;
   SUMITOMO RUBBER USA, LLC; TOYO TIRE
26 HOLDINGS OF AMERICAS Inc.; and YOKOHAMA
   TIRE Corporation.
27
                 Defendants.
28

DECLARATION OF SCOTT W. STERN
CASE NO. 23-cv-05748-JD

I, SCOTT W. STERN, state and declare as follows:

1.      I am an associate attorney at Earthjustice and an attorney of record for Plaintiffs Institute for Fisheries Resources and Pacific Coast Federation of Fishermen's Associations.

2.      I am admitted to practice law in the State of California and in the United States District Court for the Northern District of California.

3.      I have personal knowledge of the facts contained in this declaration. I submit this declaration in support of Plaintiffs' response to Defendants' Rule 12(b)(1) motion to dismiss.

4.      Attached hereto as **Exhibit A** is a true and correct copy of excerpts from U.S. Fish and Wildlife Serv. & Nat'l Marine Fisheries Serv., *Habitat Conservation Planning and Incidental Take Permit Processing Handbook* (2016), a full copy of which is publicly available at https://www.fws.gov/sites/default/files/documents/habitat-conservation-planning-handbook-entire_0.pdf.

5.      Attached hereto as **Exhibit B** is a true and correct copy of excerpts from State of Hawaiʻi, Kauaʻi Seabird Habitat Conservation Plan (Dep't of Land & Nat. Res. May 20, 2020), a full copy of which is publicly available at https://dlnr.hawaii.gov/wildlife/files/2021/03/FINAL_KSHCP.pdf.

6.      Attached hereto as **Exhibit C** is a true and correct copy of excerpts of Defendants' responses to Plaintiffs' first set of Interrogatories and Requests for Production, specifically each Defendants' responses to Interrogatory 17 and Request for Production 11. Interrogatory 17 asked Defendants to identify and describe any communications with representatives of National Marine Fisheries Service ("NMFS") or National Oceanic and Atmospheric Administration ("NOAA") "regarding tire leachate, 6PPD, 6PPD-Q, or salmonids since January 1, 1975." Request for Production 11 asked Defendants to provide any "[a]ny [Habitat Conservation Plan ("HCP")] you have proposed for your tires within the last 10 years, including all drafts thereof." As the excerpts show, no Defendant identified or described any communications with NMFS or NOAA, and no Defendant provided any HCP for their tires.

7.      Attached hereto as **Exhibit D** is a true and correct copy of U.S. Fish and Wildlife Serv., Incidental Take Permit TE812521-1 (Nov. 14, 2019), which is publicly available at https://www.dnr.wa.gov/publications/lm_mm_usfws_new_incidental_take_permit.pdf.

8.      Attached hereto as **Exhibit E** is a true and correct copy of excerpts of Sierra Pacific Land & Timber Co., Habitat Conservation Plan and Safe Harbor Agreement for Seven Anadromous Fish Populations (Sierra Pacific Industries, May 23 2023), a full copy of which is publicly available at https://spi-ind.com/pdf_forests/SPL&T%20HCP-SHA%2005262020%20updated%2005232023.pdf.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 27th day of June, 2024, in Oakland, California.

/s/ Scott W. Stern
Scott W. Stern

# Exhibit A

# HABITAT CONSERVATION PLANNING

# AND

# INCIDENTAL TAKE PERMIT PROCESSING

# HANDBOOK



December 21, 2016

U.S. Department of the Interior
Fish and Wildlife Service

U.S. Department of Commerce
National Oceanic and Atmospheric Administration
National Marine Fisheries Service

# Chapter 1: Introduction

**1.1     Purpose of the HCP Program**
**1.2     Evolution of the HCP Program**
         *1.2.1 Added Regulations and Policies*
         *1.2.2 Successes of the HCP Program*
         *1.2.3 Lessons Learned*
**1.3     Laws and Other Requirements Related to the HCP Program**
         *1.3.1 Relationship and Hierarchy*
         *1.3.2 Endangered Species Act*
         *1.3.3 National Environmental Policy Act*
         *1.3.4 National Historic Preservation Act*
         *1.3.5 Administrative Procedure Act*
         *1.3.6 Tribal Consultation and the ESA*
         *1.3.7 Other Related Process Laws*
         *1.3.8 A List of Related Natural Resource Laws*
**1.4     How to Use the HCP Handbook**
         *1.4.1 Purpose of the Handbook*
         *1.4.2 Organization of the Handbook*
         *1.4.3 Tips for Using the HCP Handbook*

_____

## 1.1 Purpose of the Habitat Conservation Plan Program

The purpose of the Endangered Species Act of 1973 (see the HCP Handbook Toolbox), as amended (ESA), is to protect and recover threatened and endangered species and the ecosystems upon which they depend. The U.S. Congress found that some species of fish, wildlife, and plants are now extinct "as a consequence of economic growth and development untempered by adequate concern and conservation" (section 2(a)(1) of the ESA). They also found that other species are in danger of extinction. Additionally, Congress held that species have aesthetic, ecological, educational, historical, recreational, and scientific value and pledged to conserve species facing extinction. Consequently, Congress passed the ESA to "…provide a means whereby the ecosystems upon which [endangered and threatened] species depend may be conserved, to provide a program for the conservation of such...species" (section 2(b) of the ESA). The ESA specifically defines conservation as "…to use and the use of all methods and procedures which are necessary to bring any [listed] species to the point at which the measures provided pursuant to this Act are no longer necessary" (section 3(3) of the ESA).

Section 9 of the ESA prohibits take of any fish or wildlife species listed as endangered. Take is defined in section 3 as "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." The U.S. Fish and Wildlife Service (FWS) determined that all of the prohibitions that apply to endangered species would also apply to threatened species, unless otherwise provided for through a special rule under section 4(d) of the ESA (42 FR 4656; 50 CFR 17.31(a)) (see the HCP Handbook Toolbox). The National Marine Fisheries Service (NMFS) does not have such a regulation, so it issues separate protective regulations specifying prohibitions of take for each threatened species under its jurisdiction. (We

refer to these two agencies collectively as "the Services" in the rest of this Handbook. We use the appropriate acronym when the discussion is applicable only to one specific agency.)

Before 1982, the ESA did not have mechanisms for exempting take prohibitions from Federal or non-Federal activities, except for permits to authorize take from scientific research or certain other conservation actions. Congress recognized the need for a process to reduce conflicts between listed species and economic development, so it amended the ESA in 1982 to add an exemption for incidental take of listed species that would result from non-Federal activities (section 10(a)(1)(B)). Incidental take is that which is incidental to, and not the purpose of, carrying out an otherwise lawful activity.

To obtain a permit for such take under this provision, an applicant must develop a conservation plan that meets specific requirements identified in section 10(a)(2)(A) of the ESA and its implementing regulations at 50 CFR 17.22 (endangered species) and 17.32 (threatened species), and 50 CFR 222.25, 222.27, and 222.31 (see the HCP Handbook Toolbox). Among other requirements, the plan must specify the impacts that are likely to result from the taking, the measures the permit applicant will undertake to minimize and mitigate such impacts, and the funding that will be available to implement such measures. Conservation plans under section 10(a)(1)(B) have come to be known as "habitat conservation plans" or "HCPs" for short. Although "HCPs" is most commonly used in this Handbook, we may use these terms interchangeably on occasion. Section 10(a)(2)(B) of the ESA sets forth the statutory criteria that must be satisfied before an incidental take permit can be issued.

Congress intended the HCP program to address listed and at-risk species in an ecosystem context, generate long-term commitments to conserve such species, and deliver regulatory assurances to project proponents. Congress also envisioned the HCP program as an opportunity to establish "creative partnerships" between the public and private sectors and State, municipal, and Federal agencies to conserve endangered and threatened species and their habitats (H.R. Rep. No. 97-835 (1982)) (see the HCP Handbook Toolbox). Congress intended the HCP program to function not only to authorize incidental take, but also as a process to integrate non-Federal development and land-use activities with conservation goals, resolve conflicts between protection of listed species and economic activities on non-Federal lands, and create a climate of partnership and cooperation.

In that spirit, the Services should encourage permit applicants and partners to use Congress' intent as the foundation for working together to develop an HCP. Collaboration, flexibility, ingenuity, innovation, and thoughtful planning are key to developing effective HCPs and resolving complex and controversial issues that may arise.

Congress also intended that HCPs include, when possible, conservation measures for candidate species, proposed species, and other species not listed under the ESA at the time an HCP is developed. Covering species likely to be listed within the term of the permit can benefit the permittee by ensuring the terms of an HCP will not need to be changed over time with subsequent species listings. It can also provide early protection for many species and, ideally, prevent subsequent declines and in some cases the need to list such species.

# Exhibit B

# Kauaʻi Seabird Habitat Conservation Plan

**State of Hawaiʻi**
**Department of Land and Natural Resources,**
**Division of Forestry and Wildlife**

**May 20, 2020**

## Executive Summary

Three listed seabird species breed seasonally in Hawaiʻi: the Newell's Shearwater (*Puffinus auricularis newelli*, Hawaiian name: ʻaʻo), the Hawaiian Petrel (*Pterodroma sandwichensis*, Hawaiian name: ʻuaʻu), and the Hawaiʻi distinct population segment (DPS) of the band-rumped storm-petrel (*Oceanodroma castro*, Hawaiian name: ʻakēʻakē, hereafter band-rumped storm-petrel), making the islands essential to the conservation of these species. These species are part of the unique natural and cultural heritage of Hawaiʻi, and the island of Kauaʻi provides important breeding habitat for all three species. Protecting and managing that habitat to support viable populations of these species is critical for their long-term survival.

Among the threats known to impact the listed seabird species is attraction to artificial lights, which has been observed and documented on Kauaʻi for decades. The Kauaʻi Seabird Habitat Conservation Plan (KSHCP) has been developed to address light attraction impacts to the listed seabirds on the island of Kauaʻi. The KSHCP also addresses the impacts of lights on the Central North Pacific distinct population segment (DPS) of the green sea turtle (*Chelonia mydas*, Hawaiian name: honu, hereafter honu). The proposed duration of the KSHCP is for 30 years and the geographic scope of the KSHCP coverage is the island of Kauaʻi.

Seabird attraction to artificial lights is a commonly-observed phenomenon affecting petrel and shearwater species around the world, in many cases negatively altering their behavior. Fledgling seabirds are more affected by light attraction than adult seabirds, although adult birds also demonstrate altered behavior in the presence of unshielded lights, particularly near breeding colonies. At night, as the fledglings make their first flight from nesting sites to the sea, artificial lights degrade and impact their migratory corridor habitat. In the presence of light, the seabirds circle repeatedly and can become exhausted and often grounded as a result (commonly termed "fallout") or collide with structures in the process. Once grounded, the seabirds experience difficulty in resuming flight, and are vulnerable to introduced predators and vehicle traffic, such that unless rescued, they are assumed to have died, based on decades of seabird observations and reports. On Kauaʻi, birds that are rescued are sent to the Save Our Shearwaters program for rehabilitation and released back into the wild where possible.

Light attraction fallout on the island of Kauaʻi occurs in a widespread manner, with certain geographic areas having concentrated, higher amounts of observed fallout. Seasonally, most fallout occurs in the autumn months, coinciding with the seabird fledgling season. Many different entities on Kauaʻi (resorts, businesses, and governmental agencies) have documented seabird fallout on their property and at their facilities resulting from the effects of light attraction. Light attraction on Kauaʻi is an island-wide problem that negatively impacts the listed seabird species and is collectively attributable to many different entities.

Of the three listed seabird species, the ʻaʻo is the species most impacted by light attraction. The ʻuaʻu and the ʻakēʻakē are impacted to a much lesser degree.

The KSHCP relies on a unique structure to best meet the need for an effective and efficient response to the widespread nature of light attraction impacts on Kauaʻi. The structure of the KSHCP enables multiple individual entities on Kauaʻi to each apply for take authorization for light attraction impacts to the listed seabird species under one coordinated framework. This framework takes advantage of economies of scale and enables a pooling of resources to collectively achieve conservation goals. The requirements of the KSHCP, and the enrollment and approval process for listed species take authorization are defined in the KSHCP and consist of two parts: 1. the KSHCP document with associated appendices and 2. materials submitted by each Applicant which provide detailed descriptions of on-site minimization measures, covered activities, a monitoring plan, and the amount of take authorization being requested.

Applicants to the KSHCP are seeking an Incidental Take Permit (ITP) from the U. S. Fish & Wildlife Service (USFWS) and an Incidental Take License (ITL) from the State of Hawaiʻi Department of Land and Natural Resources (DLNR). The mitigation and minimization measures contained in the KSHCP have been developed to inform the preparation of individual applications for listed seabird take authorization permits.

The KSHCP defines a set of actions to minimize and mitigate the effects of light attraction on the listed seabirds and to meet conservation goals. The KSHCP provides a suite of minimization actions and requires that each Applicant to the KSHCP implement all of the measures that are applicable to their facility and operational needs. Minimization measures emphasize reducing the amount of light that shines upward and reducing the amount of light output or intensity, which have been shown to reduce the effects of light attraction. Under the KSHCP, the minimization measures include:

- Deactivation of unnecessary lights;
- Use of full cut-off light fixtures (or their functional equivalent);
- Shielding existing light fixtures;
- Angling lights downward;
- Lowering the light output or intensity;
- Use of motion sensor light fixtures; and
- Decreasing the visibility of interior lights.

Under the KSHCP, mitigation actions are designed to be commensurate with the degree of impact caused by the taking of a listed seabird. Because some seabirds grounded by light attraction are found alive and deemed healthy, or are able to be rehabilitated, those birds will be released back into the wild. For seabirds that are found dead, those not found but assumed to have been impacted by light attraction, and for those birds that could not be released back into the wild, light attraction is considered to have caused the mortality of the affected birds. For impacts to those birds, mitigation will consist of predator control and the creation of a fenced seabird preserve in the northwest region of Kauaʻi. In this preserve, predators will be removed and seabirds will be lured to the site via social attraction, a well-established conservation technique for the creation of new seabird colonies. The absence of predators will enable the seabirds to breed more successfully and with higher reproduction rates than in

3

areas outside the preserve, thereby providing a conservation benefit to the seabird populations. The preserve site is located in Kōke'e State Park along the Kalalau rim. Predator control will be conducted in the vicinity of the preserve to reduce the impacts of predation on seabirds breeding nearby.

The funding design of the KSHCP features a cost-sharing structure. Total costs of the KSHCP, including implementation, mitigation, monitoring, Adaptive Management as needed and reporting, will be shared amongst the permit recipients according to the relative amounts of take authorized.

Compliance and effectiveness monitoring will be conducted to ensure that authorized amounts of take are not exceeded and to enable the wildlife agencies to determine that mitigation actions are meeting conservation goals. In response to monitoring results, Adaptive Management will be implemented in the event that mitigation actions require changes to meet conservation goals as new information is obtained during implementation of the KSHCP.

manner. Through the SOS evaluation process, downed seabirds receive a thorough physical examination including testing of feather waterproofing and treatment of injuries as necessary. In addition, any downed seabirds found dead at a Participant facility property will be turned into the SOS program for research (autopsy, discovery of cause of death, stomach contents analysis) and record keeping purposes.

## 5.4    CONSERVATION MEASURES TO MITIGATE UNAVOIDABLE IMPACTS (BIOLOGICAL GOAL 2)

Mitigation to offset authorized incidental take of the Covered Seabirds consists of conservation activities to increase breeding probability, breeding success and survival of the Covered Seabirds, and provide a net conservation benefit over the 30-year duration of the KSHCP.

To achieve this objective, a seabird preserve (the Kahuamaʻa Seabird Preserve) will be created. Conservation actions at this site will include terrestrial predator proof fencing, predator eradication and the implementation of social attraction (playing Covered Seabird calls to attract birds on the flyway from neighboring colonies to breed inside the protected predator proof fence). Feral cat control will be conducted to prevent the ingress of cats into the Kalalau Valley colonies as well as keep cats away from the fenceline to prevent reinvasion inside the predator proof fence. Barn owl control will be conducted to further reduce the threat from predation.

Predation at breeding colonies is a primary threat to the survival of the Covered Seabirds (Ainley et al. 2001, Griesemer and Holmes 2011, Raine et al. 2017c, Raine et al. 2017e). Abating the threat of predation through fencing, predator removal, and social attraction is predicted to mitigate the effects of the take authorized under the KSHCP by increasing the breeding production of the Covered Seabirds from the baseline existing condition. The seabird preserve site is located in the north-west of Kauaʻi, along the rim of the Kalalau Valley, straddling two State parks: Kōkeʻe and the Nā Pali Coast (Figure 5-1). The site is located in a geographic area known as Kahuamaʻa Flats. Full details on the creation and management of this seabird preserve are included in *Appendix A: Kahuamaʻa Seabird Preserve Management Plan*.



**Figure 5-1. Kahuamaʻa Seabird Preserve, located on the rim of the Kalalau Valley.**

ʻAʻo are the primary target of the conservation measures proposed at the Kahuamaʻa Seabird preserve because the amount of take is higher than the other Covered Species and, therefore, likely to be requested by the ITP/ITL Applicants in their respective permit/license requests. The lower levels of anticipated take of ʻuaʻu and ʻakēʻakē by Participants will be offset through active predator control for the introduced barn owl around the preserve and the Kalalau Valley, where both of these seabird species are known to nest (see Figure 5-1).

The selection of a site for a predator proof fence and social attraction project as the primary mitigation strategy to offset take impacts under the KSHCP was based on extensive consultation with conservation agencies and experts in seabird biology using the latest scientific information and analysis. Construction and maintenance of a fenced, predator free enclosure is a preferred conservation measure because it creates a sanctuary for seabird breeding, and is the only assured way to remove all predators. Predator control work alone (without a fence) is not sufficient to prevent all depredation of seabird eggs, chicks, and adults and guarantee a sufficient level of productivity to offset the take impacts anticipated under the KSHCP.

Table 5-2 lists the selection criteria that were used to evaluate the preserve site, how the site ranked in relation to these criteria, and the data source used for the evaluation. These criteria were adapted from an unpublished social attraction site ranking system that was developed by KESRP and a group of experts working on Hawaiian seabirds in 2014 (A. Raine, 2016, pers. comm., Raine et al. 2014). Local experts, such as the KESRP Coordinator, fencing experts and other seabird biologists were consulted in the evaluation process. Through this process, it was clear that this site is ideal for the purposes of creating a mitigation site that is likely to contribute to the conservation of 'a'o.

**Table 5-2. Ranking of mitigation site selection criteria.**

| Criteria | Kahuama'a Seabird Preserve ranking | Data Source |
|---|---|---|
| Presence of breeding seabirds (at site, adjacent or transiting) | **Yes**: Adjacent and transiting | KESRP auditory surveys in surrounding area (2011_2016); song meter deployed at site in 2016; KSHCP auditory surveys on site (2016 & 2017) |
| Habitat Quality | **High** presence of native plant communities | Site visits; initial plant surveys |
| Line collision threat | **Low** | Powerline distribution maps |
| Light attraction threat | **Low** | No Light Conservation Zone (NLCZ) mapping (USFWS 2016) |
| Feasibility of predator removal | **High** | Expert opinion |
| Feasibility of fence construction | **High** | Expert opinion |
| Socio-political feasibility | **High** | Low hunting use; State Parks (land owner) willing |
| Site Access | **High** | Easy road access to site |

The Kahuama'a Seabird Preserve will enclose 2ha of high quality seabird breeding habitat and provides terrain desirable for nesting colonies in terms of slope, aspect and access. The proposed size of the preserve is consistent with other seabird social attraction sites in Hawai'i (e.g. Makamaka'ole on west Maui, Nihoku on Kaua'i). An enclosure of this size allows for adequate space for both installation of artificial burrows, and also excavation of natural burrows.

A social attraction site has a lag time between the inception of seabird social attraction activities and the successful breeding of seabirds using the site. This is due to several factors, including seabird life history (birds usually begin breeding in year 6), and the time needed for the newly created colony to become established. In order to offset the seabird take impacts

that will occur during this lag time, the KSHCP conservation program will provide immediate benefit to the Covered Seabirds via a barn owl and feral cat control in the Kalalau Valley.

Barn owls are a known predator of endangered seabirds on Kaua'i (Raine et al. 2017e). They are aerial predators with a large home range of up to 31 km² (Martin et al. 2014) which makes multiple seabird colonies vulnerable to predation. In addition, when one barn owl is removed from its territory, others quickly move in to occupy the empty territory (G. Reid, 2016, pers. comm.), thus barn owl control needs to be ongoing in any given area. Barn owl control removal is likely to provide both immediate and ongoing benefit to seabirds that breed inside the fence site, in the area around the fence site, and in surrounding source colonies. In this way, this action is likely to offset the take impacts of 'ua'u and 'akē'akē and help offset the take impacts of the 'a'o covered under the KSHCP.

Feral cat removal is also key to fulfilling Biological Goal 2 as it provides direct benefit to 'a'o source populations by removing a significant predator of seabird colonies in the Kalalau Valley. It also provides secondary benefit to the Kahuama'a Seabird Preserve by reducing the number of feral cats in the vicinity that might attempt to scale the fence.

Barn owl and feral cat control are components of the KSHCP mitigation package that have the potential to be scaled marginally as an Adaptive Management response (Section 6.9.2).  For example, cat trapping lines could be extended into hanging valleys where topography allows or barn owl control could be conducted in smaller adjacent valleys. However, at this time, based on known information on breeding colonies, Covered Seabird life history and habitat,  it is not anticipated that expanding predator control within Kalalau Valley alone would provide benefits to completely offset take impacts anticipated under the Plan.

If Covered Activities under an HCP cause take in the form of harm by permanently altering or destroying the habitat of a listed species, then permanent mitigation must occur to offset this impact. In the case of the KSHCP, the Covered Activities will impact individual birds, not habitat (see Chapter 4). Under these circumstances, the mitigation offset must occur for the duration of the period where the take impacts caused by the Covered Activities are expected, but not into perpetuity. For the KSHCP, it is expected that at the end of the 30 year term the social attraction site will be heavily colonized and productive for seabirds, and will be a desirable ongoing project for either extension of the KSHCP, or as mitigation for a different program that must offset take impacts on the 'a'o. In the latter case, implementation of management activities as the social attraction site would then transfer to the appropriate program. However, in the circumstance that there is no funding available to continue management at this site past the current KSHCP permit term, then funds  for Changed Circumstances/Adaptive Management will be used for decommissioning of the fence (see Contingency Funding discussion in Section 7.1).

The details on how the fence and social attraction site will be implemented are presented in *Appendix A: Kahuama'a Seabird Preserve Management Plan*. This plan includes methods and

protocols for specific tasks, timelines, work plans, expected staffing requirements, best management practices, as well as monitoring.

### 5.4.1  CONSERVATION MEASURE ALTERNATIVES NOT SELECTED

A larger predator proof fence enclosure was considered, but modeling results showed that due to expected high density of nesting within the enclosure that will result from management at the site, an enclosure larger than 2ha would not reach carrying capacity within the 30 year permit term. Thus, expanding the size of the enclosure would not result in higher seabird production (see Discussion in *Appendix C: Social Attraction Estimator Model*).

The potential for a smaller predator proof fence enclosure was also considered, to determine if this could achieve necessary production of Covered Seabirds to offset the impacts of take under the KSHCP for a lower cost. It was determined that a minimum of approximately 2ha was necessary to allow for creation of a productive 'a'o colony and management of native vegetation for seabird habitat. Since the fence site needs to include sloped terrain to facilitate seabird takeoff, a 2ha site or larger minimizes the potential for fence collision during takeoffs and landings of seabirds and fledglings. A smaller unit would also not support enough suitable area for the installation of artificial burrows and habitat restoration for breeding birds to naturally create burrows and nest within the enclosure.

Another conservation measure alternative that was considered was translocation of Covered Seabird chicks to "jump start" the Preserve population within the social attraction site. This was considered not feasible for the following reasons. Considering the rarity of the 'a'o, the number of active and accessible source burrows is the primary limiting factor for translocation in any given year. Despite ongoing efforts to identify other breeding areas and locate active burrows, there are currently only five stable breeding colonies (Upper Limahuli Preserve, Pohakea, Hanakāpī'ai, Hanakoa, and Kīlauea Point National Wildlife Refuge) considered appropriate as a source for chicks for translocation (due to existing predator control and colony monitoring). All available chicks from these colonies are already being considered for another existing long-term translocation effort (the Nihoku site within Kīlauea Point NWR).

In addition, translocation of chicks requires extensive monitoring of remote colonies to locate nest sites that may be available for chick removal, predator control in these remote locations to offset human traffic during monitoring, and an extended period of care for translocated chicks. All of the above are costly, time intensive, and not likely necessary given the proximity of source seabird colonies to the Kahuama'a Seabird Preserve. Finally, unlike the Nihoku site, the selected fence enclosure site is located adjacent to the highest concentration of 'a'o nesting colonies on the island of Kaua'i, thus providing high confidence that social attraction alone will attract birds to nest within the fence site. It is anticipated that social attraction at the Preserve will provide beneficial seabird production earlier than translocation would, because it attracts juvenile and breeding birds to the site immediately, instead of waiting five to seven years for the translocated chicks to return to begin prospecting and breeding.

**Table 7-1. Cost components of the KSHCP and cost sharing.**

| Cost Item | Payment | Description | Shared |
|---|---|---|---|
| **Project Administration** | Paid to KSHCP Conservation Measures Implementing Fund | Administration and coordination of the KSHCP | Shared |
| **Mitigation through predator proof fence, seabird social attraction, associated barn owl and feral cat control & effectiveness monitoring** | Paid to KSHCP Conservation Measures Implementing Fund | Build fence, implement social attraction, predator control and associated actions and measure results | Shared |
| **Changed Circumstances/Adaptive Management fund** | Paid to KSHCP Reserve Account | To fund Changed Circumstances, including Adaptive Management measures that exceed operating budget | Shared |
| **Financial Assurances** | Paid to KSHCP Reserve Account | To cover costs for remaining Participants if other withdraws or fails to make required payments | Shared |
| **State compliance & annual review** | Paid to DLNR by Participants | Conduct annual review and HCP compliance | Shared |
| **Avoidance and minimization measures** | Costs incurred by each Participant but not paid to KSHCP accounts | Measures to reduce the effects of light attraction and reduce on-site predation | Not shared (cost is facility-specific) |
| **On-site take monitoring** | Costs incurred by each Participant but not paid to KSHCP accounts | Participant must provide trained monitors to search property for impacted wildlife and report the results | Not shared (cost is facility-specific) |
| **Beach honu nest monitoring and light avoidance** | Costs incurred by each Participant but not paid to KSHCP accounts | Measures to prevent honu disorientation at nests | Not shared (cost is facility specific) |

## 7.1   SHARED COST COMPONENTS

Section 10(a)(2)(B)(iii) of the ESA requires that "the Applicant will ensure that adequate funding for the plan will be provided." This issuance criterion requires that the Applicant detail the funding that will be available for all shared and facility specific funding components of the KSHCP.

HRS Chapter 195D states that the Applicant shall provide adequate funding for the plan.  This may be accomplished by "depositing a sum of money in the endangered species trust fund created by Section 195D-31, or provid[ing] other means approved by the board…" HRS § 195D-4(g)(3). Similarly, each HCP shall also "identify … an adequate funding source to ensure that the actions or measures, including monitoring, are undertaken in accordance with the schedule." HRS § 195D-21(b)(2)(D).

In connection with the KSHCP, the National Fish and Wildlife Foundation ("NFWF") will establish two accounts to receive, manage, and disburse certain funds to be deposited by Participants in the KSHCP for purposes of the Participants' implementation of the 30-year KSHCP.  The <u>KSHCP Conservation Measures Implementation Funding Account</u> will receive the Annual Payments, adjusted for inflation, paid by Participants under Section 7.1, below. The <u>KSHCP Reserve Account</u> will receive the Financial Assurances Payments and the Changed Circumstances/ Adaptive Management Payments paid by the Participants under Section 7.1, below.

The proposed funding required in any given year of Plan implementation is derived from cost estimates for implementing conservation actions as specified in Chapter 5 and *Appendix A: Kahuama'a Seabird Preserve Management Plan*. A summary of costs is presented in [Section 7.7](). The costs are based on similar seabird projects.

Upon issuance of the ITP and ITL, each Participant will, within 30 days make payments indicated below as due for year one.  Initial payments must be made before the ITP and ITL can become effective.  Thereafter, payments must be made on or before the anniversary of the effective date of either the ITP or ITL, whichever occurs earlier. NFWF will send an email confirmation of receipt of payments to the Payor, USFWS and DLNR and Participants.

Payment descriptions are as follows (also see **Table 7.2**):

**Annual payments**
Annual Payments will be used for the implementation of the mitigation measures on an annual basis.  These funds will be paid to the KSHCP Conservation Measures Implementing Funding Account.  The first year's collective payment will be greater than the following years' payments to provide sufficient funds for construction of the fence, predator removal, and social attraction site equipment.  The first year collective payment will be $643,885.

A Participant shall have the right, but not the obligation, to pre-pay its annual payments for the remainder of the KSHCP term or a portion thereof, accounting for inflation.

**Reserve Funds for Financial Assurance and Changed Circumstances/Adaptive Management**
In addition to the annual payments, Participants will make payments to the KSHCP Reserve Account to provide Financial Assurances (three years of annual payments) and provide a fund for Changed Circumstances and Adaptive Management (the cost of one complete fence and social attraction equipment replacement).

First, to provide financial assurances, Participants will collectively pay three times the anticipated annual payments after Year One.  As shown in Table 7-2, the collective anticipated annual payment after Year One is approximately $200,000.  Therefore, the Financial Assurances payment will be $600,000.  This financial assurances reserve fund is available to be drawn upon by the other Participants if a Participant does not make its annual payment or elects to withdraw from the KSHCP.  This will allow the remaining Participants to cover the mitigation costs that the delinquent or withdrawing participant would have paid.  The collective financial

assurances payment will be made to the KSHCP Reserve Fund with half ($300,000) to be paid in Year 1 and the other half ($300,000) to be paid in Year 2.

Second, the Participants will fund a reserve to provide for Changed Circumstances and Adaptive Management measures that exceed the annual payments.  As provided in Section 6.11, up to 2 events requiring complete replacement of the fence and social attraction equipment is considered a Changed Circumstance.  The Reserve Fund shall be funded initially in the amount of one complete fence and social attraction equipment replacement.  This collective payment will be $225,000.  These funds may be used if there are Changed Circumstances or Adaptive Management measures that require the expenditure of funds beyond those available from the annual payments.  This collective payment will be made in year 2 (as the first year cost includes a cushion for increased costs in year 1).  The Reserve Fund shall be replenished following withdrawals so that there are sufficient funds to pay for one complete replacement of the fence and social attraction equipment, provided however that the Changed Circumstances reserve, as replenished, shall not exceed the cost of up to 2 events requiring complete replacement of the fence and social attraction equipment, as provided in Section 6.11. Not withstanding any limits on replenishment of the Changed Circumstances/Adaptive Management Reserve Fund, the Participants remain responsible for meeting the biological goals of the KSHCP (see Adaptive Management Process in Chapter 6).

No later than Year 28 of the KSHCP, the Participants will determine whether they wish to seek an amendment to extend the term of the KSHCP.  If the Participants conclude they will seek an amendment to extend, the annual payments shall be made and the Reserve Fund maintained pending consideration of the amendment.  If the Participants conclude they will not seek an amendment to extend, they will advise the USFWS and DLNR.  At the end of Year 28, one year of the three years of Financial Assurance funds in the KSHCP Reserve Account ($200,000) shall be transferred to the KSHCP Conservation Measures Implementing Fund and shall offset the annual payment for Year 29 to the extent of the funds transferred.  At the end of Year 29 of the KSHCP, one year of the three years of Financial Assurance funds in the KSHCP Reserve Account ($200,000) shall be transferred to the KSHCP Conservation Measures Implementing Fund and shall offset the annual payment for year 30 to the extent of the funds transferred.  At the end of the original term of the HCP, or any sooner termination, any interest accrued and remaining monies in both the KSHCP Reserve Account and the KSHCP Conservation Measures Implementing Fund will be paid to the Participants remaining in the HCP based on their proportionate share of the authorized take.

**Inflation** – Participants will work with the Prime Contractor to manage costs of implementation of the KSHCP. The budget includes inflation at three percent (3%) per annum for the annual payments. Both the KSHCP Conservation Measures Implementation Funding Account and the KSHCP Reserve Account will be invested by NFWF in one or more investment portfolios or an interest-bearing account maintained by NFWF. The Changed Circumstances/Adaptive Management funds will be replenished following withdrawals so that there are sufficient funds in then-current dollars to pay for one complete replacement of the fence and social attraction

equipment, provided however that the Changed Circumstances reserve, as replenished, shall not exceed the cost of up to 2 such events, as provided in Section 6.11.

For the Financial Assurances portion of the Reserve Account, the Participants will have funded an initial three years of payments into a NFWF investment account. In the event of an early withdrawal of a Participant, the remaining Participants will replenish their individual pre-withdrawal shares for inflation, taking into account investment income, so that their three years of Financial Assurance payments are in then-current dollars.

**Table 7-2: Schematic of types of payments needed for KSHCP funding, and which payments will be required in specific years.**

|  | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Annual Payment | $643,885 | $181,094 | $186, 227 | $191,514 | $196,959 |
| Changed Circumstances | 0 | $225,000 |  |  |  |
| Financial Assurances | $300,000 | $300,000 |  |  |  |
|  |  |  |  |  |  |

The Prime Contractor shall have the right, but not the obligation, to accept payment in kind for materials or labor needed to implement the KSHCP from a Participant in satisfaction of its annual payment(s).  The Participants shall have the right, but not the obligation, to provide a letter of credit in lieu of the Financial Assurances payment, provided that the Letter of Credit shall be made payable to NFWF or the KSHCP accounts, as directed by NFWF.

## 7.2    NON-SHARED COST COMPONENTS

The minimization measures described in individual PIPs will be performed by each individual Participant. The measures consist of lighting minimization; recovery of downed seabirds and their transportation to SOS or another appropriate facility; predator control at facilities; outreach and worker training; and honu actions (see Chapter 9). These measures will be implemented by the Participants within one year of Implementing Agreements (IA) and the issuance of the ITP and ITL.

Each Non-Governmental Participant will:
- Provide the estimated cost of its non-shared minimization and other measures in its PIP, along with an explanation as to how the Participant plans to fund these costs. Unless the Participant is going to provide a funding guarantee such as an irrevocable letter of credit, the Participant should provide sufficient information to show that it has the financial ability to fund these costs, i.e., that it is financially solvent and capable of providing the necessary funding.
- Warrant that it has, and will expend, the operating funds necessary to continue its minimization obligations.

# Exhibit C

Susan E. Smith, (CA Bar No. 329539)
ssmith@bdlaw.com
456 Montgomery Street, Ste. 1800
San Francisco, CA 94104
P: 415-262-4023

Loren R. Dunn, *(pro hac vice)*
ldunn@bdlaw.com
600 University Street, Ste. 1601
Seattle, WA 98101
P: 206-315-4810

W. Parker Moore *(pro hac vice)*
pmoore@bdlaw.com
1900 N. Street NW, Ste. 100
Washington, D.C. 20036
P: 202-789-6028

*Counsel for Defendants Bridgestone Americas Tire
Operations, LLC; Continental Tire the Americas, LLC;
GITI Tire (USA), Ltd.; The Goodyear Tire & Rubber
Company, individually and as successor in interest to
Cooper Tire & Rubber Company; Nokian Tyres Inc.;
Nokian Tyres U.S. Operations, LLC; Pirelli Tire LLC;
Sumitomo Rubber North America, Inc.; Sumitomo
Rubber USA, LLC; Toyo Tire Holdings of Americas
Inc.; and Yokohama Tire Corporation.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INSTITUTE FOR FISHERIES RESOURCES; and PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS,<br><br>Plaintiffs,<br><br>vs.<br><br>BRIDGESTONE AMERICAS TIRE OPERATIONS, LLC; CONTINENTAL TIRE THE AMERICAS, LLC; GITI TIRE (USA) Ltd.; THE GOODYEAR TIRE & RUBBER COMPANY, individually and as | Case No. 23-cv-05748-JD<br><br>**DEFENDANT BRIDGESTONE AMERICAS TIRE OPERATIONS, LLC'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS** |

these matters is not relevant to or an element of the questions that are at issue in this case. Plaintiffs ask Bridgestone to identify anyone that was ever in its employ that "learned" any of these topics. Plaintiffs' use of "tire leachate" is vague and ambiguous, as it contains an unknown breadth and volume of compounds. Plaintiffs' use of "toxic" is likewise vague and ambiguous, as Plaintiffs provide no metrics or definition of toxicity.

Without waiving any of the foregoing objections or its General and Preliminary Objections, on November 24, 2020, Bridgestone employees Jean Antol, James DeMouy, Christian Gullott, Andrew Thompson, Robert Boon, Jane Johnson, and Erin Sheepwash received an email from Sarah Amick of USTMA attaching a communication from Edward Kolodziej regarding research relating to 6PPD-q impacts on coho salmon.

INTERROGATORY NO. 17:  Identify and describe any communications, whether written or oral or telephonic, between you and any employee or representative of NMFS or between you and any employee or representative of NOAA regarding tire leachate, 6PPD, 6PPD-Q, or salmonids since January 1, 1975.  In describing communications responsive to this interrogatory, please identify the persons involved or participating in the communication, the date of the communication, the subject matter of the communication, the form of the communication (written, oral, or telephonic) and a summary of the communication if oral or telephonic.

RESPONSE:  Bridgestone objects to this interrogatory as compound.  Bridgestone further objects to this Interrogatory as overly broad and burdensome and unduly vague and ambiguous, and calls for information that is neither relevant to the resolution of the Plaintiffs' claims nor

1    reasonably calculated to lead to admissible evidence.  Plaintiffs' FAC seeks to enjoin future

2    "take" of listed salmonids.  Plaintiffs' request that Bridgestone provide a broad spectrum of

3    communications dating back nearly five decades is entirely disproportionate to the needs of this

4    case. Further, "tire leachate" is vague and could contain an unknown breadth and volume of

5    compounds.  "Salmonids" is vague and could encompass hundreds of species, the majority of

6    which are not listed under the Endangered Species Act or included in Plaintiffs' Complaint, and,

7

8    therefore, not the subject of this matter.

9        Without waiver of the foregoing objections or its General and Preliminary Objections,

10   Bridgestone is not aware of such communications involving it or its employees.

11

12       INTERROGATORY NO. 18:  Identify and describe any communications, whether

13   written or oral or telephonic, between you and any employee or representative of any state

14   environmental agency in the states of Washington, Oregon, or California regarding tire leachate,

15   6PPD, 6PPD-Q, or salmonids since January 1, 1975.  In describing communications responsive

16   to this interrogatory, please identify the persons involved or participating in the communication,

17

18   the date of the communication, the subject matter of the communication, the form of the

19   communication (written, oral, or telephonic) and a summary of the communication if oral or

20   telephonic.

21

22       RESPONSE:  Bridgestone objects to this interrogatory as compound.  Bridgestone further

23   objects to this Interrogatory as overly broad and burdensome and unduly vague and ambiguous,

24   and calls for information that is neither relevant to the resolution of the Plaintiffs' claims nor

25   reasonably calculated to lead to admissible evidence.  Plaintiffs' FAC seeks to enjoin future

26

27   DEFENDANT BRIDGESTONE AMERICAS TIRE OPERATIONS,
     LLC'S RESPONSES TO PLAINTIFF'S FIRST SET OF
28   INTERROGATORIES AND REQUESTS FOR PRODUCTION OF
     DOCUMENTS - Case No. 23-cv-05748-JD - Page 20

to 6PPD, and thus requests materials related to the multitude of chemical constituents incorporated in all of the many thousands of distinct tire models Bridgestone has produced over many years. Finally, Bridgestone objects to this request to the extent complete disclosure of all chemical constituents in its tires would require disclosure of highly valuable and protected trade secret information.

REQUEST FOR PRODUCTION NO. 10:  Any application for an incidental take permit for your tires made within the last 10 years, including all drafts thereof.

RESPONSE: Subject to its General Objections and Limitations, Bridgestone states that no such material exists.  Bridgestone is ineligible to prepare or submit an application for an ESA Section 10 permit because said permits are not designed for the manufacture of products.

REQUEST FOR PRODUCTION NO. 11:  Any HCP you have proposed for your tires within the last 10 years, including all drafts thereof.

RESPONSE: Subject to its General Objections and Limitations, Bridgestone states that no such material exists.  Bridgestone cannot formulate a Habitat Conservation Plan, as the manufacture of products is outside of the scope of ESA Section 10 permits.

Respectfully submitted this 17 day of June, 2024.

DEFENDANT BRIDGESTONE AMERICAS TIRE OPERATIONS,
LLC'S RESPONSES TO PLAINTIFF'S FIRST SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION OF
DOCUMENTS - Case No. 23-cv-05748-JD - Page 29

1  Susan E. Smith, (CA Bar No. 329539)
2  ssmith@bdlaw.com
   456 Montgomery Street, Ste. 1800
3  San Francisco, CA  94104
   P: 415-262-4023
4
5  Loren R. Dunn, *(pro hac vice)*
   ldunn@bdlaw.com
6  600 University Street, Ste. 1601
   Seattle, WA  98101
7  P: 206-315-4810
8
9  W. Parker Moore *(pro hac vice)*
   pmoore@bdlaw.com
10 1900 N. Street NW, Ste. 100
   Washington, D.C.  20036
11 P: 202-789-6028

12 *Counsel for Defendants Bridgestone Americas Tire*
   *Operations, LLC; Continental Tire the Americas, LLC;*
13 *GITI Tire (USA), Ltd.; The Goodyear Tire & Rubber*
   *Company, individually and as successor in interest to*
14 *Cooper Tire & Rubber Company; Nokian Tyres Inc.;*
   *Nokian Tyres U.S. Operations, LLC; Pirelli Tire LLC;*
15 *Sumitomo Rubber North America, Inc.; Sumitomo*
   *Rubber USA, LLC; Toyo Tire Holdings of Americas*
16 *Inc.; and Yokohama Tire Corporation.*
17

18               UNITED STATES DISTRICT COURT
19          FOR THE NORTHERN DISTRICT OF CALIFORNIA

20 INSTITUTE FOR FISHERIES RESOURCES; and          Case No. 23-cv-05748-JD
   PACIFIC COAST FEDERATION OF FISHERMEN'S
21 ASSOCIATIONS,

22                Plaintiffs,                       PLAINTIFFS' FIRST SET OF
                                                    INTERROGATORIES TO
23          v.                                      DEFENDANTS
                                                    AND REQUESTS FOR
24 BRIDGESTONE AMERICAS TIRE OPERATIONS,           PRODUCTION OF
   LLC; CONTINENTAL TIRE THE AMERICAS, LLC;        DOCUMENTS
25 GITI TIRE (USA) Ltd.; THE GOODYEAR TIRE &
   RUBBER COMPANY, individually and as successor in *AND CONTINENTAL TIRE*
26 interest to COOPER TIRE & RUBBER COMPANY;        *THE AMERICAS, LLC'S*
   HANKOOK TIRE AMERICA Corp.; KUMHO TIRE          *OBJECTIONS AND*
27 U.S.A., Inc.; MICHELIN NORTH AMERICA, Inc.;      *RESPONSES THERTO*
   NOKIAN TYRES Inc.; NOKIAN TYRES U.S.
28

RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES AND REQUESTS FOR
PRODUCTION - 1
CASE NO. 23-cv-05748-JD

Without waiving any of the aforementioned objections, Continental answers as follows: See Continental's Initial Disclosures. Continental reserves the right to supplement this response because discovery is ongoing.

**INTERROGATORY NO. 17:**  Identify and describe any communications, whether written or oral or telephonic, between you and any employee or representative of NMFS or between you and any employee or representative of NOAA regarding tire leachate, 6PPD, 6PPD-Q, or salmonids since January 1, 1975.  In describing communications responsive to this interrogatory, please identify the persons involved or participating in the communication, the date of the communication, the subject matter of the communication, the form of the communication (written, oral, or telephonic) and a summary of the communication if oral or telephonic.

**RESPONSE TO INTERROGATORY NO. 17:**  Continental objects to Interrogatory No. 17 as compound.  Continental further objects to this Interrogatory as overly broad and burdensome and unduly vague and ambiguous, and calls for information that is neither relevant to the resolution of the Plaintiffs' claims nor reasonably calculated to lead to admissible evidence.  Plaintiffs' FAC seeks to enjoin future "take" of listed salmonids.  Plaintiffs' request that Continental provide a broad spectrum of communications dating back nearly five decades is entirely disproportionate to the needs of this case.

Further, "tire leachate" is vague and could contain an unknown breadth and volume of compounds.  "Salmonids" is vague and could encompass hundreds of species, the majority of which are not listed under the Endangered Species Act or included in Plaintiffs' Complaint, and, therefore, not the subject of this matter.

Without waiving these objections and the General and Preliminary Objections, Continental is not aware of such communications involving it or its employees.

**INTERROGATORY NO. 18:**  Identify and describe any communications, whether written or oral or telephonic, between you and any employee or representative of any state environmental agency in the states of Washington, Oregon, or California regarding tire leachate, 6PPD, 6PPD-

1   They are not relevant because the only tire constituent at issue in this case is 6PPD.  The request

2   is also overly broad and unduly burdensome because each rubber compound will have a dozen or

3   more chemical constituents, each tire has a dozen or more different compounds, and the

4   defendants collectively produce hundreds or thousands of tire models.  Subject to the General

5   Objections and Limitations, discovery is ongoing, and Continental reserves the right to

6   supplement this Production.

7

8   **REQUEST FOR PRODUCTION NO. 10:**  Any application for an incidental take permit for

9   your tires made within the last 10 years, including all drafts thereof.

10          **RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**  Subject to the General

11  Objections and Limitations, no such material exists.  Continental is ineligible to prepare or

12  submit an application for an ESA Section 10 permit because said permits are not designed for the

13  manufacture of products.  Discovery is ongoing, and Continental reserves the right to supplement

14  this Production.

15

16  **REQUEST FOR PRODUCTION NO. 11:**  Any HCP you have proposed for your tires within

17  the last 10 years, including all drafts thereof.

18          **RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**  Subject to the General

19  Objections and Limitations, no such material exists.  Continental cannot formulate a Habitat

20  Conservation Plan, as the manufacture of products is outside of the scope of ESA Section 10

21  permits.  Discovery is ongoing, and Continental reserves the right to supplement this Production.

22

23

24

25

26

27

28

RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES AND REQUESTS FOR
PRODUCTION - 26
CASE NO. 23-cv-05748-JD

Susan E. Smith, (CA Bar No. 329539)
ssmith@bdlaw.com
456 Montgomery Street, Ste. 1800
San Francisco, CA  94104
P: 415-262-4023

Loren R. Dunn, *(pro hac vice)*
ldunn@bdlaw.com
600 University Street, Ste. 1601
Seattle, WA  98101
P: 206-315-4810

W. Parker Moore *(pro hac vice)*
pmoore@bdlaw.com
1900 N. Street NW, Ste. 100
Washington, D.C.  20036
P: 202-789-6028

*Counsel for Defendants Bridgestone Americas Tire Operations, LLC; Continental Tire the Americas, LLC; GITI Tire (USA), Ltd.; The Goodyear Tire & Rubber Company, individually and as successor in interest to Cooper Tire & Rubber Company; Nokian Tyres Inc.; Nokian Tyres U.S. Operations, LLC; Pirelli Tire LLC; Sumitomo Rubber North America, Inc.; Sumitomo Rubber USA, LLC; Toyo Tire Holdings of Americas Inc.; and Yokohama Tire Corporation.*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

INSTITUTE FOR FISHERIES RESOURCES; and PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS,

          Plaintiffs,

     v.

BRIDGESTONE AMERICAS TIRE OPERATIONS, LLC; CONTINENTAL TIRE THE AMERICAS, LLC; GITI TIRE (USA) Ltd.; THE GOODYEAR TIRE & RUBBER COMPANY, individually and as successor in interest to COOPER TIRE & RUBBER COMPANY; HANKOOK TIRE AMERICA Corp.; KUMHO TIRE U.S.A., Inc.; MICHELIN NORTH AMERICA, Inc.; NOKIAN TYRES Inc.; NOKIAN TYRES U.S.

Case No. 23-cv-05748-JD

PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANTS
AND REQUESTS FOR PRODUCTION OF DOCUMENTS

*AND GITI TIRE (USA) LTD'S OBJECTIONS AND RESPONSES THERTO*

RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES AND REQUESTS FOR PRODUCTION - 1
Case No. 23-cv-05748-JD

the Plaintiffs' claims nor reasonably calculated to lead to admissible evidence.  Giti USA's "knowledge" of these matters is not relevant to or an element of the questions that are at issue in this case.  Plaintiffs ask Giti USA to identify anyone that was ever in its employ that "learned" any of these topics.  Plaintiffs' use of "tire leachate" is vague and ambiguous, as it contains an unknown breadth and volume of compounds.  Plaintiffs' use of "toxic" is likewise vague and ambiguous, as Plaintiffs provide no metrics or definition of toxicity.

Without waiving any of the aforementioned objections, Giti USA answers as follows: See individuals identified in Giti USA's Initial Disclosures.

Giti USA reserves the right to supplement this response because discovery is ongoing.


**INTERROGATORY NO. 17:**  Identify and describe any communications, whether written or oral or telephonic, between you and any employee or representative of NMFS or between you and any employee or representative of NOAA regarding tire leachate, 6PPD, 6PPD-Q, or salmonids since January 1, 1975.  In describing communications responsive to this interrogatory, please identify the persons involved or participating in the communication, the date of the communication, the subject matter of the communication, the form of the communication (written, oral, or telephonic) and a summary of the communication if oral or telephonic.

**RESPONSE TO INTERROGATORY NO. 17:**  Giti USA objects to Interrogatory No. 17 as compound.

Giti USA further objects to this Interrogatory as overly broad and burdensome and unduly vague and ambiguous, and calls for information that is neither relevant to the resolution of the Plaintiffs' claims nor reasonably calculated to lead to admissible evidence.  Plaintiffs' FAC seeks to enjoin the future "take" of listed salmonids.  Plaintiffs' request that Giti USA provide a broad spectrum of communications dating back nearly five decades is entirely disproportionate to the needs of this case.

Further, "tire leachate" is vague and could contain an unknown breadth and volume of compounds.  "Salmonids" is vague and could encompass hundreds of species, the majority of which are not listed under the Endangered Species Act or included in Plaintiffs' Complaint, and,

RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES AND REQUESTS FOR PRODUCTION - 17
CASE NO. 23-cv-05748-JD

1    therefore, not the subject of this matter.  Without waiving these objections and the General and

2    Preliminary Objections, Giti USA states:  None.

3

4    **INTERROGATORY NO. 18:**  Identify and describe any communications, whether written or

5    oral or telephonic, between you and any employee or representative of any state environmental

6    agency in the states of Washington, Oregon, or California regarding tire leachate, 6PPD, 6PPD-

7    Q, or salmonids since January 1, 1975.  In describing communications responsive to this

8    interrogatory, please identify the persons involved or participating in the communication, the

9    date of the communication, the subject matter of the communication, the form of the

10   communication (written, oral, or telephonic) and a summary of the communication if oral or

11   telephonic.

12           **RESPONSE TO INTERROGATORY NO. 18:**  Giti USA objects to Interrogatory No.

13   18 as compound.

14           Giti USA further object to this Interrogatory as overly broad and burdensome and unduly

15   vague and ambiguous, and calls for information that is neither relevant to the resolution of the

16   Plaintiffs' claims nor reasonably calculated to lead to admissible evidence.  Plaintiffs' FAC seeks

17   to enjoin the future "take" of listed salmonids.  Plaintiffs' request that Giti USA provide a broad

18   spectrum of communications dating back decades across three states' environmental agencies is

19   entirely disproportionate to the needs of this case.

20           Further, "tire leachate" is vague and could contain an unknown breadth and volume of

21   compounds.  "Salmonids" is vague and could encompass hundreds of species, the majority of

22   which are not listed under the Endangered Species Act or included in Plaintiffs' Complaint, and,

23   therefore, not the subject of this matter.  "Environmental agency" is vague and could produce

24   substantially more material depending on how many agencies Plaintiffs intend this Interrogatory

25   to cover.  Without waiving these objections and the General and Preliminary Objections, Giti

26   USA states:    Giti USA submitted the attached Preliminary (Stage 1) Alternatives Analysis

27   Report [Exhibit 1] to the State of California.

28

RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES AND REQUESTS FOR
PRODUCTION - 18
CASE NO. 23-cv-05748-JD

Without waiver of the foregoing objections or its General and Preliminary Objections, Giti USA states: Giti USA has no material safety data sheets related to chemicals in the tires it distributes.  Discovery is ongoing, and Giti USA reserves the right to supplement this Response.

**REQUEST FOR PRODUCTION NO. 10:**  Any application for an incidental take permit for your tires made within the last 10 years, including all drafts thereof.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**  Subject to the General Objections and Limitations, no such material exists.  Giti USA is ineligible to prepare or submit an application for an ESA Section 10 permit because said permits are not designed for the distribution of products.  Discovery is ongoing, and Giti USA reserves the right to supplement this Production.

**REQUEST FOR PRODUCTION NO. 11:**  Any HCP you have proposed for your tires within the last 10 years, including all drafts thereof.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**  Subject to the General Objections and Limitations, no such material exists.  Giti USA cannot formulate a Habitat Conservation Plan, as the distribution of products is outside of the scope of ESA Section 10 permits.  Discovery is ongoing, and Giti USA reserves the right to supplement this Production.

Dated this 17th day of June, 2024.

**Beveridge & Diamond P.C.**

By: */s/ Loren R. Dunn*
Loren R. Dunn, *(pro hac vice)*
ldunn@bdlaw.com
600 University Street, Ste. 1601
Seattle, WA  98101
P: 206-315-4810

RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES AND REQUESTS FOR PRODUCTION - 25
Case No. 23-cv-05748-JD

M. Elizabeth O'Neill (CA Bar No. 257448)
elizabeth.oneill@wbd-us.com
301 S. College Center
301 S. College Street, Suite 3500
Charlotte, NC 28202-6050
P: 704-350-6310

Keith Casto (CA Bar No. 141279)
keith.casto@wbd-us.com
1279 Oakmead Parkway
Sunnyvale, CA 94085
P: 408-720-3472

*Counsel for DefendantThe Goodyear Tire & Rubber Company, individually and as successor in interest to Cooper Tire & Rubber Company*

Susan E. Smith, (CA Bar No. 329539)
ssmith@bdlaw.com
456 Montgomery Street, Ste. 1800
San Francisco, CA  94104
P: 415-262-4023

Loren R. Dunn, *(pro hac vice)*
ldunn@bdlaw.com
600 University Street, Ste. 1601
Seattle, WA  98101
P: 206-315-4810

W. Parker Moore *(pro hac vice)*
pmoore@bdlaw.com
1900 N. Street NW, Ste. 100
Washington, D.C.  20036
P: 202-789-6028

*Counsel for Defendants Bridgestone Americas Tire Operations, LLC; Continental Tire the Americas, LLC; GITI Tire (USA), Ltd.; The Goodyear Tire & Rubber Company, individually and as successor in interest to Cooper Tire & Rubber Company; Nokian Tyres Inc.; Nokian Tyres U.S. Operations, LLC; Pirelli Tire LLC; Sumitomo Rubber North America, Inc.; Sumitomo Rubber USA, LLC; Toyo Tire Holdings of Americas Inc.; and Yokohama Tire Corporation.*

THE GOODYEAR TIRE & RUBBER COMPANY'S RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES AND REQUESTS FOR PRODUCTION.
CASE NO. 23-CV-05748-JD

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INSTITUTE FOR FISHERIES RESOURCES; and PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, <br><br> Plaintiffs, <br><br> v. <br><br> BRIDGESTONE AMERICAS TIRE OPERATIONS, LLC; CONTINENTAL TIRE THE AMERICAS, LLC; GITI TIRE (USA) Ltd.; THE GOODYEAR TIRE & RUBBER COMPANY, individually and as successor in interest to COOPER TIRE & RUBBER COMPANY; HANKOOK TIRE AMERICA Corp.; KUMHO TIRE U.S.A., Inc.; MICHELIN NORTH AMERICA, Inc.; NOKIAN TYRES Inc.; NOKIAN TYRES U.S. OPERATIONS LLC; PIRELLI TIRE LLC; SUMITOMO RUBBER NORTH AMERICA, Inc.; SUMITOMO RUBBER USA, LLC; TOYO TIRE HOLDINGS OF AMERICAS Inc.; and YOKOHAMA TIRE Corporation. <br><br> Defendants. | Case No. 23-cv-05748-JD <br><br> THE GOODYEAR TIRE & RUBBER COMPANY'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANTS AND REQUESTS FOR PRODUCTION OF DOCUMENTS |

Comes now The Goodyear Tire & Rubber Company, individually and as successor-in-interest to Cooper Tire & Rubber Company (hereinafter "Goodyear"), and pursuant to Federal Rules of Civil Procedure 33 and 34 hereby answers Plaintiffs' First Set of Interrogatories to Defendants and Request for Production of Documents.

**PRELIMINARY STATEMENT**

Goodyear's investigation of the matters at issue in this litigation is continuing. Accordingly, these Responses are based only on currently identified information. Goodyear reserves its rights to amend or supplement the Responses if different or additional information is subsequently discovered during the course of this litigation, or if the relevance, significance, or applicability of information currently identified is subsequently ascertained. Nothing in the Responses shall prejudice Goodyear's rights to further discovery, research, analysis, or presentation of evidence at trial.

**INTERROGATORY NO. 16:**  Identify when you first learned that 6PPD, 6PPD-Q, and tire leachate were possibly toxic, to what species it was possibly toxic to, how you learned that information, and who in your employ learned that information.

      **RESPONSE TO INTERROGATORY NO. 16:**  Goodyear objects to Interrogatory No. 16 as compound.  Goodyear further objects that this Interrogatory is overly broad and burdensome, unduly vague and ambiguous, and calls for information that is neither relevant to the resolution of Plaintiffs' claims nor reasonably calculated to lead to admissible evidence.  Goodyear's "knowledge" of these matters is not relevant to or an element of the questions that are at issue in this case.  Plaintiffs ask Goodyear to identify anyone that was ever in its employ that "learned" any of these topics.  Plaintiffs' use of "tire leachate" is vague and ambiguous, as it contains an unknown breadth and volume of compounds.  Plaintiffs' use of "toxic" is likewise vague and ambiguous, as Plaintiffs provide no metrics or definition of toxicity.

      Without waiving any of the aforementioned objections, Goodyear answers as follows: See individuals identified in Goodyear's Initial Disclosures.

      Goodyear reserves the right to supplement this response because discovery is ongoing.

**INTERROGATORY NO. 17:**  Identify and describe any communications, whether written or oral or telephonic, between you and any employee or representative of NMFS or between you and any employee or representative of NOAA regarding tire leachate, 6PPD, 6PPD-Q, or salmonids since January 1, 1975.  In describing communications responsive to this interrogatory, please identify the persons involved or participating in the communication, the date of the communication, the subject matter of the communication, the form of the communication (written, oral, or telephonic) and a summary of the communication if oral or telephonic.

      **RESPONSE TO INTERROGATORY NO. 17:**  Goodyear objects to Interrogatory No. 17 as compound.  Goodyear further objects that this Interrogatory is overly broad and burdensome, unduly vague and ambiguous, and calls for information that is neither relevant to the resolution of Plaintiffs' claims nor reasonably calculated to lead to admissible evidence.  Plaintiffs' FAC seeks to enjoin the alleged future "take" of listed salmonids.  Plaintiffs' request

THE GOODYEAR TIRE & RUBBER COMPANY'S RESPONSES TO PLAINTIFF'S FIRST
INTERROGATORIES AND REQUESTS FOR PRODUCTION.
CASE NO. 23-CV-05748-JD

that Goodyear provide a broad spectrum of communications dating back nearly five decades is entirely disproportionate to the needs of this case.

Further, "tire leachate" is vague and could contain an unknown breadth and volume of compounds.  "Salmonids" is vague and could encompass hundreds of species, the majority of which are not listed under the Endangered Species Act or included in Plaintiffs' Complaint, and, therefore, not the subject of this matter.

Without waiving these objections and the General and Preliminary Objections, Goodyear states: None.

**INTERROGATORY NO. 18:**  Identify and describe any communications, whether written or oral or telephonic, between you and any employee or representative of any state environmental agency in the states of Washington, Oregon, or California regarding tire leachate, 6PPD, 6PPD-Q, or salmonids since January 1, 1975.  In describing communications responsive to this interrogatory, please identify the persons involved or participating in the communication, the date of the communication, the subject matter of the communication, the form of the communication (written, oral, or telephonic) and a summary of the communication if oral or telephonic.

**RESPONSE TO INTERROGATORY NO. 18:**  Goodyear objects to Interrogatory No. 18 as compound.  Goodyear further objects that this Interrogatory is overly broad and burdensome, unduly vague and ambiguous, and calls for information that is neither relevant to the resolution of Plaintiffs' claims nor reasonably calculated to lead to admissible evidence. Plaintiffs' FAC seeks to enjoin the alleged future "take" of listed salmonids.  Plaintiffs' request that Goodyear provide a broad spectrum of communications dating back decades across three states' environmental agencies is entirely disproportionate to the needs of this case.

Further, "tire leachate" is vague and could contain an unknown breadth and volume of compounds.  "Salmonids" is vague and could encompass hundreds of species, the majority of which are not listed under the Endangered Species Act or included in Plaintiffs' Complaint, and, therefore, not the subject of this matter.  "Environmental agency" is vague and could produce

burdensome because each rubber compound will have a dozen or more chemical constituents, each tire has a dozen or more different compounds, and the defendants collectively produce hundreds or thousands of tire models.

**REQUEST FOR PRODUCTION NO. 10:**  Any application for an incidental take permit for your tires made within the last 10 years, including all drafts thereof.

   **RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**  Subject to the General Objections and Limitations, no such material exists.  Goodyear is ineligible to prepare or submit an application for an ESA Section 10 permit because said permits are not designed for the manufacturer of products.  Discovery is ongoing, and Goodyear reserves the right to supplement this Production.

**REQUEST FOR PRODUCTION NO. 11:**  Any HCP you have proposed for your tires within the last 10 years, including all drafts thereof.

   **RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**  Subject to the General Objections and Limitations, no such material exists.  Goodyear cannot formulate a Habitat Conservation Plan, as the manufacture of products is outside of the scope of ESA Section 10 permits.  Discovery is ongoing, and Goodyear reserves the right to supplement this Production.

  Dated this 17th day of  June, 2024.

        **Womble Bond Dickinson (US) LLP**

     By:  /s/ M. Elizabeth O'Neill
       M. Elizabeth O'Neill (CA Bar No. 257448)
       elizabeth.oneill@wbd-us.com
       301 S. College Center
       301 S. College Street
       Suite 3500
       Charlotte, NC  28202-6050
       P:  704-350-6310

       Keith M. Casto (CA Bar No. 141279)

THE GOODYEAR TIRE & RUBBER COMPANY'S RESPONSES TO PLAINTIFF'S FIRST
INTERROGATORIES AND REQUESTS FOR PRODUCTION.
CASE NO. 23-CV-05748-JD

1 │ ADAM BAAS (CA Bar No. 220464)
adam.baas@us.dlapiper.com
2 │ **DLA PIPER LLP (US)**
555 Mission Street, Suite 2400
3 │ San Francisco, CA 94105-2933
Tel: (415) 836-2500
4 │ Fax: (415) 836-2501

5 │ T. STEVEN HAR (Admitted pro hac vice)
steven.har@us.dlapiper.com
6 │ **DLA PIPER LLP (US)**
1251 Avenue of the Americas
7 │ New York, NY 10020-1104
Tel: (212) 335-4500
8 │ Fax: (212) 335-4501

9 │ *Attorneys for Defendant*
HANKOOK TIRE AMERICA CORP.

10

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO

| | |
|---|---|
| INSTITUTE FOR FISHERIES RESOURCES; and PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, <br><br> Plaintiff, <br><br> v. <br><br> BRIDGESTONE AMERICAS TIRE OPERATIONS, LLC; CONTINENTAL TIRE THE AMERICAS, LLC; GITI TIRE (USA) Ltd.; THE GOODYEAR TIRE & RUBBER CO., individually and as successor in interest to COOPER TIRE & RUBBER CO.; HANKOOK TIRE AMERICA CORP.; KUMHO TIRE U.S.A., INC.; MICHELIN NORTH AMERICA, INC.; NOKIAN TYRES INC.; NOKIAN TYRES U.S. OPERATIONS LLC; PIRELLI TIRE LLC; SUMITOMO RUBBER NORTH AMERICA, INC.; SUMITOMO RUBBER USA, LLC; TOYO TIRE HOLDINGS OF AMERICAS INC.; and YOKOHAMA TIRE CORPORATION, <br><br> Defendants. | Case No.: 3:23-cv-05748-JD <br><br> **DEFENDANT HANKOOK TIRE AMERICA CORP.'S RESPONSES TO PLAINTIFFS' SPECIAL INTERROGATORIES, SET ONE** <br><br> Judge: Hon. James Donato <br><br> Complaint Filed: November 8, 2023 <br> First Amended Complaint Filed: December 6, 2023 |

-1-

information, and who in your employ learned that information." Defendant further objects to this Interrogatory as vague and ambiguous due to its use of the phrase "possibly toxic," which is undefined and subject to multiple interpretations. Defendant further objects to this Interrogatory due to its use of the defined term "tire leachate," which is (1) vague and ambiguous due to its use of the terms "constituents," "chemicals," and "leach," which are undefined and subject to multiple interpretations; and (2) overbroad and unduly burdensome because it is not limited to 6PPD or 6PPD-q, which are the only chemicals at issue in Plaintiffs' Amended Complaint. Defendant further objects to this Interrogatory as overbroad, unduly burdensome, and seeks information that is neither relevant nor proportional to the needs of the case, because it is (1) not limited to 6PPD or 6PPD-q, the only chemicals at issue in Plaintiffs' Amended Complaint; and (2) not limited to the specific species identified in the Amended Complaint. Subject to and without waiving the foregoing objection, Defendant responds as follows:

Neither Defendant nor its agents or employees are currently or have in the past conducted research regarding tire leachate, tire leachate toxicity, 6PPD, or 6PPD-q. Defendant will rely on the opinions of its experts on whether 6PPD, 6PPD-Q, and tire leachate were possibly toxic or not. Defendant will disclose the identity of its testifying expert witnesses along with their opinions, in accordance with the expert discovery schedule the Court issues.

**INTERROGATORY NO. 17:**

Identify and describe any communications, whether written or oral or telephonic, between you and any employee or representative of NMFS or between you and any employee or representative of NOAA regarding tire leachate, 6PPD, 6PPD-Q, or salmonids since January 1, 1975. In describing communications responsive to this interrogatory, please identify the persons involved or participating in the communication, the date of the communication, the subject matter of the communication, the form of the communication (written, oral, or telephonic) and a summary of the communication if oral or telephonic.

**RESPONSE TO INTERROGATORY NO 17:**

Defendant objects to this Interrogatory as seeking information that is not within Defendant's possession, custody, or control. Defendant further objects to this Interrogatory as compound,

-16-

1   because it seeks not only identification of communications but also "the persons involved or

2   participating in the communication, the date of the communication, the subject matter of the

3   communication, the form of the communication (written, oral, or telephonic) and a summary of the

4   communication if oral or telephonic." Defendant further objects to this Interrogatory due to its use

5   of the defined term "tire leachate," which is (1) vague and ambiguous due to its use of the terms

6   "constituents," "chemicals," and "leach," which are undefined and subject to multiple

7   interpretations; and (2) overbroad and unduly burdensome because it is not limited to 6PPD or

8   6PPD-q, which are the only chemicals at issue in Plaintiffs' Amended Complaint. Defendant further

9   objects to this Interrogatory as overbroad, unduly burdensome, and seeks information that is neither

10  relevant nor proportional to the needs of the case, because it is (1) not limited to 6PPD or 6PPD-q,

11  the only chemicals at issue in Plaintiffs' Amended Complaint; and (2) not limited to the specific

12  species identified in the Amended Complaint. Defendant further objects to this Interrogatory on the

13  grounds that it is overbroad, unduly burdensome, and seeks information that is neither relevant nor

14  proportional to the needs of the case, because Plaintiffs' Amended Complaint alleges an ongoing or

15  imminent future take, on which communications dating back to 1975 have no bearing. Subject to

16  and without waiving these objections, Defendant responds as follows:

17          After a diligent inquiry into information known or reasonably available to it, Defendant

18  has not located any information responsive to this Interrogatory.

19  **INTERROGATORY NO. 18:**

20          Identify and describe any communications, whether written or oral or telephonic, between

21  you and any employee or representative of any state environmental agency in the states of

22  Washington, Oregon, or California regarding tire leachate, 6PPD, 6PPD-Q, or salmonids since

23  January 1, 1975. In describing communications responsive to this interrogatory, please identify the

24  persons involved or participating in the communication, the date of the communication, the subject

25  matter of the communication, the form of the communication (written, oral, or telephonic) and a

26  summary of the communication if oral or telephonic.

27  **RESPONSE TO INTERROGATORY NO 18:**

28          Defendant objects to this Interrogatory as seeking information that is not within Defendant's

-17-

ADAM BAAS (CA Bar No. 220464)
adam.baas@us.dlapiper.com
**DLA PIPER LLP (US)**
555 Mission Street, Suite 2400
San Francisco, CA 94105-2933
Tel: (415) 836-2500
Fax: (415) 836-2501

T. STEVEN HAR (Admitted pro hac vice)
steven.har@us.dlapiper.com
**DLA PIPER LLP (US)**
1251 Avenue of the Americas
New York, NY 10020-1104
Tel: (212) 335-4500
Fax: (212) 335-4501

*Attorneys for Defendant*
HANKOOK TIRE AMERICA CORP.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO**

| | |
|---|---|
| INSTITUTE FOR FISHERIES RESOURCES; and PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS,<br><br>Plaintiff,<br><br>v.<br><br>BRIDGESTONE AMERICAS TIRE OPERATIONS, LLC; CONTINENTAL TIRE THE AMERICAS, LLC; GITI TIRE (USA) Ltd.; THE GOODYEAR TIRE & RUBBER CO., individually and as successor in interest to COOPER TIRE & RUBBER CO.; HANKOOK TIRE AMERICA CORP.; KUMHO TIRE U.S.A., INC.; MICHELIN NORTH AMERICA, INC.; NOKIAN TYRES INC.; NOKIAN TYRES U.S. OPERATIONS LLC; PIRELLI TIRE LLC; SUMITOMO RUBBER NORTH AMERICA, INC.; SUMITOMO RUBBER USA, LLC; TOYO TIRE HOLDINGS OF AMERICAS INC.; and YOKOHAMA TIRE CORPORATION,<br><br>Defendants. | Case No.:  3:23-cv-05748-JD<br><br>**DEFENDANT HANKOOK TIRE AMERICA CORP.'S RESPONSES TO PLAINTIFFS' REQUESTS FOR PRODUCTION OF DOCUMENTS, SET ONE**<br><br>Judge: Hon. James Donato<br><br>Complaint Filed: November 8, 2023<br>First Amended Complaint Filed: December 6, 2023 |

1    Defendant has not sought any incidental take permit within the last 10 years.

2    **REQUEST FOR PRODUCTION NO. 11:**

3    Any HCP you have proposed for your tires within the last 10 years, including all drafts

4    thereof.

5    **RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

6    Defendant objects to this Request to the extent it seeks information subject to the attorney-

7    client privilege, work product protection, or any other applicable privilege or protection. Defendant

8    objects to this Request to the extent it seeks documents that are outside of Defendant's possession,

9    custody, or control. Defendant further objects to this Request as vague and ambiguous in its use of

10   the term "your tires," which is undefined and subject to multiple interpretations. In responding to

11   this Request, Defendant is interpreting the term "your tires" to mean tires that Defendant takes

12   possession from third party entities and then distributes. Defendant also objects to this Request to

13   the extent the term "HCP" is undefined and therefore vague and ambiguous as to the information

14   sought. In responding to this Request, Defendant is interpreting the term "HCP" to mean a "habitat

15   conservation plan." Subject to and without waiving these objections, Defendant responds as follows:

16   Defendant has not proposed any habitat conservation plan within the last 10 years.

17   Dated:  June 17, 2024                    **DLA PIPER LLP (US)**

18

19                                           By: /s/ Adam Baas
20                                           ADAM BAAS
                                             T. STEVEN HAR
21
                                             *Attorneys for Defendant*
22                                           Hankook Tire America Corp.

23

24

25

26

27

28

DocuSign Envelope ID: 8E68F3AD-C945-4396-9B35-9A7D81794442

Justin I. Park (Cal. Bar No. 250220)
Gwen Keyes Fleming (admitted *pro hac vice*)
justin.park@us.dlapiper.com
gwen.keyesfleming@us.dlapiper.com
DLA PIPER LLP (US)
500 Eighth Street, NW
Washington, DC 20004
Telephone: (202) 799-4000
Facsimile: (202) 799-5000

Attorneys for Defendant
KUMHO TIRE U.S.A., INC.

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INSTITUTE FOR FISHERIES RESOURCES; and PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS,<br><br>        Plaintiffs,<br><br>    v.<br><br>BRIDGESTONE AMERICAS TIRE OPERATIONS, LLC; CONTINENTAL TIRE THE AMERICAS, LLC; GITI TIRE (USA) Ltd.; THE GOODYEAR TIRE & RUBBER COMPANY, individually and as successor in interest to COOPER TIRE & RUBBER COMPANY; HANKOOK TIRE AMERICA Corp.; KUMHO TIRE U.S.A., Inc.; MICHELIN NORTH AMERICA, Inc.; NOKIAN TYRES Inc.; NOKIAN TYRES U.S. OPERATIONS LLC; PIRELLI TIRE LLC; SUMITOMO RUBBER NORTH AMERICA, Inc.; SUMITOMO RUBBER USA, LLC; TOYO TIRE HOLDINGS OF AMERICAS Inc.; and YOKOHAMA TIRE Corporation.<br><br>        Defendants. | Case No. 23-cv-05748-JD<br><br>**DEFENDANT KUMHO TIRE U.S.A., INC.'S RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANTS AND REQUESTS FOR PRODUCTION OF DOCUMENTS** |

DocuSign Envelope ID: 8E98F3AD-C9A5-4396-AB35-9A7D81794442

**INTERROGATORY NO. 16:**  Identify when you first learned that 6PPD, 6PPD-Q, and tire leachate were possibly toxic, to what species it was possibly toxic to, how you learned that information, and who in your employ learned that information.

**RESPONSE:**  KUSA incorporates herein its above-stated general objections and objections to Plaintiff's instructions and definitions.  KUSA further objects to this Interrogatory because the terms "toxic" and "possibly toxic" are undefined and subject to varying interpretations.  KUSA further objects to this Interrogatory on the grounds that it is unduly burdensome, and compound. KUSA further objects to this Interrogatory as overly broad, insofar as it seeks information concerning alleged toxicity of 6PPD or 6PPD-Q on species other than those at issue in the Amended Complaint.  KUSA further objects to this Interrogatory insofar as it seeks information protected by the attorney-client privilege, work product doctrine, or other privilege and/or protection.

Subject to and without waiver of the foregoing objections, KUSA first learned of alleged potential effects of 6PPD-Q on certain salmonid species when a report of a controlled laboratory study titled "A Ubiquitous Tire Rubber-Derived Chemical Induces Acute Mortality in Coho Salmon" was published in in a 2021 issue of the journal *Science*.

**INTERROGATORY NO. 17:**  Identify and describe any communications, whether written or oral or telephonic, between you and any employee or representative of NMFS or between you and any employee or representative of NOAA regarding tire leachate, 6PPD, 6PPD-Q, or salmonids since January 1, 1975.  In describing communications responsive to this interrogatory, please identify the persons involved or participating in the communication, the date of the communication, the subject matter of the communication, the form of the communication (written, oral, or telephonic) and a summary of the communication if oral or telephonic.

**RESPONSE:**  KUSA incorporates herein its above-stated general objections and objections to Plaintiff's instructions and definitions.  KUSA further objects to this

Interrogatory because the term "tire leachate" is undefined and subject to varying interpretations.  KUSA further objects to this Interrogatory on the grounds that it is unduly burdensome, and compound.  KUSA further objects to this Interrogatory as overly broad, insofar as it seeks information concerning alleged toxicity of 6PPD or 6PPD-Q on species other than those at issue in the Amended Complaint.  KUSA further objects to this Interrogatory insofar that it is temporally overbroad, in that it seeks information extending over a period of nearly fifty years.  KUSA further objects to this Interrogatory insofar as it seeks information protected by the attorney-client privilege, work product doctrine, or other privilege and/or protection.

Subject to and without waiver of the foregoing objections, KUSA responds as follows:  None.

**INTERROGATORY NO. 18:**  Identify and describe any communications, whether written or oral or telephonic, between you and any employee or representative of any state environmental agency in the states of Washington, Oregon, or California regarding tire leachate, 6PPD, 6PPD-Q, or salmonids since January 1, 1975.  In describing communications responsive to this interrogatory, please identify the persons involved or participating in the communication, the date of the communication, the subject matter of the communication, the form of the communication (written, oral, or telephonic) and a summary of the communication if oral or telephonic.

**RESPONSE:**  KUSA incorporates herein its above-stated general objections and objections to Plaintiff's instructions and definitions.  KUSA further objects to this Interrogatory because the term "tire leachate" is undefined and subject to varying interpretations.  KUSA further objects to this Interrogatory on the grounds that it is unduly burdensome, and compound.  KUSA further objects to this Interrogatory as overly broad, insofar as it seeks information concerning alleged toxicity of 6PPD or 6PPD-Q on species other than those at issue in the Amended Complaint.  KUSA further objects to this

DocuSign Envelope ID: 8E08F3AD-C945-4396-AB25-9A7D81794442

it seeks information protected by the attorney-client privilege, work product doctrine, or other privilege and/or protection.

Subject to and without waiver of the foregoing objections, KUSA responds as follows: none.

**REQUEST FOR PRODUCTION NO. 10:**  Any application for an incidental take permit for your tires made within the last 10 years, including all drafts thereof.

**RESPONSE:**  KUSA incorporates herein its above-stated general objections and objections to Plaintiff's instructions and definitions.  KUSA further objects to this Request as irrelevant to the claims at issue in the current litigation.  KUSA further objects to this Request on the grounds that it is overly broad and unduly burdensome, insofar as it seeks information for a period of ten years.  KUSA further objects to this Interrogatory insofar as it seeks information protected by the attorney-client privilege, work product doctrine, or other privilege and/or protection.

Subject to and without waiver of the foregoing objections, KUSA responds as follows: none.

**REQUEST FOR PRODUCTION NO. 11:**  Any HCP you have proposed for your tires within the last 10 years, including all drafts thereof.

**RESPONSE:**  KUSA incorporates herein its above-stated general objections and objections to Plaintiff's instructions and definitions.  KUSA further objects to this Request because the term "HCP" is undefined.  KUSA further objects to this Request on the grounds that it is overly broad and unduly burdensome, insofar as it seeks information for a period of ten years.  KUSA further objects to this Interrogatory insofar as it seeks information protected by the attorney-client privilege, work product doctrine, or other privilege and/or protection.

Subject to and without waiver of the foregoing objections, KUSA states that it

cannot respond to this Request in the absence of a definition for the term "HCP."

Dated: June 17, 2024                    As to objections,

                                        DLA PIPER LLP (US)

                                        By  _/s/ Gwen Keyes Fleming_
                                            GWEN KEYES FLEMING

                                            *Attorneys for Defendant*
                                            *KUMHO TIRE U.S.A., INC.*

1  George J. Gigounas (CA Bar No. 209334)
   george.gigounas@us.dlapiper.com
2  **DLA PIPER LLP (US)**
   555 Mission Street, Suite 2400
3  San Francisco, CA 94105
   Tel:    415.836.2500
4  Fax:    415.836.2501

5  *Attorney for Defendant*
   *Michelin North America, Inc*
6

7  (Additional Counsel on Signature Page)

8
                     **UNITED STATES DISTRICT COURT**
9
                    **NORTHERN DISTRICT OF CALIFORNIA**
10
                             **SAN FRANCISCO**
11

12 | INSTITUTE FOR FISHERIES RESOURCES;  | Case No. 3:23-cv-05748-JD
   | and PACIFIC COAST FEDERATION OF     |
   | FISHERMEN'S ASSOCIATIONS,           | **DEFENDANT MICHELIN NORTH**
13 |                                     | **AMERICA, INC.'S RESPONSE TO**
   |                Plaintiffs,           | **PLAINTIFFS' SPECIAL**
14 |                                     | **INTERROGATORIES, SET ONE**
   |        v.                           |
15 |                                     | Judge:  Hon. James Donato
   | BRIDGESTONE AMERICAS TIRE           |
16 | OPERATIONS, LLC; CONTINENTAL TIRE   | Complaint Filed:  November 8, 2023
   | THE AMERICAS, LLC; GITI TIRE (USA) Ltd.; | First Amended Complaint Filed: December 6,
17 | THE GOODYEAR TIRE & RUBBER CO.,     | 2023
   | individually and as successor in interest to |
18 | COOPER TIRE & RUBBER CO.; HANKOOK   |
   | TIRE AMERICA CORP.; KUMHO TIRE      |
19 | U.S.A., INC.; MICHELIN NORTH AMERICA,|
   | INC.; NOKIAN TYRES INC.; NOKIAN     |
20 | TYRES U.S. OPERATIONS LLC; PIRELLI  |
   | TIRE LLC; SUMITOMO RUBBER NORTH     |
21 | AMERICA, INC.; SUMITOMO RUBBER USA, |
   | LLC; TOYO TIRE HOLDINGS OF          |
22 | AMERICAS INC.; and YOKOHAMA TIRE    |
   | CORPORATION,                        |
23 |                                     |
   |                Defendants.          |
24

25

26

27

28

1  ozone-synthesized 6PPD-Q in 2020, on or about the date of publication of Zhenyu Tian et al., "A

2  Ubiquitous Tire Rubber-Derived Chemical Induces Acute Mortality in Coho Salmon," 371

3  SCIENCE 185 (2021).

4        By way of further answer, MNAI refers Plaintiffs to its Initial Disclosures.

5  **INTERROGATORY NO. 17:**

6        Identify and describe any communications, whether written or oral or telephonic, between

7  you and any employee or representative of NMFS or between you and any employee or

8  representative of NOAA regarding tire leachate, 6PPD, 6PPD-Q, or salmonids since January 1,

9  1975. In describing communications responsive to this interrogatory, please identify the persons

10  involved or participating in the communication, the date of the communication, the subject matter

11  of the communication, the form of the communication (written, oral, or telephonic) and a summary

12  of the communication if oral or telephonic.

13  **RESPONSE TO INTERROGATORY NO 17:**

14        MNAI objects to this Interrogatory as compound because it seeks not only identification of

15  communications but also "the persons involved or participating in the communication, the date of

16  the communication, the subject matter of the communication, the form of the communication

17  (written, oral, or telephonic) and a summary of the communication if oral or telephonic." MNAI

18  further objects to this Interrogatory due to its use of the defined phrase "tire leachate," which is: (1)

19  vague and ambiguous due to its use of the terms "constituents," "chemicals," and "leach," which

20  are undefined and subject to multiple interpretations; and (2) overbroad and unduly burdensome

21  because it is not limited to 6PPD or 6PPD-Q, which are the only chemicals at issue in Plaintiffs'

22  Amended Complaint. MNAI further objects to this Interrogatory as harassing, overly broad, unduly

23  burdensome, and seeks information that is neither relevant nor proportional to the needs of the case,

24  because it is: (1) not limited to 6PPD or 6PPD-Q, the only chemicals at issue in Plaintiffs' Amended

25  Complaint; and (2) not limited to the specific species identified in the Amended Complaint. MNAI

26  further objects to this Interrogatory on the grounds that it is harassing, overly broad, unduly

27

28

1  burdensome, and seeks information that is neither relevant nor proportional to the needs of the case,

2  because Plaintiffs' Amended Complaint alleges an ongoing or imminent future take, for which

3  communications dating back to 1975 have no relevance. MNAI further objects to this Interrogatory

4  as seeking information that is not within MNAI's possession, custody, or control.

5        Subject to and without waiving the foregoing objections and the objections to instructions

6  and definitions which are incorporated herein, MNAI responds as follows: After a reasonable

7  inquiry into information known or reasonably available to it, MNAI has not identified any

8  information responsive to this Interrogatory.

9  **INTERROGATORY NO. 18:**

10        Identify and describe any communications, whether written or oral or telephonic, between

11  you and any employee or representative of any state environmental agency in the states of

12  Washington, Oregon, or California regarding tire leachate, 6PPD, 6PPD-Q, or salmonids since

13  January 1, 1975. In describing communications responsive to this interrogatory, please identify the

14  persons involved or participating in the communication, the date of the communication, the subject

15  matter of the communication, the form of the communication (written, oral, or telephonic) and a

16  summary of the communication if oral or telephonic.

17  **RESPONSE TO INTERROGATORY NO 18:**

18        MNAI objects to this Interrogatory as compound because it seeks not only identification of

19  communications but also "the persons involved or participating in the communication, the date of

20  the communication, the subject matter of the communication, the form of the communication

21  (written, oral, or telephonic) and a summary of the communication if oral or telephonic." MNAI

22  further objects to this Interrogatory due to its use of the defined phrase "tire leachate," which is: (1)

23  vague and ambiguous due to its use of the terms "constituents," "chemicals," and "leach," which

24  are undefined and subject to multiple interpretations; and (2) overbroad and unduly burdensome

25  because it is not limited to 6PPD or 6PPD-Q, which are the only chemicals at issue in Plaintiffs'

26  Amended Complaint. MNAI further objects to this Interrogatory as harassing, overly broad, unduly

27

28

1   George J. Gigounas (CA Bar No. 209334)
    george.gigounas@us.dlapiper.com
2   **DLA PIPER LLP (US)**
    555 Mission Street, Suite 2400
3   San Francisco, CA 94105
    Tel:    415.836.2500
4   Fax:    415.836.2501

5   *Attorney for Defendant*
    *Michelin North America, Inc*

6

7

8                          **UNITED STATES DISTRICT COURT**

9                        **NORTHERN DISTRICT OF CALIFORNIA**

10                                 **SAN FRANCISCO**

11

12  INSTITUTE FOR FISHERIES RESOURCES;          Case No. 3:23-cv-05748-JD
    and PACIFIC COAST FEDERATION OF
13  FISHERMEN'S ASSOCIATIONS,                   **DEFENDANT MICHELIN NORTH
                                                AMERICA, INC.'S RESPONSES TO
14                  Plaintiffs,                  PLAINTIFFS' REQUEST FOR
                                                PRODUCTION OF DOCUMENTS, SET
15          v.                                  ONE**

16  BRIDGESTONE AMERICAS TIRE                   Judge:  Hon. James Donato
    OPERATIONS, LLC; CONTINENTAL TIRE
17  THE AMERICAS, LLC; GITI TIRE (USA) Ltd.;    Complaint Filed:  November 8, 2023
    THE GOODYEAR TIRE & RUBBER CO.,             First Amended Complaint Filed: December 6,
18  individually and as successor in interest to 2023
    COOPER TIRE & RUBBER CO.; HANKOOK
19  TIRE AMERICA CORP.; KUMHO TIRE
    U.S.A., INC.; MICHELIN NORTH AMERICA,
20  INC.; NOKIAN TYRES INC.; NOKIAN
    TYRES U.S. OPERATIONS LLC; PIRELLI
21  TIRE LLC; SUMITOMO RUBBER NORTH
    AMERICA, INC.; SUMITOMO RUBBER USA,
22  LLC; TOYO TIRE HOLDINGS OF
    AMERICAS INC.; and YOKOHAMA TIRE
23  CORPORATION,

24                  Defendants.

25

26

27

28

1 **RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**

2      MNAI objects to this Request to the extent it seeks documents protected from disclosure by

3 the attorney-client privilege, work product protection, or any other applicable privilege or

4 protection.

5      Subject to and without waiving the foregoing objections and the objections to instructions

6 and definitions which are incorporated herein, MNAI responds as follows: After a reasonable and

7 diligent inquiry into information known or reasonably available to it, MNAI has not identified any

8 documents responsive to this Request.

9 **REQUEST FOR PRODUCTION NO. 11:**

10      Any HCP you have proposed for your tires within the last 10 years, including all drafts

11 thereof.

12 **RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

13      MNAI objects to this Request to the extent it seeks documents protected from disclosure by

14 the attorney-client privilege, work product protection, or any other applicable privilege or

15 protection.

16      Subject to and without waiving the foregoing objections and the objections to instructions

17 and definitions which are incorporated herein, MNAI responds as follows: After a reasonable and

18 diligent inquiry into information known or reasonably available to it, MNAI has not identified any

19 documents responsive to this Request.

20

21   Dated:  June 17, 2024                          **DLA PIPER LLP (US)**

22                                        By:  */s/ George Gigounas*

23                                            GEORGE GIGOUNAS
                                            CAROLINE LEE

24                                            PAUL WIERENGA (*Admitted Pro Hac
                                            Vice*)

25                                            Attorneys for Defendant
                                            Michelin North America, Inc.

26

27

28

Susan E. Smith, (CA Bar No. 329539)
ssmith@bdlaw.com
456 Montgomery Street, Ste. 1800
San Francisco, CA  94104
P: 415-262-4023

Loren R. Dunn, *(pro hac vice)*
ldunn@bdlaw.com
600 University Street, Ste. 1601
Seattle, WA  98101
P: 206-315-4810

W. Parker Moore *(pro hac vice)*
pmoore@bdlaw.com
1900 N. Street NW, Ste. 100
Washington, D.C.  20036
P: 202-789-6028

*Counsel for Defendants Bridgestone Americas Tire Operations, LLC; Continental Tire the Americas, LLC; GITI Tire (USA), Ltd.; The Goodyear Tire & Rubber Company, individually and as successor in interest to Cooper Tire & Rubber Company; Nokian Tyres Inc.; Nokian Tyres U.S. Operations, LLC; Pirelli Tire LLC; Sumitomo Rubber North America, Inc.; Sumitomo Rubber USA, LLC; Toyo Tire Holdings of Americas Inc.; and Yokohama Tire Corporation.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INSTITUTE FOR FISHERIES RESOURCES; and PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS,<br><br>Plaintiffs,<br><br>vs.<br><br>BRIDGESTONE AMERICAS TIRE OPERATIONS, LLC; CONTINENTAL TIRE THE AMERICAS, LLC; GITI TIRE (USA) Ltd.; THE GOODYEAR TIRE & RUBBER COMPANY, individually and as | Case No. 23-cv-05748-JD<br><br>**DEFENDANTS NOKIAN TYRES, INC. AND NOKIAN TYRES U.S. OPERATIONS, LLC'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS** |

"knowledge" of these matters is not relevant to or an element of the questions that are at issue in this case.  Plaintiffs ask Nokian Tyres to identify anyone that was ever in its employ that "learned" any of these topics.  Plaintiffs' use of "tire leachate" is vague and ambiguous, as it contains an unknown breadth and volume of compounds.  Plaintiffs' use of "toxic" is likewise vague and ambiguous, as Plaintiffs provide no metrics or definition of toxicity.

Without waiving any of the foregoing objections or its General and Preliminary Objections, on November 24, 2020, Nokian Tyres, Inc. employee Darren Bakkestuen received an email from Sarah Amick of USTMA attaching a communication from Edward Kolodziej regarding research relating to 6PPD-q impacts on coho salmon.

INTERROGATORY NO. 17:  Identify and describe any communications, whether written or oral or telephonic, between you and any employee or representative of NMFS or between you and any employee or representative of NOAA regarding tire leachate, 6PPD, 6PPD-Q, or salmonids since January 1, 1975.  In describing communications responsive to this interrogatory, please identify the persons involved or participating in the communication, the date of the communication, the subject matter of the communication, the form of the communication (written, oral, or telephonic) and a summary of the communication if oral or telephonic.

RESPONSE:     Nokian Tyres objects to this interrogatory as compound.  Nokian Tyres further objects to this Interrogatory as overly broad and burdensome and unduly vague and ambiguous, and calls for information that is neither relevant to the resolution of the Plaintiffs' claims nor reasonably calculated to lead to admissible evidence.  Plaintiffs' FAC seeks to enjoin future "take" of listed salmonids.  Plaintiffs' request that Nokian Tyres provide a broad spectrum

of communications dating back nearly five decades is entirely disproportionate to the needs of this case. Further, "tire leachate" is vague and could contain an unknown breadth and volume of compounds. "Salmonids" is vague and could encompass hundreds of species, the majority of which are not listed under the Endangered Species Act or included in Plaintiffs' Complaint, and, therefore, not the subject of this matter.

Without waiver of the foregoing objections or its General and Preliminary Objections, Nokian Tyres is not aware of such communications involving it or its employees.

INTERROGATORY NO. 18:  Identify and describe any communications, whether written or oral or telephonic, between you and any employee or representative of any state environmental agency in the states of Washington, Oregon, or California regarding tire leachate, 6PPD, 6PPD-Q, or salmonids since January 1, 1975.  In describing communications responsive to this interrogatory, please identify the persons involved or participating in the communication, the date of the communication, the subject matter of the communication, the form of the communication (written, oral, or telephonic) and a summary of the communication if oral or telephonic.

RESPONSE:  Nokian Tyres objects to this interrogatory as compound.  Nokian Tyres further objects to this Interrogatory as overly broad and burdensome and unduly vague and ambiguous, and calls for information that is neither relevant to the resolution of the Plaintiffs' claims nor reasonably calculated to lead to admissible evidence.  Plaintiffs' FAC seeks to enjoin future "take" of listed salmonids.  Plaintiffs' request that Nokian Tyres provide a broad spectrum of communications dating back decades across three states' environmental agencies is entirely disproportionate to the needs of this case.  Further, "tire leachate" is vague and could contain an

chemical constituents in its tires would require disclosure of highly valuable and protected trade secret information.

REQUEST FOR PRODUCTION NO. 10:  Any application for an incidental take permit for your tires made within the last 10 years, including all drafts thereof.

RESPONSE: Subject to its General Objections and Limitations, Nokian Tyres states that no such material exists.  Nokian Tyres is ineligible to prepare or submit an application for an ESA Section 10 permit because said permits are not designed for the manufacture of products.

REQUEST FOR PRODUCTION NO. 11:  Any HCP you have proposed for your tires within the last 10 years, including all drafts thereof.

RESPONSE: Subject to its General Objections and Limitations, Nokian Tyres states that no such material exists.  Nokian Tyres cannot formulate a Habitat Conservation Plan, as the manufacture of products is outside of the scope of ESA Section 10 permits.

Respectfully submitted this 17th day of June, 2024.

**Beveridge & Diamond P.C.**

By: */s/Loren R. Dunn*

Loren R. Dunn, *(pro hac vice)*
ldunn@bdlaw.com
600 University Street, Ste. 1601
Seattle, WA  98101
P: 206-315-4810

Susan E. Smith, (CA Bar No. 329539)
ssmith@bdlaw.com
456 Montgomery Street, Ste. 1800
San Francisco, CA  94104
P: 415-262-4023

DEFENDANTS NOKIAN TYRES, INC. AND NOKIAN TYRES U.S.
OPERATIONS, LLC'S RESPONSES TO PLAINTIFF'S FIRST SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION OF
DOCUMENTS - Case No. 23-cv-05748-JD **-** Page 29

1
2  Susan E. Smith, (CA Bar No. 329539)
   ssmith@bdlaw.com
3  456 Montgomery Street, Ste. 1800
   San Francisco, CA  94104
4  P: 415-262-4023

5  Loren R. Dunn, *(pro hac vice)*
   ldunn@bdlaw.com
6  600 University Street, Ste. 1601
   Seattle, WA  98101
7  P: 206-315-4810

8
9  W. Parker Moore *(pro hac vice)*
   pmoore@bdlaw.com
10 1900 N. Street NW, Ste. 100
   Washington, D.C.  20036
11 P: 202-789-6028

12 *Counsel for Defendants Bridgestone Americas Tire*
   *Operations, LLC; Continental Tire the Americas, LLC;*
13 *GITI Tire (USA), Ltd.; The Goodyear Tire & Rubber*
   *Company, individually and as successor in interest to*
14 *Cooper Tire & Rubber Company; Nokian Tyres Inc.;*
   *Nokian Tyres U.S. Operations, LLC; Pirelli Tire LLC;*
15 *Sumitomo Rubber North America, Inc.; Sumitomo*
   *Rubber USA, LLC; Toyo Tire Holdings of Americas*
16 *Inc.; and Yokohama Tire Corporation.*
17

18            UNITED STATES DISTRICT COURT
19         FOR THE NORTHERN DISTRICT OF CALIFORNIA

20 INSTITUTE FOR FISHERIES RESOURCES; and       Case No. 23-cv-05748-JD
   PACIFIC COAST FEDERATION OF FISHERMEN'S
21 ASSOCIATIONS,

22                    Plaintiffs,                PLAINTIFFS' FIRST SET OF
                                                 INTERROGATORIES TO
23         v.                                    DEFENDANTS
                                                 AND REQUESTS FOR
24 BRIDGESTONE AMERICAS TIRE OPERATIONS,         PRODUCTION OF
   LLC; CONTINENTAL TIRE THE AMERICAS, LLC;      DOCUMENTS
25 GITI TIRE (USA) Ltd.; THE GOODYEAR TIRE &
   RUBBER COMPANY, individually and as successor in  ***AND PIRELLI TIRE LLC'S***
26 interest to COOPER TIRE & RUBBER COMPANY;     ***OBJECTIONS AND***
   HANKOOK TIRE AMERICA Corp.; KUMHO TIRE        ***RESPONSES THERETO***
27 U.S.A., Inc.; MICHELIN NORTH AMERICA, Inc.;
   NOKIAN TYRES Inc.; NOKIAN TYRES U.S.
28

for information that is neither relevant to the resolution of the Plaintiffs' claims nor reasonably calculated to lead to admissible evidence. Pirelli Tire's "knowledge" of these matters is not relevant to or an element of the questions that are at issue in this case. Plaintiffs ask Pirelli Tire to identify anyone that was ever in its employ that "learned" any of these topics. Plaintiffs' use of "tire leachate" is vague and ambiguous, as it contains an unknown breadth and volume of compounds. Plaintiffs' use of "toxic" is likewise vague and ambiguous, as Plaintiffs provide no metrics or definition of toxicity.

Without waiving any of the aforementioned objections, Pirelli Tire answers as follows: In late 2020, it was first reported by Tian, et al., that when it reacts with ozone, 6PPD can form a degradation product, 6PPD-quinone. This reaction is part of the way in which 6PPD protects tire rubber from degradation. Pirelli Tire reserves the right to supplement this response because discovery is ongoing.

**INTERROGATORY NO. 17:** Identify and describe any communications, whether written or oral or telephonic, between you and any employee or representative of NMFS or between you and any employee or representative of NOAA regarding tire leachate, 6PPD, 6PPD-Q, or salmonids since January 1, 1975. In describing communications responsive to this interrogatory, please identify the persons involved or participating in the communication, the date of the communication, the subject matter of the communication, the form of the communication (written, oral, or telephonic) and a summary of the communication if oral or telephonic.

**RESPONSE TO INTERROGATORY NO. 17:**

Pirelli Tire objects to Interrogatory No. 17 as compound. Pirelli Tire further objects to this Interrogatory as overly broad, unduly burdensome, vague, and ambiguous, and that it calls for information that is neither relevant to the resolution of the Plaintiffs' claims nor reasonably calculated to lead to admissible evidence. Plaintiffs' FAC seeks to enjoin future "take" of listed salmonids. Plaintiffs' request that Pirelli Tire provide a broad spectrum of communications dating back nearly five decades is entirely disproportionate to the needs of this case. Further, "tire leachate" is vague and could contain an unknown breadth and volume of compounds.

"Salmonids" is vague and could encompass hundreds of species, the majority of which are not listed under the Endangered Species Act or included in Plaintiffs' Complaint, and, therefore, not the subject of this matter.  Further, Plaintiffs' request for communications with government officials may call for documents protected by Pirelli Tire's First Amendment privilege against such disclosure.

Without waiving these objections and the General and Preliminary Objections, Pirelli Tire states:  None.  Pirelli Tire reserves the right to supplement this response because discovery is ongoing.

**INTERROGATORY NO. 18:**  Identify and describe any communications, whether written or oral or telephonic, between you and any employee or representative of any state environmental agency in the states of Washington, Oregon, or California regarding tire leachate, 6PPD, 6PPD-Q, or salmonids since January 1, 1975.  In describing communications responsive to this interrogatory, please identify the persons involved or participating in the communication, the date of the communication, the subject matter of the communication, the form of the communication (written, oral, or telephonic) and a summary of the communication if oral or telephonic.

**RESPONSE TO INTERROGATORY NO. 18:**

Pirelli Tire objects to Interrogatory No. 18 as compound.  Pirelli Tire further objects to this Interrogatory as overly broad, unduly burdensome, vague, and ambiguous, and that it calls for information that is neither relevant to the resolution of the Plaintiffs' claims nor reasonably calculated to lead to admissible evidence.  Plaintiffs' FAC seeks to enjoin future "take" of listed salmonids.  Plaintiffs' request that Pirelli Tire provide a broad spectrum of communications dating back decades across three states' environmental agencies is entirely disproportionate to the needs of this case.

Further, "tire leachate" is vague and could contain an unknown breadth and volume of compounds.  "Salmonids" is vague and could encompass hundreds of species, the majority of which are not listed under the Endangered Species Act or included in Plaintiffs' Complaint, and,

PIRELLI TIRE LLC'S RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES AND REQUESTS FOR PRODUCTION - 18
CASE NO. 23-cv-05748-JD

1  not specify the type of document Plaintiffs seek, seeks documents not related to 6PPD or 6PPD-

2  Q, does not specify a timeframe, is not related to the causes of action asserted in Plaintiffs' FAC

3  [Dkt. 19], and is overbroad in reach.

4

5  **REQUEST FOR PRODUCTION NO. 9:**  All material safety data sheets or any equivalent

6  regulatory document that discloses the safety of chemicals in your tires.

7  **RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

8  Pirelli Tire objects to Request No. 9 as overly broad and burdensome, not relevant, and

9  not calculated to lead to admissible evidence.  This request is tantamount to a request for Pirelli

10  Tire's tire formulations, and Pirelli Tire's product and chemical formulae are highly confidential,

11  both with respect to the Plaintiffs and to the other defendants.  They are not material to the issues

12  of the case.  They will not be produced absent a good showing of relevance and need, and a

13  confirming Court order.  They are not relevant because the only tire constituent at issue in this

14  case is 6PPD.  The request is also overly broad and unduly burdensome because each rubber

15  compound will have a dozen or more chemical constituents, each tire has a dozen or more

16  different compounds, and the defendants collectively produce hundreds or thousands of tire

17  models.

18

19  **REQUEST FOR PRODUCTION NO. 10:**  Any application for an incidental take permit for

20  your tires made within the last 10 years, including all drafts thereof.

21  **RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**

22  Subject to the General Objections and Limitations, no such material exists.  Pirelli Tire is

23  ineligible to prepare or submit an application for an ESA Section 10 permit because said permits

24  are not designed for the manufacture of products.  Discovery is ongoing, and Pirelli Tire reserves

25  the right to supplement this Production.

26

27  **REQUEST FOR PRODUCTION NO. 11:**  Any HCP you have proposed for your tires within

28  the last 10 years, including all drafts thereof.

PIRELLI TIRE LLC'S RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES AND
REQUESTS FOR PRODUCTION - 25
CASE NO. 23-cv-05748-JD

**RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

Subject to the General Objections and Limitations, no such material exists.  Pirelli Tire cannot formulate a Habitat Conservation Plan, as the manufacture of products is outside of the scope of ESA Section 10 permits.  Discovery is ongoing, and Pirelli Tire reserves the right to supplement this Production.

Dated this 17th day of June, 2024.

**Beveridge & Diamond P.C.**

By: */s/ Loren R. Dunn*
    Loren R. Dunn, *(pro hac vice)*
    ldunn@bdlaw.com
    600 University Street, Ste. 1601
    Seattle, WA  98101
    P: 206-315-4810

    Susan E. Smith, (CA Bar No. 329539)
    ssmith@bdlaw.com
    456 Montgomery Street, Ste. 1800
    San Francisco, CA  94104
    P: 415-262-4023

    W. Parker Moore *(pro hac vice)*
    pmoore@bdlaw.com
    1900 N. Street NW, Ste. 100
    Washington, D.C.  20036
    P: 202-789-6028

1  Susan E. Smith, (CA Bar No. 329539)
2  ssmith@bdlaw.com
   456 Montgomery Street, Ste. 1800
3  San Francisco, CA  94104
   P: 415-262-4023
4
5  Loren R. Dunn, *(pro hac vice)*
   ldunn@bdlaw.com
6  600 University Street, Ste. 1601
   Seattle, WA  98101
7  P: 206-315-4810

8  W. Parker Moore *(pro hac vice)*
9  pmoore@bdlaw.com
   1900 N. Street NW, Ste. 100
10 Washington, D.C.  20036
   P: 202-789-6028
11
12 *Counsel for Defendants Bridgestone Americas Tire*
   *Operations, LLC; Continental Tire the Americas, LLC;*
13 *GITI Tire (USA), Ltd.; The Goodyear Tire & Rubber*
   *Company, individually and as successor in interest to*
14 *Cooper Tire & Rubber Company; Nokian Tyres Inc.;*
   *Nokian Tyres U.S. Operations, LLC; Pirelli Tire LLC;*
15 *Sumitomo Rubber North America, Inc.; Sumitomo*
   *Rubber USA, LLC; Toyo Tire Holdings of Americas*
16 *Inc.; and Yokohama Tire Corporation.*
17

18              UNITED STATES DISTRICT COURT
19         FOR THE NORTHERN DISTRICT OF CALIFORNIA

20 INSTITUTE FOR FISHERIES RESOURCES; and     | Case No. 23-cv-05748-JD
   PACIFIC COAST FEDERATION OF FISHERMEN'S
21 ASSOCIATIONS,

22              Plaintiffs,                     | PLAINTIFFS' FIRST SET OF
                                                | INTERROGATORIES TO
23        v.                                    | DEFENDANTS
                                                | AND REQUESTS FOR
24 BRIDGESTONE AMERICAS TIRE OPERATIONS,        | PRODUCTION OF
   LLC; CONTINENTAL TIRE THE AMERICAS, LLC;     | DOCUMENTS
25 GITI TIRE (USA) Ltd.; THE GOODYEAR TIRE &
   RUBBER COMPANY, individually and as successor | ***AND SUMITOMO RUBBER***
26 in interest to COOPER TIRE & RUBBER COMPANY;  | ***NORTH AMERICA, INC.'S***
   HANKOOK TIRE AMERICA Corp.; KUMHO TIRE        | ***OBJECTIONS AND***
27 U.S.A., Inc.; MICHELIN NORTH AMERICA, Inc.;   | ***RESPONSES THERTO***
   NOKIAN TYRES Inc.; NOKIAN TYRES U.S.
28

RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES AND REQUESTS FOR
PRODUCTION - 1
CASE NO. 23-cv-05748-JD

SRNA reserves the right to supplement this response because discovery is ongoing.

**INTERROGATORY NO. 17:**  Identify and describe any communications, whether written or oral or telephonic, between you and any employee or representative of NMFS or between you and any employee or representative of NOAA regarding tire leachate, 6PPD, 6PPD-Q, or salmonids since January 1, 1975.  In describing communications responsive to this interrogatory, please identify the persons involved or participating in the communication, the date of the communication, the subject matter of the communication, the form of the communication (written, oral, or telephonic) and a summary of the communication if oral or telephonic.

**RESPONSE TO INTERROGATORY NO. 17:**  SRNA objects to Interrogatory No. 17 as compound.

SRNA further objects to this Interrogatory as overly broad and burdensome and unduly vague and ambiguous, and calls for information that is neither relevant to the resolution of the Plaintiffs' claims nor reasonably calculated to lead to admissible evidence.  Plaintiffs' FAC seeks to enjoin future "take" of listed salmonids.  Plaintiffs' request that SRNA provide a broad spectrum of communications dating back nearly five decades is entirely disproportionate to the needs of this case.

Further, "tire leachate" is vague and could contain an unknown breadth and volume of compounds.  "Salmonids" is vague and could encompass hundreds of species, the majority of which are not listed under the Endangered Species Act or included in Plaintiffs' Complaint, and, therefore, not the subject of this matter.  Without waiving these objections and the General and Preliminary Objections, SRNA states:  None.

**INTERROGATORY NO. 18:**  Identify and describe any communications, whether written or oral or telephonic, between you and any employee or representative of any state environmental agency in the states of Washington, Oregon, or California regarding tire leachate, 6PPD, 6PPD-Q, or salmonids since January 1, 1975.  In describing communications responsive to this interrogatory, please identify the persons involved or participating in the communication, the

RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES AND REQUESTS FOR PRODUCTION - 17
CASE NO. 23-cv-05748-JD

1

2   **REQUEST FOR PRODUCTION NO. 11:**  Any HCP you have proposed for your tires within

3   the last 10 years, including all drafts thereof.

4          **RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**  Subject to the General

5   Objections and Limitations, no such material exists.  SRNA cannot formulate a Habitat

6   Conservation Plan, as the manufacture of products is outside of the scope of ESA Section 10

7   permits.  Discovery is ongoing, and SRNA reserves the right to supplement this Production.

8          Dated this 17th day of June, 2024.

9

10                         **Beveridge & Diamond P.C.**

11
                  By: */s/ Loren R. Dunn*
12                   Loren R. Dunn, *(pro hac vice)*
                     ldunn@bdlaw.com
13                   600 University Street, Ste. 1601
                     Seattle, WA  98101
14                   P: 206-315-4810

15
                     Susan E. Smith, (CA Bar No. 329539)
16                   ssmith@bdlaw.com
                     456 Montgomery Street, Ste. 1800
17                   San Francisco, CA  94104
                     P: 415-262-4023
18

19                   W. Parker Moore *(pro hac vice)*
20                   pmoore@bdlaw.com
                     1900 N. Street NW, Ste. 100
21                   Washington, D.C.  20036
                     P: 202-789-6028
22

23

24

25

26

27

28

1  Susan E. Smith, (CA Bar No. 329539)
2  ssmith@bdlaw.com
   456 Montgomery Street, Ste. 1800
3  San Francisco, CA  94104
   P: 415-262-4023
4
5  Loren R. Dunn, *(pro hac vice)*
   ldunn@bdlaw.com
6  600 University Street, Ste. 1601
   Seattle, WA  98101
7  P: 206-315-4810
8
9  W. Parker Moore *(pro hac vice)*
   pmoore@bdlaw.com
   1900 N. Street NW, Ste. 100
10 Washington, D.C.  20036
   P: 202-789-6028
11
12 *Counsel for Defendants Bridgestone Americas Tire*
   *Operations, LLC; Continental Tire the Americas, LLC;*
13 *GITI Tire (USA), Ltd.; The Goodyear Tire & Rubber*
   *Company, individually and as successor in interest to*
14 *Cooper Tire & Rubber Company; Nokian Tyres Inc.;*
   *Nokian Tyres U.S. Operations, LLC; Pirelli Tire LLC;*
15 *Sumitomo Rubber North America, Inc.; Sumitomo*
   *Rubber USA, LLC; Toyo Tire Holdings of Americas*
16 *Inc.; and Yokohama Tire Corporation.*
17

18                   UNITED STATES DISTRICT COURT
19              FOR THE NORTHERN DISTRICT OF CALIFORNIA

20 INSTITUTE FOR FISHERIES RESOURCES; and       Case No. 23-cv-05748-JD
   PACIFIC COAST FEDERATION OF FISHERMEN'S
21 ASSOCIATIONS,

22              Plaintiffs,                       PLAINTIFFS' FIRST SET OF
                                                  INTERROGATORIES TO
           v.                                     DEFENDANTS
23                                                AND REQUESTS FOR
24 BRIDGESTONE AMERICAS TIRE OPERATIONS,         PRODUCTION OF
   LLC; CONTINENTAL TIRE THE AMERICAS, LLC;      DOCUMENTS
25 GITI TIRE (USA) Ltd.; THE GOODYEAR TIRE &
   RUBBER COMPANY, individually and as successor in *AND SUMITOMO RUBBER*
26 interest to COOPER TIRE & RUBBER COMPANY;     *USA, LLC'S OBJECTIONS*
   HANKOOK TIRE AMERICA Corp.; KUMHO TIRE       *AND RESPONSES THERTO*
27 U.S.A., Inc.; MICHELIN NORTH AMERICA, Inc.;
   NOKIAN TYRES Inc.; NOKIAN TYRES U.S.
28

unknown breadth and volume of compounds.  Plaintiffs' use of "toxic" is likewise vague and
ambiguous, as Plaintiffs provide no metrics or definition of toxicity.

Without waiving any of the aforementioned objections, SRUSA answers as follows: See
individuals identified in SRUSA's Initial Disclosures.

SRUSA reserves the right to supplement this response because discovery is ongoing.

**INTERROGATORY NO. 17:**  Identify and describe any communications, whether written or
oral or telephonic, between you and any employee or representative of NMFS or between you
and any employee or representative of NOAA regarding tire leachate, 6PPD, 6PPD-Q, or
salmonids since January 1, 1975.  In describing communications responsive to this interrogatory,
please identify the persons involved or participating in the communication, the date of the
communication, the subject matter of the communication, the form of the communication
(written, oral, or telephonic) and a summary of the communication if oral or telephonic.

**RESPONSE TO INTERROGATORY NO. 17:**  SRUSA objects to Interrogatory No.
17 as compound.

SRUSA further objects to this Interrogatory as overly broad and burdensome and unduly
vague and ambiguous, and calls for information that is neither relevant to the resolution of the
Plaintiffs' claims nor reasonably calculated to lead to admissible evidence.  Plaintiffs' FAC seeks
to enjoin future "take" of listed salmonids.  Plaintiffs' request that SRUSA provide a broad
spectrum of communications dating back nearly five decades is entirely disproportionate to the
needs of this case.

Further, "tire leachate" is vague and could contain an unknown breadth and volume of
compounds.  "Salmonids" is vague and could encompass hundreds of species, the majority of
which are not listed under the Endangered Species Act or included in Plaintiffs' Complaint, and,
therefore, not the subject of this matter.  Without waiving these objections and the General and
Preliminary Objections, SRUSA states:  None.

RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES AND REQUESTS FOR
PRODUCTION - 17
Case No. 23-cv-05748-JD

relevant because the only tire constituent at issue in this case is 6PPD.  The request is also overly broad and unduly burdensome because each rubber compound will have a dozen or more chemical constituents, each tire has a dozen or more different compounds, and the defendants collectively produce hundreds or thousands of tire models.

**REQUEST FOR PRODUCTION NO. 10:**  Any application for an incidental take permit for your tires made within the last 10 years, including all drafts thereof.

      **RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**  Subject to the General Objections and Limitations, no such material exists.  SRUSA is ineligible to prepare or submit an application for an ESA Section 10 permit because said permits are not designed for the manufacture of products.  Discovery is ongoing, and SRUSA reserves the right to supplement this Production.

**REQUEST FOR PRODUCTION NO. 11:**  Any HCP you have proposed for your tires within the last 10 years, including all drafts thereof.

      **RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**  Subject to the General Objections and Limitations, no such material exists.  SRUSA cannot formulate a Habitat Conservation Plan, as the manufacture of products is outside of the scope of ESA Section 10 permits.  Discovery is ongoing, and SRUSA reserves the right to supplement this Production.

      Dated this 17th day of June, 2024.

                    **Beveridge & Diamond P.C.**

      By: */s/ Loren R. Dunn*
          Loren R. Dunn, *(pro hac vice)*
          ldunn@bdlaw.com
          600 University Street, Ste. 1601
          Seattle, WA  98101
          P: 206-315-4810

1  Susan E. Smith, (CA Bar No. 329539)
2  ssmith@bdlaw.com
   456 Montgomery Street, Ste. 1800
3  San Francisco, CA  94104
   P: 415-262-4023
4
5  Loren R. Dunn, *(pro hac vice)*
   ldunn@bdlaw.com
6  600 University Street, Ste. 1601
   Seattle, WA  98101
7  P: 206-315-4810
8
9  W. Parker Moore *(pro hac vice)*
   pmoore@bdlaw.com
   1900 N. Street NW, Ste. 100
10 Washington, D.C.  20036
   P: 202-789-6028
11
12 *Counsel for Defendants Bridgestone Americas Tire*
   *Operations, LLC; Continental Tire the Americas, LLC;*
13 *GITI Tire (USA), Ltd.; The Goodyear Tire & Rubber*
   *Company, individually and as successor in interest to*
14 *Cooper Tire & Rubber Company; Nokian Tyres Inc.;*
   *Nokian Tyres U.S. Operations, LLC; Pirelli Tire LLC;*
15 *Sumitomo Rubber North America, Inc.; Sumitomo*
   *Rubber USA, LLC; Toyo Tire Holdings of Americas*
16 *Inc.; and Yokohama Tire Corporation.*
17
18               UNITED STATES DISTRICT COURT
19           FOR THE NORTHERN DISTRICT OF CALIFORNIA
20
   INSTITUTE FOR FISHERIES RESOURCES; and          Case No. 23-cv-05748-JD
21 PACIFIC COAST FEDERATION OF FISHERMEN'S
   ASSOCIATIONS,
22
                   Plaintiffs,                       PLAINTIFFS' FIRST SET OF
23                                                    INTERROGATORIES TO
         v.                                          DEFENDANTS
24                                                   AND REQUESTS FOR
   BRIDGESTONE AMERICAS TIRE OPERATIONS,            PRODUCTION OF
25 LLC; CONTINENTAL TIRE THE AMERICAS,             DOCUMENTS *AND TOYO*
   LLC;GITI TIRE (USA) Ltd.; THE GOODYEAR          *TIRE HOLDINGS OF*
26 TIRE & RUBBER COMPANY, individually and as      *AMERICAS INC.'S*
   successor in interest to COOPER TIRE & RUBBER    *OBJECTIONS AND*
27 COMPANY;HANKOOK TIRE AMERICA Corp.;             *RESPONSES THERETO*
   KUMHO TIREU.S.A., Inc.; MICHELIN NORTH
28 AMERICA, Inc.;NOKIAN TYRES Inc.; NOKIAN

RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS
CASE NO. 23-CV-05748 - PAGE 1

leachate toxicity" are vague terms, containing an unknown breadth and volume of compounds, and the interrogatory is therefore construed to seek information solely concerning 6PPD or 6PPD-Q. . Additionally, Plaintiffs' FAC [Dkt. 19] does not assert that any compound aside from 6PPD and 6PPD-Q "takes" listed salmonids.  As such, Toyo is not required to produce this information. Toyo objects to this Interrogatory to the extent that it calls for the premature disclosure of potential expert witnesses and expert testimony.  Toyo will make any witness disclosures in accordance with this Court's scheduling order [Dkt. 110].  Toyo reserves the right to supplement this response because discovery is ongoing.

**INTERROGATORY NO. 16:**  Identify when you first learned that 6PPD, 6PPD-Q, and tire leachate were possibly toxic, to what species it was possibly toxic to, how you learned that information, and who in your employ learned that information.

        **RESPONSE TO INTERROGATORY NO. 16:** Toyo objects to Interrogatory No. 16 as compound.  Toyo further objects that this Interrogatory is overly broad and burdensome and unduly vague and ambiguous and calls for information that is neither relevant to the resolution of the Plaintiffs' claims nor reasonably calculated to lead to admissible evidence.   Toyo's "knowledge" of these matters is not relevant to or an element of the questions that are at issue in this case.  Plaintiffs ask Toyo to identify anyone that was ever in its employ that "learned" any of these topics.  Plaintiffs' use of "tire leachate" is vague and ambiguous, as it contains an unknown breadth and volume of compounds.  Plaintiffs' use of "toxic" is likewise vague and ambiguous, as Plaintiffs provide no metrics or definition of toxicity. Without waiving any of the aforementioned objections, Toyo answers as follows: See individuals identified in Toyo's Initial Disclosures. Toyo reserves the right to supplement this response because discovery is ongoing.

**INTERROGATORY NO. 17:**  Identify and describe any communications, whether written or oral or telephonic, between you and any employee or representative of NMFS or between you and any employee or representative of NOAA regarding tire leachate, 6PPD, 6PPD-Q, or salmonids since January 1, 1975.  In describing communications responsive to this interrogatory, please

RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS

CASE NO. 23-CV-05748 - PAGE 16

identify the persons involved or participating in the communication, the date of the communication, the subject matter of the communication, the form of the communication (written, oral, or telephonic) and a summary of the communication if oral or telephonic.

**RESPONSE TO INTERROGATORY NO. 17:**  Toyo objects to Interrogatory No. 17 as compound. Toyo further objects to this Interrogatory as overly broad and burdensome and unduly vague and ambiguous, and calls for information that is neither relevant to the resolution of the Plaintiffs' claims nor reasonably calculated to lead to admissible evidence.  Plaintiffs' FAC seeks to enjoin future "take" of listed salmonids.  Plaintiffs' request that Toyo provide a broad spectrum of communications dating back nearly five decades is entirely disproportionate to the needs of this case. Further, "tire leachate" is vague and could contain an unknown breadth and volume of compounds.  "Salmonids" is vague and could encompass hundreds of species, the majority of which are not listed under the Endangered Species Act or included in Plaintiffs' Complaint, and, therefore, not the subject of this matter.  Without waiving these objections and the General and Preliminary Objections, Toyo states:  None.

**INTERROGATORY NO. 18:**  Identify and describe any communications, whether written or oral or telephonic, between you and any employee or representative of any state environmental agency in the states of Washington, Oregon, or California regarding tire leachate, 6PPD, 6PPD-Q, or salmonids since January 1, 1975.   In describing communications responsive to this interrogatory, please identify the persons involved or participating in the communication, the date of the communication, the subject matter of the communication, the form of the communication (written, oral, or telephonic) and a summary of the communication if oral or telephonic.

**RESPONSE TO INTERROGATORY NO. 18:**  Toyo objects to Interrogatory No. 18 as compound. Toyo further object to this Interrogatory as overly broad and burdensome and unduly vague and ambiguous, and calls for information that is neither relevant to the resolution of the Plaintiffs' claims nor reasonably calculated to lead to admissible evidence.  Plaintiffs' FAC seeks to enjoin future "take" of listed salmonids.  Plaintiffs' request that Toyo provide a broad spectrum of communications dating back decades across three states' environmental agencies is entirely

RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS

1   **REQUEST FOR PRODUCTION NO. 10:**  Any application for an incidental take permit for
2   your tires made within the last 10 years, including all drafts thereof.

3       **RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**  Subject to the General
4   Objections and Limitations, no such material exists.  Toyo is ineligible to prepare or submit an
5   application for an ESA Section 10 permit because said permits are not designed for the
6   manufacture of products.  Discovery is ongoing, and Toyo reserves the right to supplement this
7   Production.

8

9   **REQUEST FOR PRODUCTION NO. 11:**  Any HCP you have proposed for your tires within
10  the last 10 years, including all drafts thereof.

11      **RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**  Subject to the General
12  Objections and Limitations, no such material exists.   Toyo cannot formulate a Habitat
13  Conservation Plan, as the manufacture of products is outside of the scope of ESA Section 10
14  permits.  Discovery is ongoing, and Toyo reserves the right to supplement this Production.

15

16

17      Dated this 17th day of June, 2024.

18

19                                **Beveridge & Diamond P.C.**

20  By: */s/ Loren R. Dunn*
21      Loren R. Dunn, *(pro hac vice)*
        ldunn@bdlaw.com
22      600 University Street, Ste. 1601
        Seattle, WA  98101
23      P: 206-315-4810

24
        Susan E. Smith, (CA Bar No. 329539)
25      ssmith@bdlaw.com
26      456 Montgomery Street, Ste. 1800
        San Francisco, CA  94104
27      P: 415-262-4023

28

RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION OF DOCUMENTS
CASE NO. 23-CV-05748 - PAGE 24

1    Susan E. Smith, (CA Bar No. 329539)
2    ssmith@bdlaw.com
     456 Montgomery Street, Ste. 1800
3    San Francisco, CA  94104
     P: 415-262-4023
4
5    Loren R. Dunn, *(pro hac vice)*
     ldunn@bdlaw.com
6    600 University Street, Ste. 1601
     Seattle, WA  98101
7    P: 206-315-4810
8
9    W. Parker Moore *(pro hac vice)*
     pmoore@bdlaw.com
10   1900 N. Street NW, Ste. 100
     Washington, D.C.  20036
11   P: 202-789-6028

12   *Counsel for Defendants Bridgestone Americas Tire*
     *Operations, LLC; Continental Tire the Americas, LLC;*
13   *GITI Tire (USA), Ltd.; The Goodyear Tire & Rubber*
     *Company, individually and as successor in interest to*
14   *Cooper Tire & Rubber Company; Nokian Tyres Inc.;*
     *Nokian Tyres U.S. Operations, LLC; Pirelli Tire LLC;*
15   *Sumitomo Rubber North America, Inc.; Sumitomo*
     *Rubber USA, LLC; Toyo Tire Holdings of Americas*
16   *Inc.; and Yokohama Tire Corporation.*
17

18                    UNITED STATES DISTRICT COURT
19               FOR THE NORTHERN DISTRICT OF CALIFORNIA

20   INSTITUTE FOR FISHERIES RESOURCES; and       Case No. 23-cv-05748-JD
     PACIFIC COAST FEDERATION OF FISHERMEN'S
21   ASSOCIATIONS,                                 PLAINTIFFS' FIRST SET OF
                                                    INTERROGATORIES TO
22                    Plaintiffs,                   DEFENDANTS
                                                    AND REQUESTS FOR
23            v.                                    PRODUCTION OF
                                                    DOCUMENTS
24   BRIDGESTONE AMERICAS TIRE OPERATIONS,
     LLC; CONTINENTAL TIRE THE AMERICAS,
25   LLC; GITI TIRE (USA) Ltd.; THE GOODYEAR       ***AND YOKOHAMA TIRE***
     TIRE & RUBBER COMPANY, individually and as    ***CORPORATION'S***
26   successor in interest to COOPER TIRE & RUBBER ***OBJECTIONS AND***
     COMPANY; HANKOOK TIRE AMERICA Corp.;          ***RESPONSES THERTO***
27   KUMHO TIRE U.S.A., Inc.; MICHELIN NORTH
     AMERICA, Inc.; NOKIAN TYRES Inc.; NOKIAN
28

     RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES AND REQUESTS FOR
     PRODUCTION - 1
     CASE NO. 23-cv-05748-JD

1   **INTERROGATORY NO. 17:**  Identify and describe any communications, whether written or

2   oral or telephonic, between you and any employee or representative of NMFS or between you

3   and any employee or representative of NOAA regarding tire leachate, 6PPD, 6PPD-Q, or

4   salmonids since January 1, 1975.  In describing communications responsive to this interrogatory,

5   please identify the persons involved or participating in the communication, the date of the

6   communication, the subject matter of the communication, the form of the communication

7   (written, oral, or telephonic) and a summary of the communication if oral or telephonic.

8          **RESPONSE TO INTERROGATORY NO. 17:**  YTC objects to Interrogatory No. 17

9   as compound.

10         YTC further objects to this Interrogatory as overly broad and burdensome and unduly

11  vague and ambiguous, and calls for information that is neither relevant to the resolution of the

12  Plaintiffs' claims nor reasonably calculated to lead to admissible evidence.  Plaintiffs' FAC seeks

13  to enjoin future "take" of listed salmonids.  Plaintiffs' request that YTC provide a broad

14  spectrum of communications dating back nearly five decades is entirely disproportionate to the

15  needs of this case.

16         Further, "tire leachate" is vague and could contain an unknown breadth and volume of

17  compounds.  "Salmonids" is vague and could encompass hundreds of species, the majority of

18  which are not listed under the Endangered Species Act or included in Plaintiffs' Complaint, and,

19  therefore, not the subject of this matter.  Without waiving these objections and the General and

20  Preliminary Objections, YTC states:  None.

21

22  **INTERROGATORY NO. 18:**  Identify and describe any communications, whether written or

23  oral or telephonic, between you and any employee or representative of any state environmental

24  agency in the states of Washington, Oregon, or California regarding tire leachate, 6PPD, 6PPD-

25  Q, or salmonids since January 1, 1975.  In describing communications responsive to this

26  interrogatory, please identify the persons involved or participating in the communication, the

27  date of the communication, the subject matter of the communication, the form of the

28

chemical constituents, each tire has a dozen or more different compounds, and the defendants collectively produce hundreds or thousands of tire models.

**REQUEST FOR PRODUCTION NO. 10:**  Any application for an incidental take permit for your tires made within the last 10 years, including all drafts thereof.

   **RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**  Subject to the General Objections and Limitations, no such material exists.  YTC is ineligible to prepare or submit an application for an ESA Section 10 permit because said permits are not designed for the manufacture of products.  Discovery is ongoing, and YTC reserves the right to supplement this Production.

**REQUEST FOR PRODUCTION NO. 11:**  Any HCP you have proposed for your tires within the last 10 years, including all drafts thereof.

   **RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**  Subject to the General Objections and Limitations, no such material exists.  YTC cannot formulate a Habitat Conservation Plan for its tires, as the manufacture of products is outside of the scope of ESA Section 10 permits.  Discovery is ongoing, and YTC reserves the right to supplement this Production.

   Dated this 17th day of June, 2024.


   **Beveridge & Diamond P.C.**

   By: */s/ Loren R. Dunn*_____
   Loren R. Dunn, *(pro hac vice)*
   ldunn@bdlaw.com
   600 University Street, Ste. 1601
   Seattle, WA  98101
   P: 206-315-4810

   Susan E. Smith, (CA Bar No. 329539)
   ssmith@bdlaw.com
   456 Montgomery Street, Ste. 1800

RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES AND REQUESTS FOR PRODUCTION - 25
CASE NO. 23-cv-05748-JD

# Exhibit D



Page     1 of 5
NATIVE ENDANGERED & THREATENED SP. HABITAT CONSERVATION PLAN
ENDANGERED & THREATENED WILDLIFE
**Permit Number: TE812521-1**
Effective: 11/14/2019   Expires: 01/30/2067

Issuing Office:

Department of the Interior
U.S. FISH & WILDLIFE SERVICE
Endangered Species Permit Office
911 NE 11th Avenue
Portland, OR 97232-4181
permitsR1ES@fws.gov

Acting
*DEPUTY REGIONAL DIRECTOR*

Permittee:
**WASHINGTON DEPARTMENT OF NATURAL RESOURCES**
**1111 WASHINGTON ST. S.E.**
**MS# 47001**
**OLYMPIA, WA 98504-7000**
**U.S.A.**

Name and Title of Principal Officer:
Josh Wilund, Department Supervisor

Authority: Statutes and Regulations: 16 USC 1539(a), 16 USC 1533(d); 50 CFR 17.22, 50 CFR 17.32, 50 CFR 13.

**Location where authorized activity may be conducted:**
Department of Natural Resources-Managed Forest Lands within the Range of the Northern Spotted Owl in the State of Washington.

**Reporting requirements:**
 See permit conditions for reporting requirements

**Authorizations and Conditions:**

A. General conditions set out in subpart d of 50 CFR 13, and specific conditions contained in federal regulations cited in block #2 above, are hereby made a part of this permit.  All activities authorized herein must be carried out in accord with and for the purposes described in the application submitted.  Continued validity, or renewal, of this permit is subject to complete and timely compliance with all applicable conditions, including the filing of all required information and reports.
B. The validity of this permit is also conditioned upon strict observance of all applicable foreign, state, local, tribal, or other federal law.
C. Valid for use by Permittee named above and its authorized officers, employees, contractors, and agents.
D. Further conditions of authorization are contained in the attached special terms and conditions.

## U.S. FISH AND WILDLIFE SERVICE
## SPECIAL TERMS AND CONDITIONS FOR PERMIT TE812521-1

E.  General conditions set out in Subpart B of 50 CFR 13, and specific conditions contained in Federal regulations cited above, are hereby made a part of this permit. All activities authorized herein must be carried out in accordance with and for the purposes described in the application submitted. Continued validity, or renewal of this permit is subject to complete and timely compliance with all applicable conditions, including the filing of all required information and reports.

F.  The validity of this permit is also conditioned upon strict observance of all applicable foreign, state, local, tribal, or other federal law.

G.  This permit is valid for use by Permittee named above and its authorized officers, employees, contractors, and agents.

H.  This permit is subject to the provisions of Title 50 *Code of Federal Regulations* Parts 10, 13, and 17.

I.  The authorization granted by this permit is subject to full and complete compliance with, and implementation of the 1997 Habitat Conservation Plan (HCP) and subsequent amendment(s) and Implementation Agreement (IA) executed by the Permittee, the U.S. Fish and Wildlife Service and the National Marine Fisheries Service, as amended by the 2019 Long-Term Conservation Strategy for the marbled murrelet (Amendment). This permit, the HCP, Amendment, and Implementing Agreement (IA), are binding upon the Permittee, and any authorized officer, employee, contractor, or agent conducting permitted activities.

J.  The term of this permit shall be from January 30, 1997 to January 30, 2067.

K.  COVERED SPECIES: The Permittee, and its authorized officers, employees, contractors, and agents are authorized to incidentally take the gray wolves (*Canis lupus*), northern spotted owl (*Strix occidentalis caurina*), marbled murrelet (*Brachyramphus marmoratus*), Columbian white-tailed deer (*Odocoileus virginianus leucurus*), bull trout (*Salvelinus confluentus*), and the Oregon silverspot butterfly (*Speyeria zerene hippolyta*) in the course of otherwise lawful activities in accordance with the terms and conditions of the HCP, Amendment, IA, the ITP, and the Incidental Take Statement of the Biological Opinions authored and signed by the U.S. Fish and Wildlife Service in 1997, 1998, and 2019. Covered species listed at the time the original permit was issued that have since been delisted include the bald eagle (*Haliaeetus leucocephalus*), the American peregrine falcon (*Falco peregrinus*), and the Aleutian Canada geese (*Branta canadensis leucopareia*). Additional unlisted species that are covered by the 1997 HCP are described in Chapter 4F of the HCP. HCP coverage and conservation measures for these species are unchanged by this Amendment. Incidental take authorization for the grizzly bear expired January 30, 2002.

## U.S. FISH AND WILDLIFE SERVICE
## SPECIAL TERMS AND CONDITIONS FOR PERMIT TE812521-1

L. COVERED LANDS: This permit only authorizes incidental take of the Covered Species identified in section G within the lands described in Section 15.1, "Permit Lands Description," of the 1997 Implementation Agreement and inclusive of lands added since 1997 as reported under Section 17.2 of the IA.

M. COVERED ACTIVITIES: Covered activities include "Forest Product Sales and Other Management Activities Other Than Land Sales, Purchases, and Exchanges" as described in Section 16 of the Implementation Agreement, and "Land Transfers, Purchases, Sales, and Exchanges" as described in Section 17 of the Implementation Agreement.

N. LAND TRANSFERS: This permit does not restrict the Permittee from engaging in land transfers, dispositions, and acquisitions as described in Section 17 of the IA. The Permittee commits to maintaining the biological goals and objectives of the conservation program described in Amendment Section 6.0.

O. Permittee shall notify the Service of new locations of permit species that are discovered within the area covered by the HCP, including, but not limited to, locations of occupied murrelet habitat; owl site centers; wolves; nests, communal roosts, or feeding concentrations of bald eagles; peregrine falcon nests; Columbian white-tailed deer; Aleutian Canada geese; Oregon silverspot butterflies and additional stream reaches found to contain bull trout.

P. Upon locating any dead, injured, or sick individuals of any federally listed species covered by this permit, Permittee shall contact the Service's Washington Fish and Wildlife Office, Lacey, (telephone 360-753-9440) and the Office of Law Enforcement, Resident Agent in Charge, Redmond, (telephone: 425-883-8122) for care and disposition instructions, and within 3 working days, notify the U.S. Fish and Wildlife Service's Washington Fish and Wildlife Office, Lacey, Washington (360-753-9440).

In the event of an injured or sick individual and Service personnel cannot be reached, Permittee shall make a good faith effort to contact a wildlife rehabilitation facility. Take extreme care in handling sick or injured individuals to ensure effective and proper treatment. Care should also be taken in handling dead specimens to preserve biological materials in the best possible state for analysis of cause of death. In conjunction with the care of sick or injured endangered/threatened species, or preservation of biological materials from a dead specimen, the Permittee and any officers, employees, contractors, or agents shall ensure that evidence intrinsic to the specimen is not unnecessarily disturbed. If directed to do so by the State Supervisor or the Resident Agent in Charge, transport or mail the dead individual in an appropriate container to the appropriate address as soon as possible.

## U.S. FISH AND WILDLIFE SERVICE
## SPECIAL TERMS AND CONDITIONS FOR PERMIT TE812521-1

Q. Permittee shall refer to permit number PRT-812521-1 in all correspondence and reports concerning permit activities. Any questions you may have about this permit should be directed to the State Supervisor, U.S. Fish and Wildlife Service, Washington Fish and Wildlife Office, Lacey, Washington (360-753-9440).

R. All applicable provisions of this permit must be presented and clearly explained to all authorized officers, employees, contractors, or agents of Permittee conducting authorized activities.

S. Permittee shall notify the Service if any non-timber activity (as described in the IA) is expected to increase beyond its 1996 level and include with such notification a description of any take likely to result from any such increase. The DNR will review new forest product sales, or other valuable material sales, licenses, permits, leases, rights-of-way, and public uses with the Services during the annual meetings.

T. The amount and extent of take authorized by this permit is described for those Covered Species in each of the U.S. Fish and Wildlife Service's biological opinions authored and signed in 1997, 1998, and 2019 (see attached) and are herein incorporated by reference. The 2019 biological opinion authorizes the amount and extent of take for marbled murrelets in the permit area under the Amendment. The Permittee will report annually the amount of marbled murrelet habitat which has been harvested or otherwise removed by Covered Activities for marbled murrelets by HCP Planning Unit in raw and adjusted P-stage acres. Similarly, the Permittee will track and report mitigation consistent with implementation monitoring in Amendment Section 6.4. Other reporting requirements for other Covered Species are unchanged by the Amendment.

If, during the term of this permit, the conservation measures or extent of the Covered Activities are altered such that there may be an increase in the anticipated take of the Covered Species or a reduction in the mitigation; the Permittee shall contact the Service's Washington Fish and Wildlife Office (telephone: 360-753-9440). The Permittee must obtain an amendment to this permit before commencing any construction, operations, or other activities that might result in the incidental take of ESA listed species beyond that authorized by this permit.

If actions associated with implementation of the HCP are shown to result in the incidental take of ESA listed species not covered by this permit, those activities must immediately cease and any take that has occurred shall be reported to the Service's Washington Fish and Wildlife Office (telephone: 360-753-9440) within 48 hours.

If the amounts or extents of take authorized under this permit is exceeded for any of the Covered Species identified in this ITP, all activities causing such take must immediately cease and any take above that authorized under this permit shall be reported to the Service's Washington Fish and Wildlife Office, Lacey, Washington and Office of Law

## U.S. FISH AND WILDLIFE SERVICE
## SPECIAL TERMS AND CONDITIONS FOR PERMIT TE812521-1

Enforcement, Resident Agent in Charge, Redmond, Washington (telephone: 425-883-8122) within 48 hours.

U. Acceptance of the permit serves as evidence that:

1. The Permittee agrees to abide by all conditions stated.  Terms and conditions of the permit are inclusive.  Please read these conditions carefully as violations of permit terms and conditions could result in your permit being suspended or revoked.

2. Retain records as required in 50 CFR 13.46.  Acceptance of this permit authorizes the U.S. Fish and Wildlife Service to inspect and audit or copy any permits, books or records required to be kept by the permit and governing regulations (50 CFR 13.47).

3. You must allow Service personnel, or other persons designated by the Service, access to the Covered Areas and Conservation Lands with reasonable notice from the Service, for purposes of monitoring Covered Species at the site(s) while the permit is valid.

V. A copy of this permit must be on the premises of the Permittee, or in the possession of the Permittee, and their authorized officers, employees, contractors, or agents while conducting activities that may result in incidental take of the Covered Species.

***** End of Permit TE812521-1 *****

**1997 Incidental Take Statement:**

## INCIDENTAL TAKE STATEMENT

Section 9 of the Act and Federal regulations pursuant to section 4(d) of the Act prohibit the take of endangered and threatened species, respectively, without special exemption. Take is defined as to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct. Harm is further defined by the FWS to include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering. Harass is defined by FWS as an act or omission which create the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavior patterns which include, but are not limited to, breeding, feeding, or sheltering. Incidental take is defined as take that is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity. Under the terms of section 7(b)(4) and section 7(o)(2), taking that is incidental to and not intended as part of the proposed action is not considered to be prohibited taking under the Act provided that such taking is in compliance with this incidental take statement.

The proposed DNR HCP and its associated documents identify the measures that are necessary and appropriate to minimize impacts to affected species likely to result from the proposed taking. All conservation measures described in the proposed HCP, together with the terms and conditions described in any associated Implementing Agreement and any incidental take permit or permits issued with respect to the proposed HCP, are hereby incorporated by reference as reasonable and prudent measures and terms and conditions in this Incidental Take Statement. Such terms and conditions are non-discretionary and must be undertaken for the exemptions under section 10(a)(1)(B) and section 7(o)(2) of the Act to apply. If the permittee fails to adhere to these terms and conditions, the amount of take authorized may be exceeded and the protective coverage of the section 10(a)(1)(B) permit and section 7(o)(2) of the Act may lapse.

Generally, section 9 take prohibitions do not apply to listed plant species on nonfederal lands. However, FWS must review the effects of its own actions on listed plants, even when those listed plants are found on non-federal lands. In approving an HCP and issuing an incidental take permit, the FWS must determine that such an action is not likely to jeopardize the continued existence of any listed plant. Also, in the interest of conserving listed plants, the FWS may request that a landowner voluntarily assist the FWS in restoring or enhancing listed plant habitats that are present within the area covered by the HCP.

## AMOUNT OR EXTENT OF TAKE - NORTHERN SPOTTED OWL

The FWS anticipates incidental take of spotted owl pairs, young, and/or territorial singles associated with harvest of suitable habitat as outlined below. Incidental take on these acres may be in the form of harm due to the removal of suitable habitat on DNR-managed lands, as well as harassment when harvest of this habitat occurs during the nesting season. The FWS anticipates incidental take of spotted owls associated with nontimber resource activities will be in the form of disturbance and is also summarized below.

West-side Planning Units

In the near term (within the first 10 years), the FWS anticipates the incidental take in the form of harm or harassment of up to 70 known and 15 projected unknown spotted owl pairs, young, and/or territorial singles. In the long term (10 to 70 years), the FWS anticipates the incidental take in the form of harm or harassment of up to 36 potential future spotted owl pairs, young, and/or territorial singles.

East-side Planning Units

In the near term, the FWS anticipates the incidental take in the form of harm or harassment of up to 47 known and 16 projected unknown spotted owl pairs, young, and/or territorial singles. In the long term, the FWS anticipates the incidental take in the form of harm or harassment of up to 36 potential future spotted owl pairs, young, and/or territorial singles.

Olympic Experimental State Forest

In the near-term, the FWS anticipates the incidental take in the form of harm or harassment of up to 31 spotted owl pairs, young, and/or territorial singles. In the long-term, the FWS anticipates the incidental take in the form of harm or harassment of spotted owls associated with harvest of 3,300 to 16,300 acres per decade.

Disturbance-related Take

In addition, the FWS anticipates the incidental take of spotted owls adjacent to disturbance type activities which may occur on DNR-managed lands in all three areas. Disturbance may be caused by timber harvest activities as well as nontimber resource activities. The FWS anticipates that take may occur on an average of 26,675 acres of timber harvest activities per year for the first decade. The FWS anticipates that disturbance from nontimber resource activities could affect up to 1,060 acres per year. Incidental take due to these activities will be in the form of harassment, when activities occur during the nesting season and significantly disrupt normal behavior patterns.

## AMOUNT OR EXTENT OF TAKE - MARBLED MURRELET

Over the length of the permit, the FWS anticipates incidental take of marbled murrelets associated with the harvest of between 18,245 and 74,286 acres of unsurveyed, suitable marbled murrelet habitat on DNR-managed lands, as discussed under Effects of the Action. Incidental take on these acres may be in the form of harm due to the removal of suitable, occupied habitat, as well as harassment, when harvest of this habitat occurs during the nesting season.

The FWS also anticipates the incidental take of marbled murrelets located on properties adjacent to disturbance type activities which may occur on DNR-managed lands. Disturbance may be caused by timber harvest activities as well as nontimber resource activities. The FWS anticipates that take from disturbance may occur on an average of 23,500 acres of timber harvest activities per year. The FWS anticipates that disturbance from nontimber resource activities could affect up to 338 acres per year. Incidental take due to these activities will be in the form of harassment, when such harvest or nontimber resource activities occur during the nesting season and significantly disrupt normal behavior patterns.

## AMOUNT OR EXTENT OF TAKE - GRAY WOLF

The FWS anticipates incidental take of gray wolves with the harvest of timber on approximately 430,900 acres within 8 miles of Class 1 or Class 2 gray wolf sightings on DNR-managed lands over the life of the project, as discussed under Effects of the Action. Incidental take on these acres may be in the form of harm due to the removal of suitable habitat, as well as harassment, when harvest of this habitat occurs during the denning season and significantly disrupts normal behavior patterns.

Disturbance may also be caused by nontimber resource activities. The FWS anticipates that disturbance from nontimber resource activities could occur on approximately 4,520 acres per year from ORV use only. Incidental take due to these activities will be in the form of harassment, when such harvest or nontimber resource activities occur during the denning season. The FWS anticipates no incidental take of den sites occurred from nontimber resource activities.

## AMOUNT OR EXTENT OF TAKE - GRIZZLY BEAR

The FWS anticipates incidental take of grizzly bears associated with approximately 159,000 acres of timber harvest that are within 10 miles of Class 1 or Class 2 grizzly bear sightings over the life of the project. Incidental take of grizzly bears associated with the timber harvest of these acres may be in the form of harm due to the removal of suitable habitat on DNR-managed lands, as well as harassment from disturbance when harvest of this habitat occurs during the denning season.

Disturbance may also be caused by nontimber resource activities. The FWS anticipates that disturbance from nontimber resource activities in the form of harrassment could occur on approximately 1,010 acres per year from ORV use only. The FWS anticipates no incidental take of den sites from nontimber resource activities.

## AMOUNT OR EXTENT OF TAKE - BALD EAGLE

The FWS anticipates incidental take of bald eagles associated with the harvest of timber on approximately 200,000 acres that are within 3 miles of anadromous fish bearing streams over the life

of the project.  Incidental take on these acres may be in the form of harm due to the removal of suitable habitat on DNR-managed lands.  Incidental take in the form of harassment may occur when harvest of this habitat occurs during the nesting or wintering season, and it significantly disrupts normal behavior patterns.  The FWS anticipates that disturbance associated with 34,000 acres of timber harvest may occur annually on DNR-managed lands.

The FWS also anticipates the incidental take of bald eagles from nontimber resource activities could affect up to 326 acres per year.  Incidental take due to these activities will be in the form of harassment, when such harvest or nontimber resource activities occur during the nesting or wintering season, and it significantly disrupts normal behavior patterns.


## AMOUNT OR EXTENT OF TAKE - PEREGRINE FALCON

The FWS anticipates the incidental take of up to one pair of peregrine falcons due to disturbance from timber harvest activities on DNR-managed lands.  Incidental take at these sites may be in the form of harassment when such disturbance occurs during the nesting season, and results in a significant disruption of normal behavior patterns.  The FWS anticipates no incidental take of peregrine falcons due to disturbance from nontimber resource activities.


## AMOUNT OR EXTENT OF TAKE - ALEUTIAN CANADA GOOSE

Incidental take in the form of harassment (disturbance) may be caused by timber harvest and nontimber resource activities.  Due to the rare occurrence of Aleutian Canada geese on DNR-managed lands and their lack of association with habitats where these activities occur, the FWS does not anticipate these activities will incidentally take any Aleutian Canada geese.


## AMOUNT OR EXTENT OF TAKE - COLUMBIAN WHITE-TAILED DEER

Incidental take in the form of harassment (disturbance) may be caused by timber harvest and nontimber resource activities.  DNR-managed lands inhabited by the Columbian white-tailed deer are not part of the HCP area.  The FWS does not anticipate any incidental take through implementation of the HCP.


## AMOUNT OR EXTENT OF TAKE - OREGON SILVERSPOT BUTTERFLY

Incidental take in the form of harassment (disturbance) may be caused by timber harvest and nontimber resource activities.  The Oregon silverspot butterfly is not known to exist on any DNR-managed lands and DNR-managed lands contain no potential habitat.  The FWS does not anticipate these activities will incidentally take any Oregon silverspot butterflies.

1998 Incidental Take Statement:

## INCIDENTAL TAKE STATEMENT

Section 9 of the Act, as amended, prohibits taking (harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or attempt to engage in any such conduct) of listed species of fish or wildlife without a special exemption. *Harm in the definition of "take" in the Act means an act which actually kills or injures wildlife. Such act may include significant habitat degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns including breeding, feeding, or sheltering.* *Harass in the definition of "take" in the Act means an intentional or negligent act, or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering.* Incidental take is any take of listed animal species that results from, but is not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or the applicant. Under the terms of section 7(b)(4) and section 7(o)(2), taking that is incidental to and not intended as part of the agency action is not considered a prohibited taking provided that such taking is in compliance with the terms and conditions of this incidental take statement.

This incidental take statement applies only to the listed Columbia River and the proposed Coastal/Puget Sound distinct population segments of the bull trout located west of the Cascade Crest. Other listed species were previously addressed in the January 1997, Biological Opinion. Should Washington State Department of Natural Resources request that any of the currently unlisted species be added to the permit, formal consultation under section 7 of the Act will be reinitiated, at which time a definitive incidental take statement would be issued for the species, provided the proposed action is in compliance with section 7(a)(2) of the Act. The Incidental Take Statement for the Coastal/Puget Sound DPS does not become effective unless the listing is final and the Service adopts this Conference Opinion as a Biological Opinion.

The measures described below are non-discretionary, and must be implemented by the Service so that they become binding conditions of any grant or permit issued to the applicant, as appropriate, in order for the exemption in section 7(o)(2) to apply. The Service has a continuing duty to regulate the

activity covered by this Incidental Take Statement. If the Service: (1) Fails to require the permitee to adhere to the terms and conditions of the Incidental Take Statement through enforceable terms that are added to the permit or grant document, and/or (2) Fails to retain oversight to ensure compliance with these terms and conditions, the protective coverage of section 7(o)(2) may lapse.

## AMOUNT OR EXTENT OF TAKE

The Service expects that this action is likely to result in incidental take of bull trout in the form of harm or harassment due to effects from timber harvest and related activities, including road building, stream crossings, canopy removal, and potential increases in sediments and temperature which may adversely impact bull trout at a number of life-history stages. The proposed Service action of adding bull trout to the subject permit is contingent upon the implementation of the conservation measures in the HCP and as such they are part of the proposed action. Estimates of incidental take account for the operation of these conservation measures. Because of the inherent biological characteristics of bull trout, the likelihood of discovering an individual death or injury attributable to this action is very small.

The Service anticipates that impacts to bull trout will be difficult to detect at the individual organism level for the following reason(s): (1) Bull trout are wide-ranging and are affected by factors beyond the control of WSDNR; (2) Juveniles, fry, and eggs have small body size and are, therefore, difficult to detect when alive; (3) Finding dead or impaired specimens is unlikely, especially considering the often small body size of eggs and fry, denseness of vegetation/substrate, and remoteness of the area; (4) Losses may be masked by seasonal fluctuations in numbers or other causes; (5) Dead or impaired specimens may be washed downstream of the site where the impact occurred; (6) Dead or impaired specimens may be consumed by other fish and wildlife species; and, (7) There is a large area with many stream miles to monitor. However, habitat conditions may be used as a surrogate preliminary indicator of take or impact. This assessment focused on the amounts and quality of habitats provided/impacted for the Columbia River Basin and Coastal/Puget Sound distinct population segments.

Therefore, even though the Service expects incidental take to occur from the effects of the action, the best scientific and commercial data available are not sufficient to enable the Service to estimate a specific number of individuals incidentally taken based on loss or injury of individuals of the species. For instance, if the bull trout population were to increase during the permit period, a larger number of individuals may become subject to some level of take. Conversely, if bull trout were to decrease, less take might occur. Consequently, take is estimated based on the quantity of habitat likely to be impacted in the 70 to 100-year period. In some cases, this impact may adversely affect bull trout sufficiently to result in harm or harassment.

Selective harvest in riparian buffers is expected to occur at any given location only a maximum of once per rotation. While this could vary between 60 and 140 years depending on the management zone, the Service assumed this would average 100 years. Harvest in many older riparian stands will be limited by provisions of the HCP with respect to functional habitat for salmonids. However, it is

difficult to predict how every stream would be addressed at this point in time, so the Service has relied on its best assessment of a worst-case scenario. The Service expects only about 1 percent of riparian stands to be entered per year at a maximum.

On the OESF, some entry into the 88,141 acres of riparian buffers is expected. Interior buffers are to be managed in a more-conservative manner and little take is expected to result from those actions. Of the 56,716 acres of interior buffer, about 20,000 acres are over 30 years old and would be subject to some selective harvest. This could result in 286 acres per year subject to single tree removal or other conservative treatments. Of the 31,425 acres of exterior buffer, only about 11,850 are over 30 years old. This could result in selective harvest of about 169 acres of exterior buffer per year on average. The Service estimates that up to 2,000 acres of thinning per year may occur in riparian buffers on the OESF. The OESF is estimated to have 121 miles of stream that contain bull trout (WSDNR 1997).

In the west-side planning units, 133,500 acres are in riparian buffers bordering roughly 380 miles of fish bearing streams that have been estimated to contain bull trout. Approximately one-quarter to one-third of those acres are located within the range of the listed Columbia River DPS. This equates to approximately 91 miles of fish-bearing streams estimated to contain bull trout in the Columbia River DPS. The remaining 289 miles of fish-bearing streams estimated to contain bull trout is within the Coastal/Puget Sound DPS (WSDNR 1997). About 60 percent, or 80,000 acres of the 133,500, are estimated to be over 25 years of age and might be subject to selective harvest during the HCP period (1,145 acres per year). About 53,000 acres may be subject to thinnings during the HCP period (760 acres per year).

In both the OESF and the other west-side planning units, about 10-20 percent of riparian buffers are in deciduous forest. While some of this is naturally deciduous and should not be altered, some of these stands could be converted to conifer stands for the long-term benefit of salmonids. Short-term impacts and associated take are expected to result from restoration activities on about 5 percent of riparian areas, or 4,407 acres of the OESF and 6,675 acres of other west-side planning units. Together, this should average no more than about 11,080 acres or 158 acres per year.

The Service estimates that of the riparian areas entered each per year, about 75 percent will be in yarding corridors. Fifteen percent of the riparian area associated with those entries would be removed to create the corridors each year. Of the 221,641 acres of west-side riparian buffers, 6,650 acres might be subject to some level of harvest or thinnings within the buffer or in adjacent stands during a given year. This assumes two mid-rotation treatments during a 100-year rotation. If only about 5,000 acres of this required use of yarding corridors and only 15 percent of that was in corridor itself, then no more than 750 acres would be placed in yarding corridors in any given year. This would actually be somewhat less where previous yarding corridors are used during subsequent entries.

Construction and maintenance of roads are anticipated to adversely impact bull trout sufficiently to result in harm or harassment, particularly during the early life-history stages. The Service anticipates incidental take in the form of harm of bull trout associated with the construction and maintenance of

29 miles of roads per year, as a result of implementing the HCP. This estimate is based on the addition of one road for every section of west-side land during the 70-year period. We also anticipate some incidental take in the form of harm associated with upgrading or removing 30 to 60 miles of road per year.

The rationale for the above estimates is based on the assumption that bull trout occur throughout lands managed by Washington Department of Natural Resources. Because bull trout distribution is not continuous, only a fraction of the acres and activities described above have the potential to impact bull trout. Take is generally expected to be avoided; but, if it occurs, only a minimal number of individuals would likely be affected. Bull trout occur in limited areas, especially during early life stages; and, should impacts sufficient to result in take occur, it would be rare and localized. Therefore, the number of individuals likely to be subject to disturbance at any particular time, or the numbers of individuals which may be taken, is low, yet unquantifiable. Estimates of take are in terms of the amount of habitat impacted to the extent that take could possibly occur.

2019 Incidental Take Statement:

## INCIDENTAL TAKE STATEMENT

Section 9 of the ESA and federal regulation pursuant to section 4(d) of the ESA prohibit the take of endangered and threatened species, respectively, without special exemption. Take is defined as to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct. *Harm* is defined by the USFWS as an act which actually kills or

injures wildlife. Such an act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavior patterns, including breeding, feeding, or sheltering (50 CFR 17.3). *Harass* is defined by the USFWS as an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering (50 CFR 17.3). Incidental take is defined as take that is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity. Under the terms of section 7(b)(4) and section 7(o)(2), taking that is incidental to and not intended as part of the agency action is not considered to be prohibited taking under the ESA provided that such taking is in compliance with the terms and conditions of this Incidental Take Statement.

The proposed Washington State Department of Natural Resources Marbled Murrelet Long-Term Conservation Strategy Amendment to the 1997 Final State Trust Lands HCP and its associated documents clearly identify anticipated impacts to affected species likely to result from the proposed taking and the measures that are necessary and appropriate to minimize those impacts. All conservation measures described in the proposed HCP Amendment, together with the terms and conditions described in any associated Implementing Agreement, and any section 10(a)(1)(B) permit or permits issued with respect to the proposed HCP Amendment, are hereby incorporated by reference within this Incidental Take Statement as reasonable and prudent measures and terms and conditions pursuant to 50 CFR §402.14(i). Such terms and conditions are non-discretionary. The amount or extent of incidental take anticipated under the proposed Washington State Department of Natural Resources Marbled Murrelet Long-Term Conservation Strategy Amendment to the 1997 Final State Trust Lands HCP, associated reporting requirements, and provisions for disposition of dead or injured animals, are as described in the HCP Amendment, Implementing Agreement, and the accompanying section 10(a)(1)(B) permit(*s*).

## 18   AMOUNT OR EXTENT OF TAKE

The USFWS anticipates incidental take of marbled murrelet will be difficult to detect for the following reason(s): the species is wide-ranging; has a small body size; finding a dead or impaired specimen is unlikely; the species occurs in habitat that makes detection difficult; murrelets are cryptic, nest locations are rarely located, and available data suggest a patchy and inconsistent distribution in the action area. However, pursuant to 50 CFR 402.14(i)(1)(i), a surrogate can be used to express the anticipated level of take in an Incidental Take Statement, provided three criteria are met: (1) measuring take impacts to a listed species is not practical; (2) a link is established between the effects of the action on the surrogate and take of the listed species; and (3) a clear standard is set for determining when the level of anticipated take based on the surrogate has been exceeded.

The USFWS' regulations state that significant habitat modification or degradation caused by an action that results in death or injury to a listed species by significantly impairing its essential behavior patterns constitutes take in the form of harm. Those regulations further state that an intentional or negligent act or omission that creates the likelihood of injury to a listed species by annoying it to such an extent as to significantly disrupt its normal behavioral patterns constitutes

take in the form of harass. Such annoyance can be caused by actions that modify or degrade habitat conditions (e.g., excessive noise or smoke). In cases where this causal link between effects of a federal action to habitat and take of listed species is established, and the biological opinion or incidental take statement explains why it is not practical to express and monitor the level of take in terms of individuals of the listed species, the Service's regulations authorize the use of habitat as a surrogate for expressing and monitoring the anticipated level of take, provided a clear standard is established for determining when the level of anticipated take has been exceeded.

The following narrative presents the USFWS' analysis and findings with respect to the three regulatory criteria for use of a surrogate in this Incidental Take Statement to express the anticipated level of take likely to be caused by the proposed action.

The following level of take of marbled murrelet (nesting adults, eggs, nestlings) can be anticipated by quantifying the amount of nesting habitat removed, quantifying the amount of nesting habitat degraded by edge effects, and by quantifying the amount of nesting habitat exposed to disturbance because:

1. A habitat-based approach to evaluating the effects to murrelets is appropriate due to the difficulty in locating actual murrelet nest sites, the variation in the number of murrelets that breed each year, and the patchy distribution of murrelets in nesting habitat. However, numerous studies have demonstrated that murrelet numbers are strongly correlated with the amount of available nesting habitat, and where habitat is removed, marbled murrelet numbers decline.

2. A habitat surrogate will measure the amount of habitat removed, habitat degraded by edge effects, and habitat exposed to disturbance. In the accompanying Opinion, we have provided a detailed explanation of the P-stage habitat classification system used to quantify the probability of murrelet use of habitat, and how we used estimates of marbled murrelet nesting density at the landscape scale to enumerate the proportion of murrelets likely to be affected by the covered activities.

3. Monitoring the amount and quality of murrelet nesting habitat on the landscape provided by the WDNR State Lands HCP is a consistent and reliable method to track HCP implementation and is consistent with existing monitoring and reporting programs established under the 1997 HCP.

We anticipate that implementation of the Long-Term Strategy will begin in 2020 and continue through the remaining term of the HCP (2067). The following level of take of marbled murrelets (nesting adults, eggs, nestlings) can be anticipated by the loss of acres of suitable murrelet nesting habitat, the degradation of murrelet nesting habitat from edge effects caused by forest management, and disturbance effects associated with forest management activities. These habitat areas are the best available surrogate measure of the anticipated take.

- Beginning in 2020, we anticipate incidental take of murrelets in the form of harm and harass associated with the removal of up to 38,774 raw acres of habitat, which equates to 11,085 adjusted habitat acres. Approximately 5,000 adjusted acres will be deferred from harvest for a minimum of 10 years following implementation of the proposed Long-Term Strategy. The distribution of the habitat to be removed by HCP planning unit is listed below in Table 66.

- We anticipate incidental take of murrelets in the form of harm and harass associated with the removal of 114 adjusted acres of habitat for new roads (104 adjusted acres) or yarding corridors (10 adjusted acres) in occupied sites, occupied site buffers, or Special Habitat Areas.

- We anticipate incidental take of murrelets in the form of harm from habitat degradation associated with edge effects caused by covered forest management activities. The amount of habitat degraded be edge effects is approximately 6 percent of adjusted acres of habitat per decade conserved in long-term forest cover mapped as *outer edge* or *inner edge* around *interior* forest patches of murrelet nesting habitat. The estimated amount of habitat degraded by edge effects per decade is listed below in Table 67.

- We anticipate incidental take of murrelets in the form of harm and harass from disturbance associated with habitat modification and prolonged exposure to audio/visual disturbance caused by covered activities. The amount of exposed to disturbance is approximately 2.3 percent of the adjusted acres of habitat per decade conserved in long-term forest cover mapped as *outer edge* or *inner edge* around *interior* forest patches of murrelet nesting habitat. The estimated amount of habitat disturbed per decades is listed below in Table 68.

- We anticipate incidental take of murrelets in the form of harm and harass from habitat degradation associated with edge effects and disturbance caused by covered activities to 225 acres of murrelet nesting habitat per year located on adjacent federal lands (within a distance of 328-ft of WDNR-managed lands).

Table 66. Summary of the take of marbled murrelets from nesting habitat released for harvest on WDNR-managed lands.

| HCP planning unit: | Columbia | South Coast | OESF | Straits | North Puget | South Puget | Yakima | Totals |
|---|---|---|---|---|---|---|---|---|
| **Raw habitat** acres released for harvest | 4,088 | 3,782 | 6,662 | 4,009 | 14,769 | 5,314 | 150 | **38,774** |
| **P-stage**-weighted acres released for harvest | 1,161 | 1,110 | 2,326 | 1,104 | 4,886 | 1,640 | 122 | 12,349 |
| **Adjusted** acres released for harvest | 1,040 | 841 | 2,128 | 1,030 | 4,457 | 1,469 | 120 | **11,085** |

Note: The take of habitat is 38,774 raw acres over the remaining term of the HCP. The summary acres presented above provide an index of the habitat take per HCP unit. Take acres are not limited to the level indicated by each individual HCP planning unit. Take is limited by the total take acres of 38,774 raw acres.

Table 67.  Summary of the take of murrelets associated with nesting habitat degraded by edge effects on WDNR-managed lands per decade.

| Effects Category | HCP Decade | | | | | Effects to Murrelets |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | |
| Total habitat degraded by edge effects in LTFC (excluding *stringers*) (adjusted acres): | 5,489 | 5,833 | 6,287 | 6,913 | 7,470 | Habitat with increased nest failure per decade due to edge effects. |
| Percent of habitat (adjusted acres) in LTFC degraded by edge effects per decade: | 6% | 6% | 6% | 6% | 7% | Habitat with increased nest failure per decade due to edge effects. |
| Habitat degraded (raw acres) based on average P-stage | 11,364 | 11,393 | 11,818 | 12,994 | 13,937 | |

Note: LTFC = long-term forest cover.

Table 68.  Summary of the average annual take of murrelets from disturbance on WDNR-managed lands.

| Activity Group | HCP Decade | | | | | Effects to Murrelets |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | |
| **Total** average annual habitat exposed to audio/visual disturbance (adjusted acres) | 2,184 | 2,253 | 2,338 | 2,449 | 2,549 | Disruption of nesting behaviors, increased nest failure. |
| Average annual percentage of habitat in LTFC exposed to disturbance effects | 2.3% | 2.3% | 2.3% | 2.3% | 2.3% | Disruption of nesting behaviors, increased nest failure. |
| Average habitat (raw acres) exposed to disturbance (based on average P-stage) | 4,522 | 4,400 | 4,395 | 4,603 | 4,756 | - |

Note: LTFC = long-term forest cover.

# Exhibit E

# HABITAT CONSERVATION PLAN AND SAFE HARBOR AGREEMENT FOR SEVEN ANADROMOUS FISH POPULATIONS

## SIERRA PACIFIC LAND & TIMBER COMPANY

## SIERRA PACIFIC INDUSTRIES FORESTLAND MANAGEMENT PROGRAM



# 1.  INTRODUCTION

Sierra Pacific Land & Timber Company and its affiliates (SPL&T) is the largest private forest land owner in the state of California, with ownership currently encompassing approximately 1.79 million acres of timberland throughout the northern and central portions of the state. Sierra Pacific Industries (SPI) is the authorized representative and manager of SPL&T lands. Rivers and streams on portions of SPL&T lands in the Trinity River and Sacramento River basins provide habitat for anadromous salmonids, including species listed under the federal Endangered Species Act (ESA). SPI forestland management activities (collectively referred herein as "Covered Activities") have the potential to adversely affect fish species and their habitats that are listed or may be at risk of listing under the ESA (collectively referred to herein as "Covered Species").

## 1.1.  OVERVIEW AND BACKGROUND

SPI has prepared this document to address effects of forestland management in the Sacramento River and Trinity River basins on salmonids under the regulatory jurisdiction of the National Marine Fisheries Service (NMFS), which include the following species and populations:

- Chinook salmon (*Oncorhynchus tshawytscha*) (four Evolutionary Significant Units [ESU]): Central Valley fall- and late fall-run ESU, Central Valley spring-run ESU, Sacramento River winter-run ESU, and Upper Klamath/Trinity River ESU.

- Coho salmon (*O. kisutch*) (one ESU): Southern Oregon/Northern California Coast (SONCC) ESU.

- Steelhead (*O. mykiss*) (two Distinct Population Segments [DPS]):  California Central Valley DPS and Klamath Mountains Province DPS.

This document includes two components:

1. A Habitat Conservation Plan (HCP) designed to address potential impacts on listed and non-listed salmonids resulting from SPI timber harvest activities in watersheds with watercourses accessible to anadromous salmonids, or upstream of those watercourses where potential effects from Covered Activities have the potential to extend to occupied habitat. Section 10(a)(1)(B) of the ESA authorizes NMFS to issue an Incidental Take Permit (ITP) to non-federal parties for the potential incidental taking of endangered and threatened species of anadromous salmonids. In support of an ITP application, applicants must prepare an HCP that provides an assessment of impacts; measures to monitor, minimize, and mitigate for those impacts; and procedures to account for unforeseen or extraordinary circumstances.

2.  A Safe Harbor Agreement (SHA) to address potential impacts of SPI timber harvest and other activities on listed salmonids on SPL&T lands in the Sacramento and Trinity River basins upstream of impassable dams where NMFS is proposing to reintroduce populations of listed salmonids. SHAs are voluntary agreements between NMFS and cooperating non-federal landowners that promote voluntary management for protection of endangered and threatened species on non-federal property while giving assurances to participating landowners that no additional future regulatory restrictions will be imposed. In return, NMFS will authorize incidental take by issuing an Enhancement of Survival Permit (ESP) through Section 10(a)(1)(A) of the ESA. The ESP allows participants to take individual listed plants or animals or to modify habitat to return populations and habitat conditions to those agreed upon as baseline. This SHA meets the regulatory standard of producing a net conservation benefit for listed salmonids reintroduced onto SPL&T lands.

SPI developed this document in consultation with NMFS. The outline and content of this document follows the most recent guidance in the 2016 *Habitat Conservation Planning and Incidental Take Permit Processing Handbook* (USFWS and NOAA Fisheries 2016), and SHA policies and procedures (NOAA Fisheries 2016; USFWS 2016).

## 1.2.  DOCUMENT ORGANIZATION

The information, analysis, and conservation program comprising this document are organized as follows:

- Section 1: The introduction, overview and background, purposes of this document; the scope of the HCP and SHA, including the Action Area, permit duration, Covered Species, and Covered Activities; and the requirements and approval criteria for the HCP, SHA, and permits;

- Section 2: A description of SPI timber operations and forest management activities;

- Section 3: A description of the Covered Species and their habitats;

- Section 4: A description and assessment of the habitat conditions of the HCP Action Area and the SHA Plan Area;

- Section 5: An assessment of the potential for timber operations and other activities to directly or indirectly impact Covered Species and potentially result in take of listed species;

- Section 6: A description of the conservation strategy, including measures to avoid and minimize take, measures to mitigate unavoidable take, and monitoring and adaptive management criteria;

- Section 7: A description of potential changed or unforeseen circumstances, including fire, windthrow, landslides, and new species listings; and

- Section 8: Guidance on the implementation of the HCP over the permit term, including a description of funding and costs associated with implementing the HCP for the life of the permit.

## 1.3.  PURPOSE AND NEED

The National Marine Fisheries Service (2014a, 2014b) and U.S. Bureau of Reclamation (U.S. Bureau of Reclamation 2014, 2016) identified aquatic habitats in the Trinity and Sacramento River basins located upstream of existing man-made barriers to anadromy as high-quality habitat for proposed listed salmonid species reintroduction efforts. These habitats occur on federal and private lands, including lands owned by SPL&T and managed by SPI. NMFS approached SPI during 2016 requesting support for these proposed reintroduction efforts on SPL&T lands. SPI understands the conservation values of these efforts and prepared this HCP/SHA to support ITP and ESP permits covering land management activities on SPL&T lands within the proposed reintroduction areas, and areas within the current range of anadromy.

This document supports SPL&T's ITP and ESP application to comply with Section 10(a)(2)(A) of the ESA. Anadromous salmonids listed under the ESA are found in several watersheds within SPL&T lands, along with other anadromous salmonids that could potentially be listed in the future. Additionally, NMFS proposes to reintroduce listed salmonids above currently impassable barriers into rivers and streams on other portions of SPL&T property. SPI forestland management activities could potentially result in incidental take of those species.

The purposes of the HCP include:

1. Facilitate SPI's compliance with the ESA.

2. Provide NMFS with the basis for authorizing incidental take of Covered Species resulting from SPI timber management activities.

3. Detail measures that will minimize and mitigate potential take to the maximum extent practicable.

4. Establish measures intended to ensure that any take caused by Covered Activities is incidental.

5. Ensure that the impacts of unavoidable take will be mitigated.

The purposes of the SHA include:

1. Promote voluntary management of endangered and threatened species on SPL&T lands while giving assurances to SPL&T that no additional future regulatory restrictions will be imposed.